## CASE NO. 14-30067

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

### ELZIE BALL, NATHANIEL CODE, AND JAMES MAGEE
Plaintiffs/Appellees

v.

### JAMES LEBLANC, SECRETARY OF THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, BURL CAIN, WARDEN OF THE LOUISIANA STATE PENITENTIARY, ANGELIA NORWOOD, WARDEN OF DEATH ROW, AND THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS
Defendants/Appellants

---

## APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF LOUISIANA
Civil Action No. 3:13-cv-00368

---

### APPELLEES' OPPOSITION TO APPELLANTS' RE-URGED MOTION FOR EMERGENCY STAY OF JUDGMENT PENDING APPEAL

---

Mercedes Montagnes, La. Bar No. 33287 (Lead Counsel)
Elizabeth Compa, La. Bar No. 35004
The Promise of Justice Initiative
636 Baronne Street
New Orleans, LA 70113
Tel. (504) 529-5955
Fax (504) 558-0378
Email: mmontagnes@thejusticecenter.org

Mitchell A. Kamin, Ca. Bar No. 202788
Jessica C. Kornberg, Ca. Bar No. 264490

Nilay U. Vora, Ca. Bar No. 268339
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks & Lincenberg, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Tel. (310) 201- 2100
Fax (310) 201- 2110
Email: mak@birdmarella.com

Steven Scheckman, La. Bar No. 08472
Schiff, Scheckman, & White LLP
829 Baronne Street
New Orleans, Louisiana 70113
Tel. (504)581-9322
Fax (504)581-7651
Email: steve@sswethicslaw.com

COUNSEL FOR PLAINTIFFS-APPELLEES

**CASE NO. 14-30067**

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

ELZIE BALL, NATHANIEL CODE, AND JAMES MAGEE
Plaintiffs/Appellees

v.

JAMES LEBLANC, SECRETARY OF THE LOUISIANA DEPARTMENT OF
PUBLIC SAFETY AND CORRECTIONS, BURL CAIN, WARDEN OF THE
LOUISIANA STATE PENITENTIARY, ANGELIA NORWOOD, WARDEN OF
DEATH ROW, AND THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY
AND CORRECTIONS
Defendants/Appellants

---

**CERTIFICATE OF INTERESTED PERSONS**

Pursuant to Fifth Circuit Rule 28.2.1, the undersigned counsel of record certifies that the following listed persons have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal:

1. Plaintiffs-Appellees: ELZIE BALL, NATHANIEL CODE, AND JAMES MAGEE;

2. Attorneys for Plaintiffs-Appellees: MERCEDES MONTAGNES, ELIZABETH COMPA, AND THE PROMISE OF JUSTICE INITIATIVE;

3. Attorneys for Plaintiffs-Appellees: MITCHELL A. KAMIN, NILAY U. VORA, JESSICA C. KORNBERG, AND THE LAW FIRM OF BIRD, MARELLA, BOXER, WOLPERT, NESSIM, DROOKS & LINCENBERG, P.C.;

4. Attorneys for Plaintiffs-Appellees: STEVEN SCHECKMAN AND THE LAW FIRM OF SCHIFF, SCHECKMAN & WHITE, LLP;

5. Defendants-Appellants: JAMES M. LEBLANC, BURL CAIN, ANGELIA NORWOOD, AND THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS;

6. Attorneys for Defendants-Appellants: E. WADE SHOWS, JAMES L. HILBURN, GRANT J. GUILLOT, AND THE LAW FIRM OF SHOWS, CALI & WALSH, LLP;

7. Attorneys for Defendants-Appellants: THOMAS E. BALHOFF, JUDITH R. ATKINSON, CARLTON JONES III, AND THE LAW FIRM OF ROEDEL, PARSONS, KOCH, BLACHE, BALHOFF & MCCOLLISTER

Respectfully Submitted:

/s/ Mercedes Montagnes
Mercedes Montagnes, La. Bar No. 33287
(Lead Counsel)
Elizabeth Compa, La. Bar No. 35004
The Promise of Justice Initiative
636 Baronne Street
New Orleans, LA 70113
Tel. (504) 529-5955
Fax (504) 558-0378
Email: mmontagnes@thejusticecenter.org

Mitchell A. Kamin, Ca. Bar No. 202788
Jessica C. Kornberg, Ca. Bar No. 264490
Nilay U. Vora, Ca. Bar No. 268339
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks & Lincenberg, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Tel. (310) 201- 2100
Fax (310) 201- 2110
Email: mak@birdmarella.com

Steven Scheckman, La. Bar No. 08472
Schiff, Scheckman, & White LLP
829 Baronne Street
New Orleans, Louisiana 70113
Tel. (504)581-9322
Fax (504)581-7651
Email: steve@sswethicslaw.com

**PLAINTIFFS-APPELLEES' OPPOSITION
TO DEFENDANTS-APPELLANTS' MOTION FOR
EMERGENCY STAY OF JUDGMENT PENDING APPEAL**

## I.    INTRODUCTION

Defendant-Appellants ("Defendants") have failed to meet the two most critical and necessary elements for issuance of an emergency stay: a strong showing of a likelihood to succeed on appeal and irreparable harm in the absence of a stay.  The failure to meet either one of these elements is fatal.

First, Defendants have not shown a strong likelihood of success on the merits. Defendants have not made any showing that the district court's factual findings were clearly erroneous.  The district court's legal conclusions were consistent with guiding precedents requiring a particularized analysis of the totality of the circumstances.  Defendants' assertions to the contrary ignore the factual record in this case as well as binding precedent.

Second, and perhaps most important, Defendants fail to present any evidence that they face irreparable harm.  This Court has previously granted stays of injunctive relief in the prison context only after the presentation of affirmative affidavits of irreparable harm and security risks.  There is no such evidence in support of Defendants' Motion.  Instead, Defendants' alleged harm is nothing more than conclusory assertions of time, money, and efforts required to implement the district court's order.  Under this Court's precedents, time, money, and efforts are

insufficient to warrant a stay as a matter of law.

But even if such considerations were legitimate, Defendants fail to provide any evidence of the time and money involved. And for good reason. Defendants have stated that ***costs of implementation are within Defendants' present budget, involve "not overly complicated" labor, and can be completed in merely four weeks***. The time, money, and efforts required, therefore, do not support Defendants' claims of irreparable harm sufficient to warrant a stay.

Additionally, Defendants' purported harm is plainly outweighed by the potential harm to Plaintiffs-Appellees ("Plaintiffs") if a stay is issued. Absent Defendants' implementation of the injunctive relief—which Defendants themselves proposed—Plaintiffs will suffer the risks of extremely dangerous heat exposure, including risk of heatstroke, paralysis, or even death; these risks plainly outweigh any harms in the form of time, money, and effort. In contrast, in the event that Defendants prevail on appeal, Defendants will have, at worst, expended funds unnecessarily.

Plaintiffs respectfully submit, therefore, that no stay is warranted.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs initially note that Defendants only seek an emergency stay regarding the implementation of mechanical cooling in the Death Row tiers. All other parts of the district court's injunctive order, including the provision of ice

chests, provision of one cold shower per day, and Plaintiff-Appellee Magee's addition to the heat precaution list, are in the process of being implemented. Vora Decl., attached hereto as Ex. 2; Kornberg Decl., Ex. 3; Scheckman Aff., Ex. 4, Compa Decl., Ex. 5.[1]

In that context, the factual and procedural background in this matter is well-established in the district court's order as well as Defendants' Re-Urged Motion and need not be repeated here. Mot., Ex. B at 2-6. Plaintiffs note, however, several material inaccuracies in Defendants' Motion.

Defendants assert that the Death Row cells are not exposed to direct sunlight. Mot. at 2. This assertion contradicts testimony given during the trial by Plaintiff Nathaniel Code. *See* Mot., Ex. B at 20. To the extent that some cells are no longer exposed to direct sunlight, this is a result of Defendants' unauthorized addition of awnings to the two tiers that receive the most direct sunlight, which constituted spoliation of the court-ordered data. Mot., Ex. B at 29; Ruling and Order, Rec. Doc. 88, attached hereto as Ex. 1.

Contrary to Defendants' assertion that the only temperature reading exceeding 90 degrees Fahrenheit was recorded on Tier C, Mot. at 3, the district

---

[1] The parties have noted that the district court's Order of Dec. 19, 2013, contemplates the provision of ice chests to "Plaintiffs, and other death row inmates who are at risk of developing heat-related illness." Plaintiffs emphasize that uncontroverted expert testimony at trial indicated that "the problem with these temperatures [recorded on the Death Row tiers] is that everybody is at risk in these temperatures. . . . [T]hese temperatures are dangerous when you're confined in this setting." Mot., Ex. B at 52.

court Order actually shows that *every tier exceeded this temperature*. Mot., Ex. B at 24-38.[2] Defendants further state that shower temperatures, "are adjusted . . . seasonally to be warmer during colder months and cooler during warmer months." Mot. at 4. The district court found, to the contrary, that the temperature was always maintained between 100 and 120 degrees. Mot., Ex. B at 15. Finally, Defendants state that inmates at Death Row are provided ice throughout the day from a large ice chest to which every inmate has access. Mot. at 4. This contradicts the district court's findings that ice is not always available because Plaintiffs must stay in cells 23 hours per day. Mot., Ex. B at 15.

Defendants assert that the fans on the Death Row tiers—which are shared between two cells—"move air across the skin, making it feel cooler." Mot. at 2. This conclusory assertion contradicts the district court's factual finding that "the windows, fans, and cell vents did not provide a cooling effect or relief from the heat conditions in the tier," Mot., Ex. B at 39, as well as the Center for Disease Control's caution that electric fans will not prevent heat-related illness at elevated temperatures, Mot., Ex. B at 59.

## III.  LEGAL STANDARD

"A stay is not a matter of right," but rather an "exercise of judicial

---

[2]    The highest recorded temperature on Tier C was 92.12 degrees, Mot., Ex. B at 28, and the highest recorded temperature overall was Tier H and at 92.66 degrees. Mot., Ex. B at 36.

discretion" whose propriety depends on a case's particular circumstances. *Nken v. Holder*, 556 U.S. 418, 433 (2009). This Court reviews denial of a stay for abuse of discretion. *Beverly v. United States*, 468 F.2d 732, 740 n.13 (5th Cir. 1972).[3]

A four-factor test applies to the determination of whether a stay is warranted. *See Weingarten Realty Investors v. Miller*, 661 F.3d 904, 910 (5th Cir. 2011). This Court must evaluate the following:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken*, 556 U.S. at 434. The first two factors are the "most critical." *Id*.

## IV.  DEFENDANTS ARE UNLIKELY TO PREVAIL ON THE MERITS.

Notably absent from the Motion is any discussion of the standard of review applying to Defendants' likelihood of prevailing on the merits. And for good reason. Defendants cannot meet that standard's heavy burden.

The district court's order granting injunctive relief is reviewed for abuse of discretion. *See Peaches Entm't Corp. v. Entm't Repertoire Associates, Inc.*, 62 F.3d 690, 693 (5th Cir. 1995). The district court only abuses its discretion in the

---

[3]  Defendants ask this Court to apply the standard of *Ruiz v. Estelle*, 650 F.2d 555 (5th Cir. 1981), under which a stay should be entered if Defendants can show a "substantial case on the merits" and that the "balance of equities weighs heavily in favor of granting the stay." Mot. at 9. However, for this standard to apply, Defendants must first present a "serious legal question." As the district court correctly recognized, Defendants' Motion fails to make such a showing. Mot., Ex. H at 3-4.

grant of injunctive relief if the district court:

> (1) relies on clearly erroneous factual findings when deciding to grant or deny the permanent injunction, (2) relies on erroneous conclusions of law when deciding to grant or deny the permanent injunction, or (3) misapplies the factual or legal conclusions [in] its injunctive relief.

*Id.* Defendants cannot show a likelihood of success for any of these elements.

### A.    There was no clear error in the trial court's factual findings.

It is "well established" that a bench trial's "findings of fact are reviewed for clear error." *Bd. of Trs. New Orleans Employers Intern. Longshoremen's Ass'n v. Gabriel, Roeder, Smith & Co.*, 529 F.3d 506, 509 (5th Cir. 2008). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). None of the district court's findings were clearly erroneous.

### 1.    Defendants cannot show clear error in the district court's factual finding of Defendants' deliberate indifference.

Defendants assert that the district court erred in finding Defendants were deliberately indifferent, or that they knowingly disregarded risks to Plaintiffs' health. Mot. at 15-16. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact." *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004). As such, this finding of deliberate indifference is reviewed for clear error.

Despite this heavy burden of clear error, Defendants' assert that they were

not deliberately indifferent *without any citation to the record or the district court's factual findings*.  The district court, after the conclusion of the three-day trial, found that Defendants had the requisite knowledge because the risk was obvious given Plaintiffs' medical conditions and medications, as well as the uncontroverted temperature data collected by the court-appointed neutral expert. Mot., Ex. B at 64.  The district court further found that Defendants were aware of the risk because of (a) Plaintiffs' (and others') written complaints of excessive heat conditions and (b) Defendants' own policies requiring monitoring of the temperatures on the Death Row tiers.  Mot, Ex. B at 64-71. Finally, the district court found that Defendants disregarded the risk based on Defendants' failure to mitigate known extreme heat conditions—including failing to enforce their own policies on heat-related illnesses.  Mot., Ex. B at 71-79.

Defendants assert that Wardens Cain and Norwood contested their knowledge of the substantial risk to Plaintiffs' health and safety.  Mot. at 15-16. This is insufficient to show a likelihood of clear error, particularly where the district court weighed conflicting evidence prior to its determination.  Moreover, to the extent that Defendants point to Warden Norwood's testimony, the district court found that Warden Norwood was not a credible witness.  Mot., Ex. B at 6-12. Determinations by a fact-finder after weighing conflicting evidence and credibility

determinations are not subject to review.[4]

## 2. The district court properly relied on heat index data.

Defendants assert that the district court improperly relied on heat index instead of temperature, as recommended by Defendants' expert. Mot. at 16-17. Again, Defendants' failure to support this assertion with citation to the district court's factual findings is telling. The district court found that the heat index was the proper measurement to determine the risk to Plaintiffs' health. Mot., Ex. B at 60-63. Indeed, the district court found the testimony of Defendants' expert, a television meteorologist, to be inconsistent with his own televised weather reports, which include the heat index, a figure that Defendants' expert expects viewers to take into account. *Id.* The district court further found that use of the heat index was supported by federal and state agencies. *Id*. Finally, this Court has already accepted use of the heat index in determining the constitutionality of prison conditions. *See Gates v. Cook*, 376 F.3d 323, 339 (5th Cir. 2004).

Defendants are similarly incorrect in their assertion that the district court's order was "erroneous" in its "arbitrary" determination that Defendants must maintain a heat index below 88 degrees to ensure Plaintiffs' safety. Mot. at 17. Again, this assertion is belied by the district court's detailed factual findings. The district court found, based on evidence presented by Plaintiffs' expert—which was

---

[4]    *Strauch v. Gates Rubber Co.*, 879 F.2d 1282, 1285 (5th Cir. 1989).

"largely uncontroverted" by Defendants—that a heat index at or below 88 degrees was required to ensure Plaintiffs' safety. Mot., Ex. B at 3-4, n.8 & 49-55. Finally, this finding was consistent with multiple precedents from this and other courts.[5]

### 3. The district court did not err in finding that Plaintiffs' medical conditions exacerbated the risk to their health.

Defendants assert that the district court improperly concluded that Plaintiffs' individual health conditions exacerbated the risk to Plaintiffs' health from the extreme heat. Mot. at 16. In support of this assertion, Defendants suggest that evidence showed no adverse effect on Plaintiffs from the extreme heat in the past and that trial testimony established that Plaintiffs, "failed to properly treat their medical conditions." *Id.* Again, Defendants' failure to cite to the district court's Order reveals that Defendants cannot show clear error.

Plaintiffs' medical conditions and medications taken were undisputed at trial. The district court found that the evidence showed Plaintiffs suffered from a variety of conditions exacerbated by the extreme heat. Mot., Ex. B at 19-22. The district court concluded that a sufficient risk of harm could still exist even if an adverse result of that risk had not yet materialized. Mot., Ex. B at 55. *See Gates*, 376 F. 3d at 333 ("It is also important to note that the inmate need not show that death or serious illness has occurred."). *See also Helling v. McKinney*, 509 U.S.

---

[5]  *See, e.g.*, *Blackmon*, 484 F. App'x at 869; *Valigura v. Mendoza*, 265 F. App'x at 236; *Smith v. Sullivan*, 553 F.2d at 381 (5th Cir. 1977); *Graves v. Arpaio*, 623 F.3d 1043 (9th Cir. 2010); *Jones'El v. Berge*, 374 F.3d 541, 545 (7th Cir. 2004).

25, 33 (1993) ("It would be odd to deny an injunction to inmates who plainly

proved an unsafe, life-threatening condition in their prison on the ground that

nothing yet had happened to them.").[6]  The district court also rejected Defendants'

factual contention that Plaintiffs failed to treat their own medical conditions

because—as the district court found—it was "uncontested that Plaintiffs'

conditions of confinement, including Plaintiffs' food, beverage, and exercise

options, are in the exclusive control of Defendants."  Mot., Ex. B at 56.  Given

these detailed factual findings, Defendants cannot show clear error.

### B.     The trial court did not rely upon erroneous conclusions of law.

Defendants assert that the district court erred in "effectively order[ing] that

air conditioning or some other expensive cooling method be installed" and

"refused to consider the costs of mechanical cooling."  Mot. at 10, 17.[7]

Defendants' argument fails for at least three reasons.

First, the district court made detailed factual findings as to what would

constitute minimally safe conditions required by the eighth Amendment.  The

district court specifically took into account (Mot., Ex. B at 96) the requirement in

---

[6]    The Supreme Court in *Helling* and this Court in *Gates* have, therefore, explicitly rejected
Defendants' contention, Mot. at 16, that no injunction is warranted because Plaintiffs have been
living in the Death Row tiers for several years without adverse consequence.

[7]    Defendants' Motion is replete with assertions of high costs and their attendant burden on
Defendants, but Defendants have failed to provide any competent evidence to this Court
detailing the costs involved.  This failure is telling given Defendants' statements that the work
could be completed within four weeks and within Defendants' presently allocated budget.

the Prison Litigation Reform Act (the "PLRA") that the injunctive relief be

"narrowly drawn, extends no further than necessary to correct the violation of the

Federal right, and is the least intrusive means necessary to correct the violation of

the Federal Right." 18 U.S.C. § 3626(a)(1). The district court, therefore, ordered

Defendants to develop a plan to ensure that the Eighth Amendment violations be

remedied *and* that the least burdensome method will be adopted. Defendants

proposed a plan to install air-conditioning as the means to achieve the minimal

conditions. Defendants' Submission of Heat Remediation Plan, Rec. Doc. 118,

attached hereto as Ex. 6. The district court ordered Defendants' proposal to be

implemented. Having chosen air-conditioning as the means to ensure

constitutional compliance, Defendants now implausibly assert that air-conditioning

is not the most cost-effective and efficient means to achieve the constitutionally

required minimum safety standards. This argument should, therefore, be rejected.

Second, the district court's order went no further than this Court's well-

established rule that a lack of financial means can never justify a constitutional

violation. Mot., Ex. B at 98 (citing *Smith*, 553 F. 2d at 378 (rejecting defendants'

argument that "lack of funds to implement the trial court's order" justified the

defendants' failure to remedy ongoing constitutional violations); *Gates v. Collier*,

501 F. 2d 1291, 1319 (5th Cir. 1972) ("Where state institutions have been

operating under unconstitutional conditions and practices, the defense[] of fund

shortage . . . ha[s] been rejected by the federal courts.")).  Defendants provide no authority to support their assertion that costs must be considered where injunctive relief is designed to end a constitutional rights violation.  To the contrary, having established the minimally safe levels of the heat index to prevent unconstitutional risks to Plaintiffs' health, the district court advised Defendants—consistent with this Court's precedents in *Smith* and *Gates*—that costs could not justify a failure to meet such standards.

Third, Defendants' assertion relies on an implausible and misleading paraphrasing of the district court's order.  The district court's order required Defendants to develop a plan to achieve minimally safe standards.  At the time of that order, there was no mechanical cooling that Defendants had proposed.  As such, the plain meaning of the pertinent language is that Defendants could not cite costs as a reason *not to propose a plan* (or to seek a stay of a requirement that Defendants propose a plan), not that the district court would not consider the costs in developing injunctive relief.  To the contrary, the district court provided Defendants an opportunity to minimize the costs through their own plan.

In sum, Defendants cannot show that they are likely to prevail on any claim that the district court erred in its conclusions of law.

## C.    The trial court appropriately fashioned its order consistent with its factual findings and legal conclusions.

Defendants appear to assert that the district court erred by ordering remedies

beyond those upheld by this Court in *Gates*. Mot. at 12. Again, a review of the

district court's findings and order reveal that Defendants' argument is unlikely to

prevail. The district court found that Plaintiffs were exposed to a substantial health

risk as a result of exposure to heat indices exceeding 88 degrees during Louisiana

summers and that such conditions violated the Eighth Amendment. The district

court ordered Defendants to develop a plan to maintain a heat index of less than 88

degrees in the summer months, and Defendants did so. Nothing in the injunctive

relief ordered is a misapplication of factual findings or legal conclusions.

A review of legal authorities further reveals that Defendants cannot show

a likelihood of success on the merits. The district court's Order is not only

consistent with other district court orders upheld on appeal, but also Supreme

Court precedent making clear that there can be no static test for prison conditions

to pass constitutional muster.

### 1. Supreme Court precedent rejects Defendants' argument that *Gates* outlines minimally sufficient conditions *per se*.

Defendants assert that the district court erred in ordering relief beyond the

remedial measures ordered by the *Gates* district court and upheld by this Court.

Mot. at 12-13. Put differently, Defendants assert that no Eighth Amendment

violation can occur if Defendants provide "use of fans, access to water, access to

ice, and daily showers." Mot. at 16. Not so. The Supreme Court has directed that

courts "considering an Eighth Amendment challenge to conditions of confinement

*must examine the totality of the circumstances*." *Rhodes v. Chapman*, 452 U.S. 337, 362-63 (1981). "No static 'test' can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Id*. at 346. The determination of whether objective conditions of confinement violate the Eighth Amendment is whether such conditions present a substantial risk of serious harm to inmates. *Gates*, 376 F.3d at 339-40.[8] Both the Supreme Court and this Court have, therefore, rejected Defendants' very assertion, Mot. at 13, that meeting a static test—*e.g.*, the provision of ice, water, fans, and showers as outlined by *Gates*—is sufficient to pass constitutional muster.

### 2.   The district court found that the *Gates*-type relief provided by Defendants was insufficient.

Giving *Gates* its appropriate deference, the district court nevertheless found, after a three-day trial, that the injunctive relief ordered in *Gates* was insufficient to prevent the risk of harm to the health of Plaintiffs in the instant litigation. The district court noted that Plaintiffs are extremely limited in their ability to gain access to ice and that it was "uncontroverted" that the ice "frequently runs out,"

---

[8]   While *Gates* upheld the ***remedy*** that was ordered by the district court, nothing in *Gates* stated that provision of fans, water, ice, and showers constituted *per se* constitutionally sufficient conditions. Nor would such a standard in *Gates* have been consistent with the Supreme Court's guidance as described above. Moreover, the district court found that the Defendants' provision to Plaintiffs of limited access to ice, water, fans, and showers, Mot., Ex. B at 14-15, was insufficient to prevent the substantial risk of harm to Plaintiffs' health from exposure to the extreme heat—and therefore ordered that Plaintiffs be provided with increased access.

that Plaintiffs did not have individual fans as in *Gates*, that the fans occasionally break, that the drinking water was lukewarm, and that the shower temperatures were between 100 and 120 degrees.  Mot., Ex. B at 14, 15-17, 40, 80 & n.100.

The district court itself observed during its inspection of the Death Row tiers that the fans do not provide relief from the heat, consistent with Plaintiffs' testimony.  Mot., Ex. B at 14, 19-22, 39.

Finally, the testimony of Plaintiffs' expert was uncontroverted and indicated that only maintenance of a heat index below 88 degrees could ensure minimally safe conditions of confinement that did not pose undue health risks.  Mot., Ex. B at 3-4 & n.8.  The district court adopted Plaintiffs' expert's recommendation in fashioning its order requiring Defendants to develop a plan to maintain a heat index below 88 degrees during the summer months.   While *Gates* upheld a district court's injunction order, even the Court in *Gates* made clear that this Court should defer to the district court's findings on the propriety, necessity, and scope of injunctive relief where such injunctive relief was based on testimony and evidence of medical and public health experts.  *See Gates*, 373 F.3d at 339-40 (upholding injunctive relief because relief recommended by medical expert to trial court).

Given the district court's personal observation of the conditions on the Death Row tiers, the evidence evaluated in making factual findings, the Supreme Court's unequivocal statement that no static test suffices to ensure constitutional

conditions, and the Supreme Court's requirement that the totality of the circumstances be evaluated, Defendants cannot show that the district court erred in its application of its factual findings and legal conclusions to fashion its order.[9]

### 3.    Similar district court orders have been upheld on appeal.

Contrary to Defendants' assertions, Mot. at 14-15, the district court in fashioning its order noted its consistency with other district court orders upheld on appeal.  Mot., Ex. B at 79-83.  The Ninth Circuit has upheld a district court's order requiring that those taking psychotropic drugs be housed where the temperature does not exceed 85 degrees.  *Graves*, 623 F.3d at 1049-50.  The Seventh Circuit upheld a district court's order requiring prison officials to cool cells to between 80 and 84 degrees during the summertime.  *Jones'El*, 374 F.3d at 545.

In sum, Defendants fail to show any likelihood of this Court finding that the district court's Order misapplied its factual findings and conclusions of law.

## V.    DEFENDANTS WILL NOT BE IRREPARABLY INJURED.

Defendants cannot show any irreparable injury absent a stay of the district court's Order.  Defendants bear the burden of showing irreparable injury, but have presented no evidence of irreparable injury in their motion.  *See* Mot. at 18-19.[10]

---

[9]    Defendants' assertion that Plaintiffs enjoy a more favorable set of conditions than those of plaintiffs in *Chandler v. Crosby*, 379 F. 3d 1278 (11th Cir. 2004) (Mot. at 12-13) was rejected after detailed analysis by the district court.  Mot., Ex. B at 83-88.

[10]   This deficiency distinguishes Defendants' Motion from this Court's decision to grant a stay in *Ruiz*, where prison officials provided "reams of affidavits and other evidentiary materials." (footnote continued)

Defendants aver in their Motion that they face "substantial costs and considerable time and efforts expended in fulfilling and implementing the district court's Orders" in that they would "not only have to consult with and hire engineers and other experts to determine how to implement such plans, but they would then have to put the plans into action no matter how exorbitant the costs . . . ." Mot. at 18. This argument fails as both a legal and a factual matter.

First, the law is well established that time, money, and efforts are insufficient to show irreparable injury. The Supreme Court and this Court have recognized that this type of time, money, and effort harm does not—as a matter of law—constitute irreparable harm. *See, e.g.*, *Sampson v. Murray*, 415 U.S. 61, 90 (1974); *Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir. 1975) ("Mere injuries . . . in terms of money, time and energy necessarily expended in the absence of a stay are not enough.").

Second, even if the time, money, and energy were examined, Defendants have failed as a factual matter to provide any evidence of irreparable harm.[11]

---

*Ruiz v. Estelle*, 650 F.2d 555, 566 (5th Cir. 1981). Indeed, this Court's decision to grant the *Ruiz* defendants' motion for stay was based in large part on the evidence provided. *See, e.g.*, *id.* at 570 (evaluating prison official's affidavit indicating that order would create dangerous situation).
[11]   This continued failure to provide any specifics, affidavits, or any other sworn testimony of showing irreparable harm is telling—particularly when examined in the context of Defendants' previous sanction for their misconduct in the district court for, *inter alia*, willful failure to provide information about Defendants' potential costs and burdens in maintaining a heat index lower than 88 degrees. Ex. 1 at 18-27, 41-46. This Court should not permit Defendants to profit from this misconduct by granting a stay on the basis of naked assertions of irreparable harm (footnote continued)

Indeed, ***Defendants' own statements orally and in writing to Plaintiffs and the Special Master*** indicate that installation of mechanical cooling—which Defendants themselves proposed—would require only four weeks and would "not be overly complicated." Exs. 2-5. Defendants indicated that the costs would be ***within the present budget of the Department of Public Safety and Corrections***. *Id.* Finally, Defendants further stated that the materials are easily sourced and that the labor required for implementation is readily available. *Id.* This evidence plainly shows that the time, money, and energy are not overly burdensome and do not constitute irreparable harm.

In sum, Defendants cannot identify ***any*** irreparable injury sufficient to justify an emergency stay of the district court's Order. The harms asserted are either purely monetary or imaginary and do not justify an emergency stay.

## VI.    A STAY WILL CAUSE IRREPARABLE INJURY TO PLAINTIFFS.

Issuance of a stay of the district court's Order would virtually guarantee—as the district court found—that Plaintiffs will suffer conditions of confinement in violation of the Eighth Amendment. The salient question is whether a stay will cause irreparable injury to Plaintiffs because of the summer climate conditions and the attendant extreme heat. Defendants' blithely assert—without any citation to the record—that the stay will "not have any effect on the alleged infringement of

---

unsupported by any sworn evidence.

Plaintiffs' constitutional rights." Mot. at 19. This assertion defies common sense and the district court's findings—findings to which this Court should defer. The district court found significant constitutional violations in the form of health risks to Plaintiffs. The district court's ruling and order exceeded 100 pages and followed a three-day trial and a visit to the Death Row tiers by the Court itself. Mot., Ex. B at 95. Defendants purported harms are merely expenditure of moneys for remedies that might be reversed by this Court. Plaintiffs' purported harms are not abstract constitutional violations—but rather constitutional violations that could result in heat stroke, paralysis, and even death. A fair balancing of the irreparable harms at issue here requires that no stay be issued.[12]

## VII.   PUBLIC INTEREST REQUIRES DENIAL OF A STAY

As a matter of law, this Circuit has consistently held that the public interest is best served where constitutional rights are protected. *See, e.g.*, *Nobby Lobby, Inc. v. City of Dallas*, 970 F.2d 82, 93 (5th Cir. 1992). Defendants' request for a stay, if granted, would result in further violations of the Eighth Amendment. This

---

[12]   While Defendants do not cite *Ruiz* in support of their assertion of irreparable harm, Plaintiffs briefly note the stay in *Ruiz* was granted in part based on the *Ruiz* defendants' actions that reduced or eliminated the unconstitutional conditions at issue. *See Ruiz v. Estelle*, 650 F.2d 555, 572 (5th Cir. 1981) (concluding that stay would not substantially harm plaintiffs because "many of the unconstitutional conditions . . . are to be eliminated pursuant to the consent decree . . . and the portions of the district court's injunction that we do not stay" and "overcrowded conditions [have been] ameliorated by the temporary housing"). The instant case is plainly distinguishable in that ***Defendants seek a stay precisely to avoid any mitigation or amelioration of the Eighth Amendment violations.*** *Ruiz* is at best inapposite, and arguably warrants denial of a stay here.

result is plainly outside of the public interest as a matter of law.

To the extent that this Court entertains Defendants' assertion that prudent spending is in the public interest, Defendants have stated that the costs associated with implementing the relief is within Defendants' budget. As such, this money has already been allocated and no public interest would be harmed.

Finally, Defendants' ominous argument that the district court's Order could result in a flood of litigation "from prisoners across the country demanding . . . air conditioning" is unavailing. Mot. at 15. It is well established that Eighth Amendment violations require particularized inquiries into the totality of the circumstances—thereby precluding a one-size-fits-all precedent. Even if this were not the case, while this Court's ultimate decision on the merits will be binding precedent on this constitutional question, the issuance of a stay will have no bearing on the merits of this case. As such, public interest favors denial of a stay.

## VIII. CONCLUSION

For these reasons, Plaintiffs respectfully request that no emergency stay issue.

Respectfully submitted this 5th day of June, 2014.

/s/ Mercedes Montagnes
Mercedes Montagnes, La. Bar No. 33287
(Lead Counsel)
Elizabeth Compa, La. Bar No. 35004
The Promise of Justice Initiative

636 Baronne Street
New Orleans, LA  70113
Tel. (504) 529-5955
Fax (504) 558-0378
Email:  mmontagnes@thejusticecenter.org

Mitchell A. Kamin, Ca. Bar No. 202788
Jessica C. Kornberg, Ca. Bar No. 264490
Nilay U. Vora, Ca. Bar No. 268339
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks & Lincenberg, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California  90067-2561
Tel. (310) 201- 2100
Fax (310) 201- 2110
Email:  mak@birdmarella.com

Steven Scheckman, La. Bar No. 08472
Schiff, Scheckman, & White LLP
829 Baronne Street
New Orleans, Louisiana  70113
Tel. (504)581-9322
Fax (504)581-7651
Email:  steve@sswethicslaw.com

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

Pursuant to 5th Cir. Rules 25.2.1 and 25.2.13, I certify that the required privacy redactions have been made and the electronic submission is an exact copy of the paper document.  Pursuant to 5th Cir. Rule 32, I certify that this motion complies with the type-volume limitations of Fed. R. App. P. 8 and Fed. R. App. P. 27(d)(2) because it not greater than 20 pages in length.

This motion complies with the typeface and type style requirements of Fed. R. App. P. 27(d)(1)(E), Fed. R. App. P. 32(a)(5), and Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 software in Times New Roman 14-point font.

I understand that a material misrepresentation in completing this certificate or circumvention of the type-volume limits in Fed. R. App. P. 32(a)(7) may result in the Court striking the brief and imposing sanctions against the person signing the brief.

/s/ Mercedes Montagnes
Mercedes Montagnes, La. Bar No. 33287
The Promise of Justice Initiative
636 Baronne Street
New Orleans, LA 70113
Tel. (504) 529-5955
Fax (504) 558-0378
Email: mmontagnes@thejusticecenter.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 5th day of June, 2014, a copy of the foregoing has this date been served upon all parties through their respective counsel of record by operation of the Court's electronic filing system and has been filed electronically with the Clerk of Court using the CM/ECF system.

/s/ Mercedes Montagnes
Mercedes Montagnes

E. Wade Shows
James L. Hilburn
Grant J. Guillot
Shows, Cali & Walsh, L.L.P.
628 St. Louis Street
Baton Rouge, LA 70802
Telephone: 225.346.1461
Facsimile:  225.346.1467
wade@scwllp.com
jamesh@scwllp.com
grantg@scwllp.com

Thomas E. Balhoff
Judith R. Atkinson
Carlton Jones, III
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Hwy., Suite 301
Baton Rouge, LA 70809
Telephone: (225) 929-7033
Facsimile: (225) 928-4925
cjones@roedelparsons.com

*Counsel for Defendants*

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

ELZIE BALL, ET AL.                                         CIVIL ACTION

VERSUS

JAMES M. LEBLANC, ET AL.                    NO.: 3:13-cv-00368-BAJ-SCR

RULING AND ORDER

I.   INTRODUCTION

Before the Court are two motions by Plaintiffs Elzie Ball, Nathaniel Code, and James Magee (collectively "Plaintiffs"), seeking sanctions against Defendants James M. LeBlanc, Nathan Burl Cain, Angelia Norwood, and the Louisiana Department of Public Safety and Corrections (collectively "Defendants") for discovery violations and spoliation of evidence. (Docs. 62, 63.) Plaintiffs also request that sanctions be imposed against Defendants' counsel based on representations made throughout this litigation regarding discovery and spoliation of evidence. (Doc. 85, p. 10.) Defendants oppose each motion. (Docs. 66, 68.) The Court heard oral argument on Plaintiffs' motions on August 5, 2013, (Doc. 75), and, subsequently, Plaintiffs filed reply memoranda addressing Defendants' arguments in opposition to sanctions, (Docs. 84, 85). It is uncontested that this Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 1331, 1343, and 2201.

Upon thorough review, and for reasons fully explained below, this Court determines that sanctions against Defendants are warranted based on Defendants'

willful, bad faith attempts to manipulate data critical to Plaintiffs' cause of action, and for abuses of the discovery process.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motions for Imposition of Sanctions (Docs. 62, 63) are each **GRANTED IN PART** and **DENIED IN PART.**

Further, in reviewing Plaintiffs' requests for sanctions, this Court has come to share Plaintiffs' concerns regarding the alarming lack of candor demonstrated by Defendants' counsel throughout this litigation. Accordingly,

**IT IS HEREBY ORDERED** that Defendants' counsel **E. WADE SHOWS, AMY L. MCINNIS,** and **JACQUELINE B. WILSON SHOW CAUSE WHY SANCTIONS SHOULD NOT BE IMPOSED** against each personally, under Fed. R. Civ. P. 37(c); M.D. La. LR83.2.4 and LR83.2.8; Louisiana Professional Conduct Rules related to honesty and fair dealing to opposing counsel; Louisiana Professional Conduct Rules related to candor to the tribunal; and this Court's inherent powers; possible sanctions to include, but not limited to, reprimand, ethics training, suspension, disbarment, and/or the payment of attorneys' fees to cover the cost of motions and discovery related to this proceeding. A show cause hearing on this matter shall follow.

2

## II.   FACTUAL AND PROCEDURAL BACKGROUND

At this point, the facts and procedural history in the underlying civil action are well-established.[1]  Suffice for now to say that Plaintiffs are death row inmates, currently incarcerated at the Louisiana State Penitentiary in Angola, Louisiana ("Angola"), who allege that Defendants have subjected them to cruel and unusual punishment in violation of the Eighth Amendment and certain statutory provisions, including the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 794.  (Doc. 1.)  The gravamen of Plaintiffs' complaint is that Defendants have subjected them to excessive heat during the summer months, acted with deliberate indifference to their health and safety, and discriminated against them on the basis of their disabilities.

Against this backdrop, Plaintiffs assert the following independent, but related, bases for imposing sanctions against Defendants: (1) Defendants deliberately "undermine[d] the accuracy . . . of court-ordered data collection" related to temperature, humidity, and heat index in Angola's death row tiers, and thus should be sanctioned for spoliation of evidence, (Doc. 63, p. 14); (2) Defendants were "evasive," "incomplete," and untimely in their responses to Plaintiffs' discovery requests regarding the cost of installing air-conditioning in the death row tiers, (Doc. 62, p. 3), and also refused to permit Plaintiffs' "shadow" expert "to bring

---

[1]  For a complete summary of the underlying facts and procedural history, see docket entry 87, *Ball v. LeBlanc*, No. 13-368, ___ F.Supp.2d ___ (M.D. La. Dec. 19, 2013) (hereinafter "Slip Op., Doc. 87").

instruments into the prison to verify any of the data collection" efforts, (Doc. 63, p. 3), and thus should be sanctioned for violating the Federal Rules of Civil Procedure and this Court's discovery orders.  The following facts are pertinent to Plaintiffs' allegations.

### A. Defendants' attempts to "undermine the accuracy . . . of court-ordered data collection"

Plaintiffs' first complaint is that Defendants deliberately "undermine[d] the accuracy . . . of court-ordered data collection" related to temperature, humidity, and heat index in Angola's death row tiers and, accordingly, should be sanctioned for spoliation of evidence.  (Doc. 63, p. 14.)

#### 1. The data collection period

On June 18, 2013, Plaintiffs filed a Motion for Preliminary Injunction (Doc. 12), seeking an order from this Court instructing Defendants to "maintain a heat index along the death row tiers that . . . does not pose substantial risk to [Plaintiffs'] health—i.e. maintain a heat index below 88°," (Doc. 12-1, p. 28).  Defendants opposed Plaintiffs' motion arguing, among other things, that Plaintiffs request for a preliminary injunction should be denied because Plaintiffs could not show a likelihood of success on the merits of their claim.  (Doc. 15 pp. 8–16.)  Specifically, Defendants took issue with Plaintiffs' assertions that conditions on death row were unconstitutional based on "temperature and humidity conditions . . . [that]

4

regularly reach into the category of 'extreme danger' heat index." (Doc. 12-1, p. 3.)

Defendants stated:

> As *Angola does not calculate the heat index on tiers*, the numbers provided by Plaintiffs in their memorandum and exhibits are simply calculations, which must be proven like any other fact.    And as explained in defendants' Motion to Strike, calculations made by counsel are not competent evidence and cannot be considered. Furthermore, as will be borne out through testimony at the hearing, the calculations utilized are deficient. It is scientifically impossible to reach the heat indexes that Plaintiffs claim to exist inside the cells at Angola (even though *no heat index, humidity or dew point measurements were taken inside the facility*, further questioning the reliability of the data being presented to the Court).

(Doc. 15, p. 12 (emphasis added).)

On July 2, 2013, this Court heard oral argument on Plaintiffs' Motion for Preliminary Injunction.  (Doc. 24.)  Based on Plaintiffs' claims and Defendants' defenses, the need for current, accurate temperature, humidity, and heat index data from Angola's death row housing tiers was obvious.  Accordingly, the Court deferred its ruling on Plaintiffs' motion pending the collection of such data by a neutral expert, re-set the hearing on the motion, set trial on the merits, and ordered the parties to meet, confer, and develop an accelerated joint discovery plan and schedule. (Doc. 24.) Subsequently, the parties submitted a proposed joint discovery schedule, which was later adopted by the Court.  (Docs. 26, 28.)  The discovery schedule included the parties' joint stipulation to retain a neutral expert to collect,

5

analyze, and disseminate the temperature, humidity, and heat index data over a 21-day period to begin July 15, 2013. (Doc. 28.)

After some back and forth, the parties agreed to retain the expert proposed by Defendants, United States Risk Management, LLC. (*See* Docs. 31, 36.) On July 12, 2013, this Court ordered "U.S. Risk Management . . . [to install] the necessary equipment, collect[] the required data, and disseminat[e] such data," so that the temperature, humidity, and heat index in Angola's Death row could be reliably measured over a 21-day period. (Doc. 36, p. 2.) Data collection was intended to accurately capture climate conditions as they existed on Death row, *without* adulteration due to remedial measures undertaken by Defendants. (*See* Transcript, July 2, 2013 (Hearing on Preliminary Injunction) (BY THE COURT: "The goal here is to have 21 straight days of data."); Doc. 31, p. 5 (Defendants' Submission of Proposed Independent Expert) ("Most importantly, the data must be accurate so that it can be relied upon by this Court."); Doc. 36, p. 2 (providing certain instructions to ensure collection of "the most accurate data"); Doc. 63-17 (email from Norwood admonishing death row supervisors "to ensure accurate and consistent temperature recording" and to avoid making adjustments to cells that would "tamper with" data collection).) This Court's July 12 Order also directed that Plaintiffs would be allowed to retain their own expert, and that this expert would "be permitted to shadow U.S. Risk Management during the installation of the

6

necessary equipment, and inspect the equipment at least once per week." (Doc. 36, pp. 2–3.)

## 2. Defendants' modifications to the death row tiers

On July 15, the first day that data collection was set to begin, Defendant Assistant Warden Angelia Norwood sent the following email to all Death row Supervisors:

> In order to ensure accurate and consistent temperature recording, all fans and windows are not to be adjusted in any manner. In addition, no offender and/or employee is to tamper with the recording devices placed on each tiers. Only authorized persons will be allowed inside the cells with the recording devices.

> If you have any questions, please see me. Your assistance is appreciated.

(Doc. 63-17.)    Nevertheless, despite Norwood's email, and this Court's emphatic instruction "that the most accurate data . . . be collected," (Doc. 36, p. 2), Defendants undertook efforts to change the conditions in the death row tiers soon after the data collection period began.

First, under cover of night, Defendants installed awnings over the windows of death row tiers C and G.  Trial Transcript, Testimony of Nathan Burl Cain, Aug. 6, 2013 ("We worked the inmates all night long to get the awnings up . . . ."). At trial, Defendant Warden Burl Cain testified that he ordered the awnings installed "to shade the window to see what would happen. To see if the temperature would fall." *Id.*    Whether or not the awnings had the intended effect of reducing the

7

temperature in the selected tiers, it is uncontroverted that the awnings "shaded the window[s]." *See id.*; *see also* Doc. 85-11, p. 39 (Deposition of David Garon).

Next, Defendants employed "soaker hoses"[2] to "mist[] the walls" of certain tiers, and also endeavored—albeit unsuccessfully—to "put[] the sprinkler system on the roof, [and a ] water sprinkler in the yard." Trial Transcript, Testimony of Nathan Burl Cain, Aug. 6, 2013; Doc. 85-9, p. 34 (Deposition of Nathan Burl Cain). As with the awnings, the intent of these measures was to "cool[]" the selected death row tiers.  (Doc. 85-9, p. 34 (Deposition of Nathan Burl Cain) ("We are actually misting the walls of the building to try to see if we can get the cinder blocks to be cooler so then they won't conduct the heat all the way through . . . .").)  Again, however, it is unclear precisely what effect Defendants' efforts to "mist[] the walls of the building" actually had on temperatures in the selected death row tiers.

Finally, Defendants repaired a malfunctioning vent in Plaintiff Nathaniel Code's cell one business day prior to this Court's scheduled site visit to Angola's death row facility.  (*See* Doc. 85-2.)

The precise date that Defendants installed the awnings and soaker hoses on the selected death row tiers is not clear from the record.   Trial Transcript, Testimony of Nathan Burl Cain, Aug. 6, 2013 ("I don't recall the specific dates and

---

[2] At trial, Warden Cain described the "soaker hoses" as "three-quarter inch" hoses with "half-inch" perforations to allow water to seep out. Trial Transcript, Testimony of Nathan Burl Cain, Aug. 6, 2013.  According to Cain, Defendants' attempted use of soaker hoses was unsuccessful because "the water all ran out as soon as you put it on.  We didn't have enough power." *Id.*

times [that the awnings and soaker hoses were installed]."); *id.* (stating "I'm not exactly sure when we [installed the awnings]," and indicating that installation may have occurred in the early morning hours of Thursday, July 25, 2013 or Friday, July 26, 2013).) Nor is it clear when, exactly, Defendants' fixed Code's vent. (*See* Doc. 85-2 (suggesting that repairs occurred sometime after Code's complaints on August 8, 2013, but before Wilson's email of August 10).) A few things, however, *are* clear. First, the installation of awnings and soaker hoses, and the repairs to Code's vent occurred *after* this Court ordered Defendants to collect "the *most accurate* data," *and after* the data collection period had begun. (*See* Doc. 36, p. 2 (emphasis added); Doc. 24, p. 2; Doc. 63-14 (July 26, 2013 email from Amy McInnis to Mercedes Montagnes stating that "awnings . . . are *being installed* over the windows on only two tiers" (emphasis added)); Trial Transcript, Argument of Amy McInnis, Aug. 5, 2013 ("[T]hose awnings were erected after we—after Defendants had disclosed [to the Magistrate Judge on July 25, 2013] that this is something that we were going to do.").) Second, there is no indication in the record that Defendants informed Plaintiffs or Plaintiffs' counsel of their plans to modify the death row tiers prior to the modifications being made. Third, and perhaps most importantly, Defendants never requested permission from this Court to make any alterations whatsoever to the death row tiers.

9

### 3. Plaintiffs' discovery of Defendants' modifications

On July 15, 2013—the same day that data collection began—Plaintiffs served Defendants with interrogatories requesting: (1) disclosure of "any steps that have been taken, since the Complaint in the LAWSUIT was filed, related to altering climate conditions in the DEATH ROW FACILITY"; and (2) disclosure of "any changes to any of the climate control mechanisms in the DEATH ROW FACILITY that have occurred since this action was filed." (Doc. 63-11, p. 6 (Interrogatories Nos. 4–5) (emphasis in original).)     Four days later, on July 19, Defendants responded that "since the filing of the complaint, only routine maintenance and inspections were performed on the climate control systems," but "reserve[d] the right to supplement their answer[s] at a later time."     (*Id.*)     Despite this "reserv[ation]," Defendants failed to follow through with additional information regarding changes to the climate control mechanisms.

Instead, Plaintiffs learned about Defendants' modifications through their own channels.[3]     Having heard rumors of modifications being made to the death row tiers, Plaintiffs' counsel emailed Defendant's counsel the following message at 3:02 p.m., July 26, 2013:

Counsel,

---

[3] It is hardly surprising that Plaintiffs found out about Defendants efforts to modify the death row facility, given that they each live there.

10

> We have received numerous reports from various sources that alterations are being made to death row. We believe these actions are designed to reduce the heat.
>
> Can you please confirm this as soon as possible? Obviously we are entitled to this information pursuant to our discovery requests as well as our pending lawsuit.
>
> Yours very truly,
>
> Mercedes Montagnes

(Doc. 63-13.)

A little more than an hour-and-a-half after Montagnes sent her email, at 4:39 p.m., defense counsel Amy McInnis reported the installation of awnings, but failed to mention the soaker hoses. Specifically, McInnis wrote:

> Mercedes and all,
>
> I think what you may [sic] referring to as "alterations" are awnings that are being installed over the windows on only two tiers. *This was discussed with Magistrate Judge Riedlinger yesterday in our settlement conference.* We had indicated to him that although the terms of your proposed settlement were not agreeable to our clients, that they were nonetheless committed to exploring and implementing measures that would make the inmates housed on Death Row more comfortable and that they would do so own [sic] their own, without being ordered to do so by the Court. We had specifically mentioned the possibility of installing awnings on windows on only two tiers during the monitoring period, so that we could ascertain whether such effort would have a measurable effect on temperatures on those two tiers. *Judge Riedlinger indicated that he believed that this would be a good idea.* It was our impression that this was being communicated to you during the settlement conference.

11

Please note that the awnings are being installed on only two tiers, not all tiers, as we want to be certain that we do not skew the data monitoring.

In the spirit of full disclosure, please see the attached pictures of the awnings being installed.

I trust that this will suffice in lieu of a formal supplemental discovery response.

Regards, Amy

(Doc. 63-14 (emphasis added).[4])

Three days later, on July 29, 2013, Defendants' counsel sent Plaintiffs' counsel Defendants' Supplemental Response to Plaintiffs' Discovery (Doc. 63-16), which, among other things, stated: "Since the filing of the complaint, the forced ventilation system was inspected and awnings were added on to tiers C and G by inmates and/or employees of LSP," (*id.*, pp. 6–7.) Again, however, Defendants' counsel neglected to mention Defendants' installation of soaker hoses on certain tiers. (*See generally id.*)

Indeed, Plaintiffs' counsel only learned of the soaker hoses when they deposed Defendant Warden Nathan Burl Cain on July 31, 2013. (*See* Doc. 85-9, p. 34 (Deposition of Nathan Burl Cain).) Even *after* Warden Cain's deposition, Defendants' counsel failed to supplement Defendants' responses to Plaintiffs'

---

[4] For reasons explained, *infra*, defense counsels' representations to the effect that Magistrate Judge Riedlinger approved installation of the awnings are dubious.

interrogatories with information regarding Defendants' use of soaker hoses and/or misting devices.

Plaintiffs' counsel learned of Defendants' attempts to repair Plaintiff Code's cell vent in much the same way that they learned of Defendants' construction of awnings and installation of soaker hoses. Yet again, Defendants only informed Plaintiffs' counsel regarding this "routine maintenance" to Code's vent *after* Montagnes emailed to inquire about work done in Code's cell. (*See* Doc. 85-2, pp. 2–3.) And, as before, Defendants' did not supplement their interrogatory responses to reflect their maintenance to this "climate control mechanism." (*See* Doc. 63-11, p. 6.)

### 4. The Court's discovery of Defendants' modifications

The Court did not learn that Defendants installed awnings and soaker hoses on the death row tiers until the final pretrial conference on July 31, 2013. During this conference, which was not on the record, Plaintiffs' counsel informed the Court that Defendants had installed awnings over the windows in certain death row tiers, including tiers subject to the Court's data-collection Order. (*See* Doc. 57, p. 2.) Plaintiffs further informed the Court that Defendants had attempted to soak and/or mist some of the tiers by spraying water on the roof of and/or on the side of the buildings. (*See id.*)

13

In response, Defendants' counsel conceded that Defendants took such actions. (*See id.*).  Defendants' counsel also conceded that Defendants had done so without seeking permission from the Court.  (*See id.*)  However, Defendants' counsel E. Wade Shows asserted that Magistrate Judge Riedlinger "knew" that Defendants planned to take such actions, and also asserted that counsel informed Judge Riedlinger of Defendants' intentions during the parties' settlement conference on July 25.

Defendants' counsel maintained the position that Magistrate Judge Riedlinger endorsed Defendants' modifications to the death row tiers in their memorandum opposing Plaintiffs' Motion for Imposition of Sanctions for Defendants' Spoliation of Evidence, (Doc. 63).  Specifically, Defendants' counsel stated:

> Plaintiffs have not and cannot demonstrate that Defendants acted in bad faith in the installation of awnings on the windows on only two tiers of the Death Row Facility.  First, Defendants' motivation in installation awnings was the same as all of the other possible solutions discussed in the July 25, 2013 settlement conference with Magistrate Judge Riedlinger—to explore all feasible solutions to alleviate effects of heat on the inmates housed on the Death Row Tiers.  *This good faith impetus was expressed to Magistrate Judge Riedlinger, who indicated that he thought any good faith solutions would be appreciated by this Court.*  During this same conference, Defendants stated that they intended to erect awnings over the windows to explore whether such measures would enhance the comfort level of inmates by preventing the glare from the sun from reflecting into their cells.

(Doc. 66, pp. 10–11 (emphasis added).)

14

In the same memorandum Defendants' counsel represented to the Court that Defendants' had fully complied with all discovery obligations, despite having failed to inform Plaintiffs regarding Defendants' use of soaker hoses/misting devices prior to Warden Cain's deposition. Specifically, Defendants' counsel stated:

> Defendants were anything but evasive in the discovery process, as evidenced by (1) Defendants' prior notice of the awning installation during the settlement conference; (2) Defendants' prompt notification of the awning installation the same day as the installation; and (3) the fact that Plaintiffs certified to the Court on July 31, 2013, that *no discovery issues remained*.

(*Id.*, p. 12 (emphasis added).)

On August 5, 2013, at the hearing on Plaintiffs' Motion for Sanctions, Defendants' counsel again laid blame with Magistrate Judge Riedlinger for Defendants' alterations to the death row tiers. Specifically, the following colloquy ensued between this Court, and Defendant's counsel Amy McInnis:

| BY MS. MCINNIS: | And, Your Honor, the attempts that were made—and let me just be clear about what those attempts are. Because I think we're talking around. There were awnings that were erected. Those— |
|---|---|
| BY THE COURT: | And they were erected after I ordered the collection of the data, correct? |
| BY MS. MCINNIS: | Correct, Your Honor. |
| BY THE COURT: | No one came to me and asked for permission to make any material changes to any of the conditions during the period of time that the data was being collected, correct? |

15

BY MS. MCINNIS:          That is correct, Your Honor.

BY THE COURT:            And why is that?

BY MS. MCINNIS:          Your Honor, that very remedial measure,
                         along with several other possible ones were
                         *specifically   discussed   at   length   with*
                         *Magistrate Judge Riedlinger in the 20—the*
                         *July 25th summary conference.*

Trial Transcript, Argument of Amy McInnis, Aug. 5, 2013 (emphasis added).

Defendants' counsel persisted in her position that Magistrate Judge

Riedlinger tacitly approved Defendants' actions even *after* this Court cautioned

about relating the contents of confidential settlement discussions.

BY THE COURT:            Let me say, Ms. McInnis.  The discussions,
                         as I appreciate it, and I don't even know the
                         extent of those discussions, because those
                         discussions occurred in the context of a
                         settlement conference.  Which, of course, the
                         District Court is not privy to, and nor do I
                         want to be privy to it.  So, with that in mind,
                         please proceed.

BY MS. MCINNIS:          And, Your Honor, I'm not trying to violate
                         that rule.  The reason that I mention it is
                         only to show the court that it was taken in
                         good faith.  We—the erection of the awnings.
                         And that those awnings were erected after
                         we—after Defendants had disclosed that this
                         is something that we were going to do and, in
                         fact, do it tomorrow.  So.

BY THE COURT:            I understand that.  But, as I appreciate it, it
                         was shared in the context of if we settle this
                         case—if we settle this case, contingent upon

16

|                    | a settlement, these are the things we can and will do. |
|--------------------|---------------------------------------------------------|
| BY MS. MCINNIS:    | That was not the—that's not the context in which that statement was made. It was we are going to do this outside of any court order. We are going to do in order to, as a sign of good faith. And it was our impression that it was taken that way. |

*Id.*

Later, *after* the Court informed Defendants' counsel that it had independently conferred with Magistrate Judge Riedlinger regarding his approval—tacit or otherwise—of Defendants' actions, Defendants' counsel retreated from her position.

|                    |                                                         |
|--------------------|---------------------------------------------------------|
| BY THE COURT:      | Ms. McInnis, were you present at the conference with the Magistrate Judge? |
| BY MS. MCINNIS:    | Yes, Your Honor. I was. |
| BY THE COURT:      | I will tell you that I have conferred with the Magistrate Judge. And he has made it very clear to me, and if necessary I will produce evidence, that he gave no party any approval to make any material changes. Now, I believe it is the case that to the extent there were discussions of the installation of awnings and other devices, that it was, again, contingent upon a settlement in the case. So, I want to ask you to be very, very careful, Ms. McInnis. Because if you tell me, as Mr. Shows told me, that the Magistrate Judge knew it and at least tacitly approved it, it will—I am obligated then to verify that. |

17

| | |
|---|---|
| BY MS. MCINNIS: | I understand. |
| BY THE COURT: | And if the one person who is in position to verify that doesn't verify it, then I'm in a position to impose not just sanctions on the parties. I may have to impose sanctions on counsel. |
| BY MS. MCINNIS: | I understand, Your Honor. |
| BY THE COURT: | I'm not threatening you. Now, I want to be clear about that. But I just want to be absolutely certain that everyone knows the rules. |
| BY MS. MCINNIS: | I understand, Your Honor. And, Your Honor, and I do want to be very careful and I do want the court to understand what I'm saying. That what I'm saying is that we had put this forward. And I'm—what I'm representing to the court. This was done— we had given plaintiffs prior notice. I'm not offering it to say that this was a term of settlement or—because I know that those conversations are off limits at this time. Just to say that there is no culpable breach insofar as it was discussed and it was mentioned in advance. |

*Id.*

### B. Defendants' "evasive," "incomplete," and untimely responses to Plaintiffs' discovery requests regarding the cost of installing air-conditioning in the death row tiers

Next, Plaintiffs' complain that Defendants' responses to discovery requests regarding the cost of installing air-conditioning in the death row tiers were

18

"evasive," "incomplete," and untimely in violation of the Federal Rules of Civil Procedure and this Court's discovery orders. (Doc. 62, p. 3).

### 1. Putting the cost of air-conditioning at issue

Almost from the outset, it was clear that the potential cost of remedial measures was a relevant and, indeed, critical consideration to determining whether Plaintiffs' would achieve the relief that they sought, at least in the short-term. In response to Plaintiffs' request for a preliminary injunction ordering Defendants to "maintain a heat index below 88°," (Doc. 12-1, p. 28), Defendants took the position that "the harm to Defendants greatly exceeds the actual likelihood of [Plaintiffs'] serious health problems," because remedial measures—specifically installation of air-conditioning in the death row tiers—could "only be done at a huge expense and after massive construction and installation efforts." (Doc. 15, p. 16.)

### 2. Plaintiffs' attempts to discover Defendants' cost estimates for installation of air-conditioning on death row

Notably, Defendants' opposition to Plaintiffs' preliminary injunction motion did *not* include an actual cost estimate for the installation of air-conditioning. (*See id., pp.* 16–17.) Nor did Defendants' opposition include any suggested alternatives for reducing the temperature, humidity, and heat index in the death row tiers.[5] (*See generally id.*) Thus, after this Court deferred ruling on Plaintiffs' request for a

---

[5] Indeed, Defendants' took the position that "[t]he conditions on Death Row are not objectively serious." (Doc. 15, p. 13.)

19

preliminary injunction pending a full evidentiary hearing, (Doc. 24, p. 2), Plaintiffs included among their July 15 interrogatories questions aimed at assessing the balance of harm prong of the preliminary injunction inquiry. *See La Union Del Pueblo Entero v. Fed. Emergency Mgmt. Agency*, 608 F.3d 217, 219 (5th Cir. 2010) ("A preliminary injunction is an extraordinary remedy that should only issue if the movant shows: (1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) the injunction will not disserve the public interest."). Specifically, Plaintiffs' interrogatories included the following:

**INTERROGATORY NO. 11:**

DESCRIBE IN DETAIL how YOU would be willing [sic] ensure that the heat index on the DEATH ROW TIERS remains below 88 degrees Fahrenheit.

**INTERROGATORY NO. 12:**

DESCRIBE IN DETAIL the expenses associated with furnishing air conditioning on the DEATH ROW TIERS so as to ensure that the heat index on the DEATH ROW TIERS remains below 88 degrees Fahrenheit.

(Doc. 62-1, pp. 7–8 (Interrogatories 11–12) (emphasis in original).)

20

### 3. Defendants' responses to Plaintiffs' interrogatories

Despite the obvious relevance of Plaintiffs' interrogatories given Defendants'

position on the issue of air-conditioning, Defendants' July 19 response to Plaintiffs'

discovery requests stated:

**RESPONSE TO INTERROGATORY NO. 11:**

    *Defendants object to the interrogatory as written, as it seeks
information that is not relevant to a claim or defense of either party nor
is it calculated to lead to the discovery of admissible evidence. Further,
it presumes that a heat index below 88 degree is an optimal heat index.*

    *Defendants reserve the right to supplement their answer at a
later time.*

**RESPONSE TO INTERROGATORY NO. 12:**

    *Defendants cannot answer this question, as it seeks information
that it not in its possession, custody, or control.*

    *Defendants reserve the right to supplement their answer at a
later time.*

(Doc. 62-2, pp. 4–5 (Responses to Interrogatories 11–12) (emphasis in original).)

Immediately upon receipt of Defendants' Responses, Plaintiffs' counsel sent a

twelve-page letter to Defendants' counsel, requesting a meeting "to resolve issues

relating to the issues raised by Defendants' deficient discovery responses." (Doc. 62-

3, p. 1.) Plaintiffs' letter outlined each of Plaintiffs' concerns with Defendants'

Interrogatory Responses. (*See id.*, pp. 5–7.) Specifically, as to Defendants'

Response to Interrogatory 11, Plaintiffs noted that Defendants' refusal to answer

was without basis because "[t]he request plainly seeks information relating to the

21

permanent injunctive relief sought by Plaintiffs, including without limitation the balance of the harms that Defendants have themselves contended are in Defendants' favor." (*Id., p.* 7.) As to Defendants' Response to Interrogatory 12, Plaintiffs' stated that despite Defendants' insistence that the information requested was beyond their "possession, custody, or control," Defendants were known to "have retained a consulting engineer to testify as an expert—thereby making clear that Defendants have information readily available and the ability to answer the Interrogatory." (*Id.*)

Plaintiffs' initial attempts to resolve this discovery dispute with Defendants' counsel were fruitless. Thus, Plaintiffs' counsel raised the issue again during discovery conferences with Magistrate Judge Riedlinger on July 23 and 25, 2013. (*See* Doc. 49, pp.1–2.) Following these conferences, the Magistrate Judge issued an Order stating, in pertinent part:

> Interrogatory Number 11: defendants required to supplement, even if the substantive answer is that Defendants currently do not have a plan to keep the heat index below 88 degrees F on the Death row tiers.

> Interrogatory Number 12: defendants required to supplement, even if the substantive answer is that Defendants currently do not have an estimate of the cost to air condition the Death row tiers.

(*Id.*, p. 2.) The Magistrate Judge further ordered that Defendants were "to file their supplemental discovery responses by 5:00 p.m., on July 29, 2013." (*Id.*, p. 1.)

22

### 4. Further developments: Defendants' Expert's Report regarding costs of installing remedial measures on death row

On July 24, in accordance with the Court's discovery schedule, (Doc. 28, p. 2), Defendants provided to Plaintiffs the expert report of Henry C. Eyre, III, (Doc. 62-5). Defendants retained Eyre, a consulting engineer, "to determine the feasibility of adding cooling to the existing inmate holding cells & inmate tiers" at Angola's Death row. (*Id.*, p. 1.) Eyre's report—titled "Feasibility Study – Addition of Cooling"—made no mention of costs or expenses, specific *or* general, associated with installing air conditioning in the death row tiers. (*See generally id.*) Nor did Eyre's report indicate that an estimate of costs or expenses would follow. (*See generally id.*)

On July 26, two days after the deadline for exchanging expert reports had passed, (Doc. 28, p. 2), Defendants' counsel provided Plaintiffs with "exhibits to the expert report submitted by Mr. Eyre." (Doc. 62-6, p. 1.) Defendants' counsel described these exhibits as "nothing new but simply the supporting documentation that was relied upon by [Eyre] in forming his opinion." (*Id.*) Included in the exhibits were three cost estimates: (1) "Budget Price for (8) new air units is $ 52,000"; (2) "Budget Price for (8) new cooling coil sections with cooling coils and drain pans is $ 22,000"; and (3) "Budget Price for (8) new cooling coils only is

23

$ 14,000." (Doc. 62-7, p. 1) The exhibits also included a "Schedule of Rates" for Eyre's consulting firm. (*Id.*, p. 31)

On July 29, Plaintiffs deposed Eyre. In his deposition, Eyre was emphatic that he could not "give total construction cost estimates" for the installation of air-conditioning on the death row tiers, despite having relied upon certain estimates in creating his report. (*See* Doc. 62-8, p. 44.) Specifically, Eyre stated:

> I can't give you the entire job estimate because, like I said already, an electrical engineer would be involved. There would be an electrical aspect. You know, I believe I state that in my report, and I don't—I'm not qualified to estimate those costs so I'm just one piece to the puzzle.

(Doc. 62-8, p. 42);

> I can't give you a final—I can't give you a number because any number would not be a knowledgeable—I wouldn't have all of the information.

(*Id.*, p. 43);

> Again, I can't give you a complete project cost estimate. I just can't. . . . There's so many different scenarios on how—the total construction cost estimate to give that I'm not qualified to give you on all of those other disciplines.

(*Id.*, pp. 43–44); and again,

> I don't give total construction cost estimates.

(*Id.*, p. 44.)

24

### 5. Defendants' supplemental responses to Plaintiffs' interrogatories

Also on July 29, the same day that Plaintiffs deposed Eyre, Defendants produced their Supplemental Responses pursuant to Magistrate Judge Riedlinger's Order. (Doc. 62-4.) In pertinent part, these Responses stated:

#### *RESPONSE TO INTERROGATORY NO. 11:*

> *Defendants do not believe that the question of maintenance of the heat index below 88 degrees answers the ultimate question of how to ensure that Plaintiffs are not at risk of suffering heat-related medical problems. Defendants think a more appropriate inquiry is to consider various measures (in addition to those currently provided) designed to ensure that Plaintiffs' body temperatures are not elevated to a level that jeopardizes their health during the summer months. Defendants do not currently have a plan to keep the heat index below 88 degrees on the Death Row Tiers.*

#### *RESPONSE TO INTERROGATORY NO. 12:*

> *Defendants have no personal knowledge as to the information sought in the request. However, the report of Defendants' expert, Henry C. Eyre, III, discusses generally the services of various professionals and/or vendors needed to undertake such an enormous task. Specific costs associated with each of these professionals and/or vendors and the construction of the system desired by Plaintiffs would need to be obtained individually.*

(*Id.*, pp. 7–8 (emphasis in original).) Notably, despite the specific cost estimates included in the exhibits to Eyre's Report, Defendants' responses still did not include any cost estimates, or any indication that cost estimates would be forthcoming, except to provide a general disclaimer that "Defendants are presently in the process of gathering additional information and documents that are responsive to plaintiffs'

25

requests. Defendants will supplement these responses to produce those documents as soon as possible." (*Id.*, p. 1.)

On July 31, 2013, the Court and the parties convened for the final pretrial conference. (Doc. 57.) Still not satisfied that Defendants had complied with their discovery obligations, Plaintiffs' counsel sought, and were granted, "leave to file one or more motions, related to the evidentiary and discovery issues discussed during the pretrial conference." (Doc. 57, p. 2.) This Court ordered that Plaintiffs' motions were due by 12:00 p.m. on Friday, August 2, 2013. (*Id.*)

### 6. Defendants' Expert's Supplemental Report with cost estimates included

After all this, at 6:00 p.m. on Thursday, August 1, 2013, Defendants produced "Henry Eyre III's supplemental report in the form of an email," stating Eyre's opinion that "the potential Mechanical Construction cost could reach as high as $1,860,000.00," (Doc. 62-9, p. 1.) In full, this "supplemental report in the form of an email," provided:

Jackie,

Assuming the highest tonnage of the potential HVAC solutions, and the higher of the range of equipment installations of this caliber, the potential Mechanical Construction cost could reach as high as $1,860,000.00. This would have an engineering fee of $203,574.00. I have added a renovation factor to the design fee calculation to assume worst case, however this would be at the discretion of the state. I have attached the State of Louisiana fee calculator that shows this computation. If you need anything further in regard to this matter please let me know.

26

(*Id.*)  Notably, Defendants produced Eyre's supplemental report one day *after* the July 31 deadline to take expert depositions had expired, and one business day *before*: (1) the evidentiary hearing on Plaintiffs' Motion for Preliminary Injunction; and (2) trial on the merits of Plaintiffs' Complaint.  (Doc. 28, p. 2.)

### C. Defendants' refusal to permit Plaintiffs' "shadow" expert "to bring instruments into the prison to verify any of the data collection" efforts

Last, Plaintiffs' allege that Defendants violated this Court's discovery order by refusing to permit Plaintiffs' "shadow" expert, David Garon, "to bring instruments into the prison" for the purpose of "verify[ing] the temperature and humidity levels being taken and to ensure that Defendants had not tampered with the equipment."  (Doc. 63, pp. 3–4.)

#### 1. Plaintiffs' request for a "shadow" expert

On July 9, 2013, the parties filed their joint Proposed Discovery Order, (Doc. 26), outlining a joint proposed discovery schedule, certain stipulations, and an agreed upon data collection plan, (*id.*, pp. 1–3).  Also included in this document was a request by Plaintiffs for permission "to send in an identified designee to verify the temperatures that are being taken and to insure that the instruments in Defendants' possession have not suffered any tampering once per week for the three weeks of data collection," (*id.*, p. 3).  Defendants opposed this request for a variety of

27

reasons, including that it was unduly "burdensome" and, in any event, "duplicitous."

(*Id.*)

Initially, the Court denied Plaintiffs' request, stating that "such weekly monitoring shall be conducted by the [parties'] mutually-agreed upon expert." (Doc. 28, p. 4.) However, on July 12, after a status conference in which the parties agreed that U.S. Risk Management would serve as the neutral expert to collect data on the death row tiers, this Court relented and allowed Plaintiffs to retain a "shadow" expert to monitor the data collection. Specifically, this Court ordered:

> Plaintiffs shall be permitted to retain an own expert to shadow U.S. Risk Management. Plaintiffs shall identify one individual, who shall be permitted to shadow U.S. Risk Management during the installation of the necessary equipment, and inspect the equipment at least once per week. However, Plaintiffs shall bear all costs of retaining such expert.

(Doc. 36, p. 2.)

### 2. Plaintiffs' request that their "shadow" expert be allowed to bring monitoring equipment to death row

The same day that this Court issued its Order granting Plaintiffs' request to retain a "shadow" expert, Plaintiffs' counsel emailed Defendants' counsel to disclose that Plaintiffs' "intend to use as our 'shadow' expert David Garon of Consolidated Balancing Services, Inc.," and to request "confirm[ation] that arrangements will be made so that Mr. Garon will be able to bring in his own equipment to engage in the necessary shadow measurements." (Doc. 63-3, p. 2.) Shortly thereafter,

28

Defendants' counsel responded to confirm that they would "check[] with the facility regarding your requests as to Mr. Garon." (*Id.*, p. 1.) A half-hour later, however, Defendants' counsel emailed to "advise[] that Mr. Garon will not be allowed to bring his own equipment during his shadowing visits." (*Id.*) After some additional back and forth, Defendants' counsel sent an email elaborating that Defendants' refusal was due to Plaintiffs' request "being outside of the scope" of the parties' discussions at the status conference and this Court's Order. (*Id.*) Defendants' counsel explained:

> At no point was it ever requested that the "shadow" expert be allowed to bring his own instruments and act as a check on the third-party neutral expert. In fact, the Court's minute entry does not support your assumption that the "shadow" would bring in his own equipment and spot check.

(*Id.*)

Despite Defendants' initial protestations, Plaintiffs' concede that "Garon was subsequently able to bring . . . his instrument[s into the prison] on two occasions," (Doc. 85, p. 4), but only after Plaintiffs submitted to Defendants a formal Request for Entry Upon Land For Inspection, (Doc. 63-5; *see also* Doc. 63-6, p. 1 (Defendants' Response to Plaintiff's Request for Entry Upon Land for Inspection, stating "Defendants will agree to allow reasonable instrumentation that does not pose a security risk which are necessary to perform the inspections agreed upon").

29

## III.   DISCUSSION

### A. Spoliation of Evidence

Plaintiffs' claims for sanctions for spoliation of evidence relate to "Defendants . . . various actions since the filing of this lawsuit, and especially during the three-week Court-ordered data collection period, seeking to lower the temperature on the Death Row Tiers." (Doc. 85, p. 1). In particular, Plaintiffs seek sanctions based on Defendants' installation of awnings, Defendants' installation of soaker hoses, and Defendants' maintenance to Plaintiff Code's cell vent. (*See* Doc. 63, pp. 5–10.)

A federal court has the inherent power to sanction a party who has abused the judicial process. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991). Spoliation of evidence is among the offenses for which a court may assess sanctions using its inherent powers. *See Hodge v. Wal–Mart Stores, Inc.*, 360 F.3d 446, 449 (4th Cir. 2004) ("The imposition of a sanction . . . for spoliation of evidence is an inherent power of federal courts."). "Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) (*citing West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)); *see also* Black's Law Dictionary 1531 (9th ed. 2009). Before a Court may sanction a party for spoliation of evidence, the party seeking the sanction must show: (1) the existence of a duty to preserve the evidence;

30

(2) a culpable breach of that duty; and (3) resulting prejudice to the innocent party. *Ashton v. Knight Transp., Inc.*, 772 F. Supp. 2d 772, 800 (N.D. Tex. 2011).

### 1. Defendants' duty to preserve conditions in the death row tiers

"[I]t is beyond question that a party to civil litigation has a duty to preserve relevant information . . . when that party has notice that the evidence is relevant to litigation or should have known that the evidence may be relevant to future litigation." *John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008) (*citing Fujitsu Ltd. v. Fed. Express Corp.,* 247 F.3d 423, 436 (2d Cir. 2001) (quotation marks and alteration omitted).

At the outset, Defendants' "acknowledge that they . . . were under a court-ordered obligation to preserve the data collected" during the data collection period. (Doc. 66, p. 9; *see also id.*, p. 10 ("[T]here is no dispute as to the obligation of the parties to preserve the U.S. Risk Management data collection.").)  Although Defendants' concession does *not* go so far as to acknowledge a duty to preserve the status quo in the death row tiers during the data collection period, this Court has little trouble determining: (1) Defendants' obligation was *precisely* to preserve the status quo during the data collection period; and (2) Defendants *understood* their obligation as such.

First, given the nature of Plaintiffs' claims, this Court repeatedly emphasized the necessity for "the most accurate data" reflecting confinement conditions in

31

Angola's death row tiers. (*See* Doc. 36, p. 2; *see also* Transcript, July 2, 2013 (Hearing on Preliminary Injunction).) It is simply untenable to suggest that this imperative could be accomplished if Defendants were not also obliged to avoid modifying the death row tiers in such a way as to affect cell temperatures during the data collection period.

Second, Defendants' own communications indicate that they appreciated the necessity of collecting accurate data during the data collection period, (Doc. 31, p. 5 (Defendants' Submission of Proposed Independent Expert) ("Most importantly, the data must be accurate so that it can be relied upon by this Court.")), and, even more significantly, that Defendants understood this obligation to be concurrent with an obligation to avoid making *any* modifications that could possibly affect the measurements being taken. Assistant Warden Norwood's admonishment to avoid adjusting fans and windows "in any manner" would be an empty letter if Defendants also believed that they could make structural changes to the death row tiers aimed at reducing cell temperatures. (Doc. 63-17; *see also* Trial Transcript, Testimony of Angelia Norwood, Aug. 5, 2013 (Norwood's acknowledgement that she "had a duty to obey the court's order and to not engage in any action that might interfere with the court's collection of . . . data").)

In sum, it is inescapable that the status quo condition of Angola's death row tiers was "evidence . . . relevant to [this] litigation." *See Goetz*, 531 F.3d at 459.

32

Accordingly, Defendants' concession and common sense dictate that Defendants were under a duty to avoid making modifications to the death row tiers during the data collection period.[6]

### 2. Defendants' culpable breach of their duty to preserve the status quo

Because the Court is proceeding according to its inherent authority, Plaintiffs must show "bad faith or willful abuse of the judicial process" in order to prove that Defendants committed a culpable breach of their duty to preserve the status quo conditions on death row. *Pressey v. Patterson*, 898 F.2d 1018, 1021 (5th Cir. 1990). The Fifth Circuit has opined that the spoliation doctrine's "bad faith" requirement entails the intentional destruction of important evidence whose contents is unfavorable to the destroying party. *See Whitt v. Stephens Cnty.*, 529 F.3d 278, 284 (5th Cir. 2008). In a similar vein, this Court has previously described "bad faith" as "act[ing] with fraudulent intent and a desire to suppress the truth." *Consol. Aluminum Corp. v. Alcoa, Inc.*, 244 F.R.D. 335, 344 (M.D. La. 2006).

Under either of these articulations, this Court has little trouble determining that Defendants' construction of awnings and installation of soaker hoses exhibited

---

[6] Although not entirely clear from the record, it appears that Defendants repaired Plaintiff Code's malfunctioning vent sometime around August 9, 2013—in other words, *after* the data collection period had ended. (Doc. 85-2, p. 2.) Thus, while this Court entertains doubts regarding Defendants' motives in repairing the vent given the close proximity between the repairs and the undersigned's August 12 site visit, it cannot say that the repairs violated Defendants' duty to maintain the status quo on death row throughout the data collection period. It is another matter whether Defendants' failure to update their responses to Plaintiffs' interrogatories regarding this maintenance was a discovery violation.

33

"bad faith." First, although the precise date that Defendants installed the awnings and experimented with the soaker hoses is unclear from the record, (*see* Transcript, Aug. 6, 2013 (Testimony of Warden Burl Cain) (stating "I don't recall the specific dates and times [that the awnings and soaker hoses were installed]."); *id.* (stating "I'm not exactly sure when we [installed the awnings]," and indicating that installation may have occurred in the early morning hours of Thursday, July 25, 2013 or Friday, July 26, 2013)), it is abundantly clear that Defendants' manipulations occurred *after* this Court ordered that "the most accurate data . . . be collected," *and after* the 21-day data collection period had commenced. (*See* Doc. 36, p. 2 (ordering Defendants to retain U.S. Risk Management); Doc. 24, p. 2 (ordering Defendants to collect data from the death row tiers for a period of 21 days beginning on July, 15, 2013).)

Second, it is not beyond the Court's notice that Defendants' chose to modify tiers C and G—the two death row tiers exhibiting the highest recorded temperatures and heat indices, (*see* Slip Op., Doc. 87 at pp. 23–40)—and that Defendants made their modifications under cover of darkness.

Finally, and most significantly, Defendants' *stated purpose* for installing the awnings and soaker hoses was to *manipulate* the very data that they concede they were "oblig[ed] to preserve." (Doc. 66, p. 9.) Warden Cain testified at trial that he ordered the awnings installed "[t]o see if the temperature would fall." Trial

34

Transcript, Testimony of Nathan Burl Cain, Aug. 6, 2013; *see also* Trial Transcript, Testimony of Angelia Norwood, Aug. 5, 2013 (stating that the awnings were installed "to see if it would make a difference as far as providing shade over the windows, to see if it would cool—to see if it would make a difference, as far as the temperature, to bring it down").  Likewise, at his deposition, Warden Cain stated "[w]e are . . . misting the walls of the building to try to see if we can get the cinder blocks to be cooler so then they won't conduct the heat all the way through." (Doc. 85-9, p. 34.)  Certainly, had Defendants' achieved their goal of cooling the temperatures in the death row tiers, they would have ameliorated data unfavorable to their position, and reaped data more favorable to their position.  This Court simply cannot ignore Defendants' brazen attempt to "suppress the truth" regarding the temperatures in the death row tiers. *Consol. Aluminum Corp.*, 244 F.R.D. at 344; *see Whitt*, 529 F.3d at 284.

Defendants insist that the bad faith element is not satisfied here because: (1) they "never intended to undermine or otherwise interfere with the termperature [sic] and/or humidity readings by U.S. Risk Management," (Doc. 66, p. 11); (2) they installed the awnings and soaker hoses in a "good faith" attempt "to explore all feasible solutions to alleviate effects of heat on the inmates housed on the Death Row Tiers," (*id., p.* 10–11)[7]; and, in any event, (3) they "have not deprived Plaintiffs

---

[7]  Defendants' counsel further states that "[t]his good faith impetus was expressed to Magistrate Judge Riedlinger, who indicated that he thought any good faith solutions would be appreciated by

35

of any evidence whatsoever" because "[t]hey did not destroy any evidence," (*id.*, p. 11).

The Court is not convinced by any of Defendants' protestations. First, Defendants' insistence that their actions were "never intended to undermine or otherwise interfere with the termperature [sic] and/or humidity readings" is flatly contradicted by Warden Cain's testimony that Defendants' actions were taken "[t]o see if the temperature would fall."

Second, Defendants' insistence that they were merely "explor[ing] all feasible solutions to alleviate effects of heat on the inmates housed on the Death Row Tiers," is belied by: (1) Defendants' decision to undertake such efforts only *after* the Court-ordered data collection period had begun, despite having been on notice of Plaintiffs' complaints regarding the heat on death row since at *least* the preceding year, *see* Trial Transcript, Testimony of Angelia Norwood, Aug. 5, 2013 (indicating that Norwood received as many as thirteen prisoner ARPs complaining about "heat" since February 2011); (2) Defendants' decision to "explore" remedial efforts designed "[t]o see if the temperature would fall," rather than investigating alternatives that would not impact data collection in the tiers, such as providing additional ice chests to prisoners, or access to cold showers; (3) Defendants' decision to target the two tiers with the highest temperatures and heat indices in their "explor[ations]"; and

---

this Court." (Doc. 66, p. 11.) This attempt to lay blame for Defendants' actions at the Magistrate Judge's door is indicative of the lack of candor for which Defendants' counsel is being ordered to show cause for why sanctions should not be imposed against each individually, *infra*.

36

(4) Defendants' decision to target tiers occupied by inmates and specified for data collection despite the existence of unoccupied, unmeasured tiers that could have served as control experiments, (*see* Slip Op., Doc. 87 at pp. 2, 23–40). More fundamentally, Defendants' stance that they were merely "explor[ing] all feasible solutions to alleviate effects of heat on the inmates housed on the Death Row Tiers," is at odds with the position Defendants' took throughout the course of this litigation, specifically that "[t]he conditions on Death Row are not objectively serious." (Doc. 15, p. 13.)

Finally, for reasons discussed more fully in the Court's analysis of whether Plaintiffs suffered prejudice as a result of Defendants' manipulations, *infra*, this Court is not at all satisfied that "Defendants . . . have not deprived Plaintiffs of any evidence whatsoever," nor "destroy[ed] any evidence." To the contrary, although the temperature, humidity, and heat index each remained dangerously high after Defendants' installation of awnings and soaker hoses, the Court cannot be sure that the readings would not have been *higher* absent Defendants' actions. Indeed, Plaintiffs' expert David Garon testified in his deposition that the awnings "should stop the sun from coming in the windows," which, in turn, could alleviate "solar radiation issues." (Doc. 85-11, p. 38.) When asked to clarify, Garon stated:

> [W]hen the sun beats on the windows and they get hot and the air passes over it, it's almost like a heater. So if you get the sun off of there, it might help. And it should help keep the sun from penetrating into the jail cell for sure. I would expect that to happen.

37

(*Id.*) Additionally, Plaintiffs have submitted unrebutted evidence indicating that *after* the awnings were installed on tier C, the temperature variations between tier C (with awnings) and tier A (without awnings) were less significant than the variations between the two tiers *before* the installation of awnings on tier C. (Doc. 85-10.)

Quite simply, the Court finds Defendants' protestations that they acted in "good faith" when installing the awnings and soaker hoses to be incredible. Defendants' chosen structural modifications, combined with their stated reasons for making them, make it quite clear that Defendants' breached their duty to preserve the status quo on death row with the goal of thwarting accurate measurement of temperature, humidity and heat index.   This intentional, and by Plaintiffs' unrebutted account *successful*, destruction of unfavorable evidence is quite sufficient to satisfy the "bad faith" standard. *See Whitt*, 529 F.3d at 284; *Consol. Aluminum Corp.*, 244 F.R.D. at 344.

### 3. Prejudice to Plaintiffs

In assessing prejudice, a Court may consider whether a party "was precluded from obtaining much more reliable evidence tending to prove or disprove the validity [of his position]." *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 946 (11th Cir. 2005).   Although the Court cannot assess the full extent of the prejudice Plaintiffs suffered as a result of Defendants' manipulations, it is satisfied that

38

Plaintiffs suffered at least *some* prejudice. The temperature, humidity, and heat index were each dangerously high in the impacted tiers prior to Defendants' modifications, and each remained dangerously high after the installation of awnings and soaker hoses. However, Plaintiffs' unrebutted evidence shows that the temperatures in the selected tiers may have been gone higher but for Defendants' installation of awnings—at least in tier C. (*See* Doc. 85-10.) Accordingly, while this Court cannot say that Defendants' actions were "highly prejudicial" to Plaintiffs' case, *see Silvestri*, 271 F.3d at 594 (indicating that spoliation was "highly prejudicial" where "[i]t denied [defendant] access to the only evidence from which it could develop its defenses adequately"), Plaintiffs have produced sufficient unrebutted evidence to conclude that they were "precluded from obtaining much more reliable evidence tending to prove or disprove the validity [of their position]." *Flury*, 427 F.3d at 946.

### 4. Remedy

Being satisfied that Plaintiffs have made out a claim for spoliation based on the installation of awnings and soakers hoses at the death row tiers, the question becomes what sanctions to impose. Pursuant to its inherent powers, a court has broad discretion in crafting a remedy for abuses of the judicial process. *See Chambers*, 501 U.S. at 44–45. However, the remedy must be proportionate to both the culpable conduct of the guilty party and resulting prejudice to the innocent

39

party. *See id.* ("A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process."); *see also Anderson v. Beatrice Foods Co.*, 900 F.2d 388, 395 (1st Cir. 1990) ("[A] trial court confronted by sanctionable behavior should consider the purpose to be achieved by a given sanction and then craft a sanction adequate to serve that purpose. . . . [T]he judge should take pains neither to use an elephant gun to slay a mouse nor to wield a cardboard sword if a dragon looms. Whether deterrence or compensation is the goal, the punishment should be reasonably suited to the crime."). When the sanctionable conduct is spoliation of evidence, an appropriate sanction should: "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) (quotation marks omitted).

Plaintiffs request that multiple sanctions be imposed on Defendants, ranging from judgment in their favor, to the imposition of a rebuttable presumption, to the assessment of fees and costs attendant to Plaintiffs' motion for sanctions for spoliation. (*See* Doc. 63, p. 1.) Ultimately, while the Court condemns Defendants' bad faith efforts to subvert collection of data and discovery in the strongest terms, it

40

remains mindful of the Supreme Court's admonishment to exercise its discretion prudently. *See Chambers*, 501 U.S. at 44–45.

Here, despite Defendants' efforts to lower the temperature in the selected tiers, the data produced in the collection period remains compelling, and is more than sufficient to sustain Plaintiffs' claim that they are being subjected to unconstitutional conditions of confinement, even *after* the awnings and soaker hoses were installed. (*See* Slip Op., Doc. 87 at pp. 32–36.) Accordingly, the Court determines that neither the extreme sanction of judgment in Plaintiffs' favor, or an adverse inference, is necessary. Instead, the Court shall impose upon Defendants Plaintiffs' legal costs for preparing their Motion for Spoliation (Doc. 63) and Reply (Doc. 85), as well as any costs of discovery or fees attendant to the preparation of those filings.

### B. Discovery Violations

Next, Plaintiffs seek sanctions against Defendants under Federal Rules of Civil Procedure ("Rule") 26 and 37 for violation of their discovery obligations. Specifically, Plaintiffs seek sanctions based on Defendants' failure to timely produce cost estimates related to the installation of air-conditioning in the death row tiers despite repeated requests, Defendants' failure to supplement their disclosures with information regarding installation of soaker hoses and maintenance to Plaintiff

41

Code's cell vent, and Defendants' refusal to permit Plaintiffs' "shadow" expert access

to the death row tiers with his measuring equipment.

### 1. Defendants' breach of discovery obligations

Rule 26 establishes the general rules regarding parties' duty to disclose. Rule

26(a) provides, in pertinent part:

> [A] party must, without awaiting a discovery request, provide to the other parties: . . . a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses.

Fed. R. Civ. P. 26(a)(1)(A)(ii). Further, this duty to disclose is ongoing. Specifically:

> A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response:
>
> (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or
>
> (B) as ordered by the court.

*Id.* at 26(e)(1).

The rules regarding disclosure of expert testimony are also established by

Rule 26(a). All parties are required to "disclose to the other parties the identity of

any witness it may use at trial to present evidence." *Id.* at 26(a)(2)(A). Further,

42

"[u]nless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report" that contains, among other things:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them; [and]

> (ii) the facts or data considered by the witness in forming them;

*Id.* at 26(a)(2)(B). "A party must make these disclosures at the times and in the sequence that the court orders." *Id.* at 26(a)(2)(C). Finally, as with all other disclosures under Rule 26(a), parties have an obligation to supplement their disclosures regarding expert testimony. *Id.* at 26(a)(2)(E). As it relates to expert testimony, Rule 26 states:

> For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due.

*Id.* at 26(e)(2); *see also id.* at 26(e)(1).

Rule 37 outlines sanctions that a court may impose upon parties for failing to fulfill their discovery obligations under Rule 26. *See* Fed. R. Civ. P. 37. Rule 37 also provides for sanctions where a party has failed to comply with Court imposed discovery obligations. *Id.* at 37(b). Rule 37(c) provides:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

43

In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:

(A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

(B) may inform the jury of the party's failure; and

(C) may impose other appropriate sanctions . . . .

Fed. R. Civ. P. 37(c). Finally, Rule 37(d) provides that the district court "must require the party failing to act, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." *Id.* at 37(d)(3).

Here, the Court again determines that sanctions against Defendants' are appropriate based on Defendants' failure to timely disclose information regarding the cost of installation of air-conditioning in Angola's death row tiers. Defendants' put the cost of installing air-conditioning at issue from the outset by their insistence that Plaintiffs could not satisfy the standard for injunctive relief because the balance of harms—particularly the cost of installing air-conditioning—favored Defendants' position. Defendants then repeatedly refused to answer Plaintiffs' interrogatories aimed at assessing Defendants' estimate of the cost of installation, to the point that Plaintiffs' requested, and received, an order from the Magistrate Judge compelling Defendants' to answer their questions, even if the answer was

44

simply that "defendants currently do not have an estimate of the cost to air condition the Death Row Tiers." (Doc. 49, p. 2.)  Still, even after the Magistrate Judge's Order, Defendants' refused to produce a cost estimate.  Instead, at his deposition, Defendants' expert witness adamantly and repeatedly insisted that he was utterly unable to provide such an estimate.  (*See* Doc. 62-8, pp. 42–44.) Nonetheless, one day *after* the July 31 deadline for deposing expert witnesses had passed, and one business day *before* trial was set to begin, Defendants' produced Eyre's emailed "report" stating that "the potential Mechanical Construction cost could reach as high as $1,860,000." (Doc. 62-9.)  This "report" did not reference Eyre's original report, and provided little independent basis for its cost estimate, except to say that it included "an engineering fee of $203,574.00." (*Id.*)

Eyre's "supplemental report in the form of an email" was relevant to Defendants' defenses, responsive to Plaintiffs' discovery requests, and certainly expressed an expert "opinion" that Defendants' intended to rely on.  Further, there is simply no reason why this bare-boned "opinion" could not have been generated prior to the expiration of the deadline for deposing expert witnesses, and prior to the eleventh hour in the timeline to trial.  At a minimum, Defendants' failure to produce this report earlier prejudiced Plaintiffs' ability to prepare for Eyre's deposition.

45

The Court further finds that sanctions are appropriate based on Defendants'
failure to supplement their responses to Plaintiffs' interrogatories with information
regarding the installation of soaker hoses on the selected death row tiers. At trial,
Warden Cain testified that the soaker hoses were installed "at the same time" as
the awnings. Trial Transcript, Testimony of Nathan Burl Cain, Aug. 6, 2013.
However, while Defendants' eventually supplemented their interrogatory responses
to include information about the awnings, they never updated their responses to
report Defendants' installation of soaker hoses despite the fact that such
information was directly responsive to Plaintiffs' inquiries regarding "any steps that
have been taken . . . related to altering climate conditions in the DEATH ROW
FACILITY." (*See* Doc. 63-16, pp. 6–7 (emphasis in original).) Instead, Plaintiffs'
learned about the soaker hoses only when they deposed Warden Cain. Lacking this
information in advance, Plaintiffs were, at a minimum, prejudiced in their ability to
prepare for Warden Cain's deposition.

On the other hand, the Court will not impose sanctions based on Defendants'
failure to supplement their disclosures with information regarding maintenance to
Plaintiff Code's cell vent. Rule 26 states that supplemental disclosure is required "if
the additional or corrective information has not otherwise been made known to the
other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A).
In this instance, Plaintiffs' were not prejudiced by Defendants' failure to

46

supplement their interrogatory responses regarding the vent maintenance because maintenance occurred *after* the evidentiary hearing and trial on the merits of Plaintiffs' Complaint.

Likewise, the Court declines to sanction Defendants for their initial refusal to allow Plaintiffs' "shadow" expert access to the death row tiers with his measurement equipment. Although Plaintiffs' assert that Defendants agreed to their request that Garon be allowed to bring his instruments into death row as part of the compromise reached to retain U.S. Risk Management, (*see* Doc. 63, pp. 3–4), this Court's July 12 Order does not reflect that understanding, (*see* Doc. 36, p. 2). Instead, this Court's Order states merely that Plaintiffs' expert "shall be permitted to shadow U.S. Risk Management during the installation of the necessary equipment, and inspect the equipment at least once per week." (*Id.*) Although the Court certainly understands Plaintiffs' position that lacking instrumentation, Garon could not "meaningfully 'shadow' the Court appointed expert"—in other words, verify the accuracy of the data collection, (Doc. 63, p. 4)—Defendants' position that the Court's Order only allowed Garon access *without* his equipment is not unreasonable. Further, Plaintiffs concede that Garon was eventually allowed to access the death row tiers with his equipment in hand. (Doc. 85, p. 4.)

47

### 2. Remedy

When considering sanctions under Rule 37, particularly under Rule 37(b), a district's court's discretion is limited by "two standards—one general and one specific." *Compaq Computer Corp. v. Ergonome Inc.*, 387 F.3d 403, 413 (5th Cir. 2004). "First, any sanction must be 'just'; second, the sanction must be specifically related to the particular 'claim' which was at issue in the order to provide discovery." *Id.* (quoting *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982)).

Here again, the Court determines that a "just" sanction is to assess attorney's fees and costs related to Defendants' failure to respond to Plaintiffs' requests for information regarding the cost of installing air-conditioning, as well as the installation of soaker hoses. *See id.*

### C. Counsels' lack of candor to Plaintiffs' counsel and the Court

Before concluding, this Court takes a moment to address its grave reservations regarding defense counsels' conduct in the course of this litigation. In assessing Plaintiffs' motions for sanctions, it appears that Defendants' counsel deliberately dodged requests for information related to the cost of installing air-conditioning; avoided turning over to Plaintiffs' information regarding Defendants' installation of soaker hoses; and, when confronted with information regarding Defendants' willful attempts to manipulate data collection in the death row tiers,

48

excused Defendants' behavior by creating the impression that remedial measures were approved and encouraged by Magistrate Judge Riedlinger. In light of defense counsel's various representations to opposing counsel and this Court—particularly those which suggested that the Magistrate Judge endorsed and approved Defendants' attempts to manipulate data collection in the death row tiers when, in fact, no such approval was given—there appears to be a basis to sanction Defendants' counsel individually for lack of candor to the tribunal and lack of candor to opposing counsel.

## IV.    CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' **MOTIONS FOR SANCTIONS (Docs. 62, 63)** are each **GRANTED IN PART and DENIED IN PART.** Plaintiffs' Motions are **GRANTED** to the extent that they seek reimbursement of attorney's fees and costs. Defendants' **SHALL REIMBURSE** Plaintiffs the full value of all attorney's fees and costs associated with the evidentiary and discovery violations described in this Order. Plaintiff's Motions are **DENIED** to the extent that they seek additional relief.

**IT IS FURTHER ORDERED** that Plaintiffs' shall file a motion for attorneys' fees and costs within 30 days of the date of this Order. Such motion shall

49

comply with the Federal Rules of Civil Procedure and the Local Rules for the United States District Court for the Middle District of Louisiana.

**IT IS FURTHER ORDERED,** in light of the Court's serious concerns regarding defense counsels' lack of candor, that Defendants' counsel **E. WADE SHOWS, AMY L. MCINNIS,** and **JACQUELINE B. WILSON SHOW CAUSE WHY SANCTIONS SHOULD NOT BE IMPOSED** against each personally, under Fed. R. Civ. P. 37(c); M.D. La. LR83.2.4 and LR83.2.8; Louisiana Professional Conduct Rules related to candor to the tribunal (specifically, Rules 3.3, 8.3, and 8.4); Louisiana Professional Conduct Rules related to honesty and fair dealing to opposing counsel (specifically, Rules 3.4, 4.1, and 8.4); and this Court's inherent powers; possible sanctions to include, but not limited to, reprimand, ethics training, suspension, disbarment, and/or the payment of attorneys' fees to cover the cost of motions and discovery related to this proceeding.

**IT IS FURTHER ORDERED** that this Order to Show Cause, and the facts contained herein, **SHALL SERVE AS NOTICE** of the possibility of such disciplinary action, in accordance with M.D. La. LR83.2.8. *See Matter of Thalheim*, 853 F.2d 383, 386 (5th Cir. 1988) ("It is well-settled that federal district courts are bound by their own disciplinary rules when proceeding against attorneys for violation of ethical standards.").

An order setting a date for a hearing on this Order to Show Cause shall follow. *See id.*; M.D. La. LR83.2.8.

Baton Rouge, Louisiana, this 19th day of December, 2013.

**BRIAN A. JACKSON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

51

Exhibit 2

## DECLARATION OF NILAY U. VORA IN SUPPORT OF OPPOSITION TO MOTION TO STAY INJUNCTIVE RELIEF PENDING APPEAL

**NILAY U. VORA** declares, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, as follows:

1. I am an attorney at Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg, & Rhow P.C. ("Bird Marella") in Los Angeles, California.

2. I have been a member of the California Bar since December 2009. I have been admitted to appear before the Central District of California, the Courts of Appeal for the Fifth and Ninth Circuits, and the Middle District of Louisiana *pro hac vice*.

3. On June 2, 2014, I participated in a telephone conference (the "Conference") with Defendants-Appellants' counsel James Hilburn ("Mr. Hilburn"), as well as my co-counsel in this matter, Mercedes Montagnes, Steven Scheckman, Jessica Kornberg, and Elizabeth Compa.

4. The purpose of the Conference was for the parties to meet and confer in relation to various aspects of the implementation of the district court's Order requiring Defendants to immediately implement Defendants' Proposed Heat Remediation Plan (the "Plan"). As part of the Plan, Defendants were required to install a mechanical cooling system to ensure certain levels of a heat index would be maintained for purposes of inmate safety.

5. During the Conference, Mr. Hilburn stated that the acquisition and installation of the mechanical cooling mechanisms would take a total of four weeks. Mr. Hilburn further indicated that he believed that this would provide a "comfortable"

timeline, and that barring unforeseen circumstances, it could be completed even sooner. Mr. Hilburn stated that the process was "not overly complicated."

6. I specifically asked Mr. Hilburn if Defendants believed that there would be some need for authorization of spending for purposes of the acquisition and installation of the mechanical cooling. Mr. Hilburn also stated in response that the money required to acquire and install the mechanical cooling mechanism was already budgeted and would not require any further authorization.

7. Attached as Exhibit 2a is a true and correct copy of an email from Mr. Hilburn to all Plaintiffs' counsel and the Special Master in this action.

8. Attached as Exhibit 2b is a true and correct copy of minutes prepared at the Special Master's direction in relation to a conference call between all parties' counsel and the Special Master.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 5, 2014.

NILAY U. VORA

Exhibit 2a

## Nilay U. Vora

| | |
|---|---|
| **From:** | James Hilburn <jamesh@SCWLLP.COM> |
| **Sent:** | Monday, June 02, 2014 2:41 PM |
| **To:** | Paul Hebert |
| **Cc:** | Wade Shows; Grant Guillot; Amy McInnis; Beth Everett; Carlton Jones; Mercedes Montagnes; Nilay U. Vora; Jessie Kornberg; Beth Compa; Renatti Dupont; Mitzi Smith |
| **Subject:** | RE: Elzie Ball, et al. v. James M. LeBlanc, et al., Civil Action No. 3:13-00368-BAJ-SCR, USDC, MDLA |

Mr. Hebert,

Undersigned counsel and counsel for the plaintiffs discussed several issues during this afternoon's conference call, including the provision of ice coolers, additional showers, and the scope of work.

We are waiting on a final decision from DOC regarding distribution of the ice chests/coolers. As soon as we get a final decision from DOC we will let you know. The provision of the extra ice will not imply or concede we have abandoned or mooted the appeal of that portion of the order.

Regarding the "cool" showers, the American Correctional Association standards require the shower temperatures to be between 100-120 degrees Fahrenheit. We would need court approval to go below the ACA standards. We have asked plaintiffs' counsel to consult and let us know what lower shower temperature range is requested and we will discuss same with our clients. We will let you know the resolution of that issue. The provision of the extra showers will not imply or concede we have abandoned or mooted the appeal of that portion of the order.

Should the Fifth Circuit deny the defendants' motion to stay the order, DOC has a contract vendor for the mechanical equipment such as the A/C units, temperature/humidity controls, etc., and those items do not have to go out for bid. The sheet metal and related "installation" items are either on-hand or easily sourced. The wall boring for the ductwork will be conducted by an outside contractor who performs those functions for DOC. The installation of the equipment will be overseen by Louisiana State Penitentiary physical plant staff, under the direction of Mr. Tim Byrd and others, and with the use of skilled inmate labor. I have been told the project should take approximately four weeks barring some unusual circumstance.

Should you need additional information we will make ourselves available.

*JAMES L. HILBURN*
Associate Attorney
Shows, Cali & Walsh, LLP
628 St. Louis Street
Baton Rouge, LA 70802
Telephone: 225.346.1461
Facsimile: 225.346.1467

*CONFIDENTIALITY NOTICE: This communication and any attachments thereto, constitute an "electronic communication" within the meaning of the Electronic Communications Privacy Act, 18 U.S.C.A. §2510, and disclosure of these contents is limited to the recipient(s) intended by the sender of this messages. Unless expressly stated otherwise, this message and any documents accompanying this Email transmission are confidential and may be*

*subject to the attorney client privilege or deemed work product documents. The Sender's expectation of privacy regarding the content of this e-mail message and any documents accompanying this transmission is extremely high. This message is intended solely for the addressee(s). If the reader of this message is not the intended recipient, you are hereby notified that you have received this in error and any review, dissemination, or copying is strictly prohibited. If you are not an addressee, any disclosure or copying of the contents of this e-mail, or any action taken or not taken in reliance on it, is strictly unauthorized and may be unlawful. If you are not an addressee, please destroy the message and inform the sender immediately at the number, address or Email address above. This e-mail transmission and any accompanying material may contain embedded metadata. Any included metadata is confidential or privileged information and is not intended to be viewed by a non-client recipient.*

Exhibit 2b

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

ELZIE BALL, ET AL.                    :     CIVIL ACTION NO. 3:13:00368

VERSUS                               :

JAMES M. LEBLANC, ET AL.             :     JUDGE JACKSON

---

## MINUTES
of
JOINT TELEPHONE CONFERENCE
FRIDAY - MAY 30, 2014

### INTRODUCTIONS

1.  Introduction of participants on call and representation

    For Plaintiffs:              For Defendants:

    Beth Compa                  Carlton "Trey" Jones
    Jessie Kornberg             Grant Guillot
    Mercedes Montagnes          James Hilburn
    Nilay Vora
    Steve Sheckman

2.  Introduction of Renatti Dupont, Paul Hebert's paralegal.

3.  Confirmation of Paul Hebert's appointment as Special Master.

### COURT ORDERS REGARDING REMEDIATION PLAN
### AND IMPLEMENTATION OF PLAN

1.  Paul Hebert stated he does not have all the history and information on the case.

2.  Ms. Montagne informed Mr. Hebert that the defendants had filed a Motion for Emergency Stay of Judgment Pending Appeal on the afternoon of May 30, 2014.

3.    Mr. Hillburn stated:

    a.    The request for a stay of the Order was geared toward the mechanical aspects of the Order, i.e., the installation of the air conditioning system.

    b.    Mr. McGee has been placed on the heat precautions list and the plaintiffs have individual ice chests.

    c.    If the Fifth Circuit grants the stay, certain aspects of the Order would halt for the foreseeable future and monitoring of the mechanical aspects would not be required.

4.    Ms. Mercedes stated:

    a.    Certain parts of the Order can be done immediately, such as providing all death row inmates with ice chests and cool showers.

    b.    Preliminary steps that are low cost can be taken to prepare for the mechanical cooling, such as identifying vendors.

    c.    The monitoring should proceed until the Fifth Circuit rules otherwise.

5.    Paul Hebert stated:

    a.    He has not seen the stay motion.

    b.    He would like the parties to discuss those kinds of issues by telephone on Monday, June 2, 2014, and notify him of the status by the end of the week.

    c.    The parties will keep him apprised by email.

## PROCEDURES DURING PENDENCY
## OF SPECIAL MASTER PROCEEDINGS

### EX PARTE COMMUNICATIONS

1.    Paul Hebert proposed that any party representative can contact his paralegal, Renatti Dupont; there were no objections.

2.    Paul Hebert does not encourage *ex parte* communications between himself and any party representative.

3.    Paul Hebert stated that he needs to discuss some issues with Judge Jackson privately and asked if there were any objections; there were no objections.

## PLAN IMPLEMENTATION

1.  After the stay/appeal is decided, Paul Hebert would like to keep the process structured and orderly.

2.  Calendar docketing will be provided by Renatti Dupont.

3.  James Hillburn stated:

    a.  The outside air conditioning units are sourced by the state. They just need to be ordered; there is no bid process. Johnson Supply is a contractor with the state who can provide those, so the process is simple.
    b.  The labor for the sheet metal and framing work to install the HVAC to the existing HVAC system will be provided by inmate labor under the prison's supervision.
    c.  There is an outside contractor in place who will bore holes through the cinderblock walls so the ductwork can be run. Mr. Hillburn can provide the name of the contractor.
    d.  The outside contractor should be able to send daily project reports to Paul Hebert.
    e.  Mr. Bird at the prison helped develop the plan and will be involved in the project. He could send photos of the work in progress to Paul Hebert .

## SPECIAL MASTER REPORTS

1.  Paul Hebert plans to follow the Order as stated.

2.  Special Master reports will be provided to all counsel for review. Comments should be directed to the Special Master and not the Court for consideration.

3.  Comments or objections on plan actions or status should be directed to the Special Master with copies to all counsel and Renatti Dupont, paralegal.

## DECLARATION OF JESSICA KORNBERG IN SUPPORT OF PLAINTIFFS' OPPOSITION TO RE-URGED MOTION TO STAY INJUNCTIVE RELIEF PENDING APPEAL

**JESSICA KORNBERG** declares, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, as follows:

1. I am an attorney at Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, P.C. ("Bird Marella") in Los Angeles, California.

2. I have been a member of the California Bar since October 2009. I have been admitted to appear before the Central District of California, the Courts of Appeal for the Fifth Circuit, and the Middle District of Louisiana *pro hac vice*.

3. On June 2, 2014, I participated in a telephone conference (the "Conference") with Defendants-Appellants' counsel James Hilburn ("Mr. Hilburn"), as well as my co-counsel in this matter, Mercedes Montagnes, Steven Scheckman, Nilay Vora, and Elizabeth Compa.

4. The Conference was scheduled during an initial meeting between the same participants and the recently-appointed Special Master in this matter. The Special Master requested that the parties confirm by June 3, 2014, which of the measures in the Defendants' Proposed Heat Remediation Plan (the "Plan") could be implemented immediately. As part of the Plan, Defendants were required to

install a mechanical cooling system to ensure certain levels of a heat index would be maintained for purposes of inmate safety. Other heat remediation measures included provision of ice chests and cooling showers. The parties conducted the Conference on June 3, 2014, to meet and confer to determine which measures could be implemented immediately.

5. Mr. Hilburn indicated that ice chests could be provided immediately. There was an open question as to whether or not those ice chests would be provided only to Plaintiffs or to all similarly situated inmates. There was also an open question as to whether or not cooling showers could be provided immediately, because the desired temperature of such a shower was not determined. In the days following the conference, Plaintiffs' counsel have consulted with the expert witnesses in this matter and recommended cooling showers of no hotter than 90 to 95 degrees.

6. During the Conference, Mr. Hilburn stated that the acquisition and installation of the mechanical cooling mechanisms would take a total of four weeks. Mr. Hilburn further indicated that he believed that this would provide a "comfortable" timeline, and that barring unforeseen circumstances, it could be completed even sooner. Mr. Hilburn stated that the process was "not overly complicated."

7. Mr. Vora specifically asked Mr. Hilburn if Defendants believed that there would be some need for authorization of spending for purposes of the acquisition and installation of the mechanical cooling. Mr. Hilburn stated in response that the

money required to acquire and install the mechanical cooling mechanism was

already budgeted and would not require any further authorization.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 5, 2014.


JESSICA KORNBERG

# AFFIDAVIT OF STEVEN SCHECKMAN IN SUPPORT OF
# PLAINTIFFS' OPPOSITION TO RE-URGED MOTION TO STAY INJUNCTIVE
# RELIEF PENDING APPEAL

**STEVEN SCHECKMAN** declares, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, as follows:

1. I am an attorney at Schiff, Scheckman & White, LLP in New Orleans, Louisiana..

2. I have been a member of the Louisiana Bar since October of 1978, and the New York Bar since May of 1986. I have been admitted to appear before all United States District Courts in Louisiana and the Court of Appeal for the Fifth Circuit.

3. On June 2, 2014, I participated in a telephone conference (the "Conference") with Defendants-Appellants' counsel James Hilburn ("Mr. Hilburn"), as well as my co-counsel in this matter, Mercedes Montagnes, Nilay Vora, Elizabeth Compa and Jessica Kornberg.

4. The Conference was scheduled during an initial meeting between the same participants and the recently-appointed Special Master in this matter. The Special Master requested that the parties confirm by June 3, 2014, which of the measures in the Defendants' Proposed Heat Remediation Plan (the "Plan") could be implemented immediately. As part of the Plan, Defendants were required to install a mechanical cooling system to ensure certain levels of a heat index would

be maintained for purposes of inmate safety. Other heat remediation measures included provision of ice chests and cooling showers. The parties conducted the Conference on June 3, 2014, to meet and confer to determine which measures could be implemented immediately.

5. Mr. Hilburn indicated that ice chests could be provided immediately. There was an open question as to whether or not those ice chests would be provided only to Plaintiffs or to all similarly situated inmates. There was also an open question as to whether or not cooling showers could be provided immediately, because the desired temperature of such a shower was not determined. In the days following the conference, Plaintiffs' counsel have consulted with the expert witnesses in this matter and recommended cooling showers of no hotter than 90 to 95 degrees.

6. During the Conference, Mr. Hilburn stated that the acquisition and installation of the mechanical cooling mechanisms would take a total of four weeks. Mr. Hilburn further indicated that he believed that this would provide a "comfortable" timeline, and that barring unforeseen circumstances, it could be completed even sooner. Mr. Hilburn stated that the process was "not overly complicated."

7. Mr. Vora specifically asked Mr. Hilburn if Defendants believed that there would be some need for authorization of spending for purposes of the acquisition and installation of the mechanical cooling. Mr. Hilburn stated in response that the

money required to acquire and install the mechanical cooling mechanism was

already budgeted and would not require any further authorization.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 5, 2014.

STEVEN SCHECKMAN

SWORN TO AND SUBSCRIBED,
before me, this 5th day of June, 2014.

Notary Public

**ALLISON K. NESTOR**
**NOTARY PUBLIC**
**Parish of Orleans**
**State of Louisiana**
**Bar # 27269**
**My Commission Is For Life**

## DECLARATION OF ELIZABETH COMPA IN SUPPORT OF OPPOSITION TO MOTION TO STAY INJUNCTIVE RELIEF PENDING APPEAL

**ELIZABETH COMPA** declares, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, as follows:

1. I am an attorney at The Promise of Justice Initiative in New Orleans, La.

2. I have been a member of the Louisiana Bar since April 2013. I have been admitted to appear before the Fifth Circuit and the Middle District of Louisiana. I have been a member of the Georgia Bar since December 2011.

3. On June 2, 2014, I participated in a telephone conference (the "Conference") with Defendants-Appellants' counsel James Hilburn ("Mr. Hilburn"), as well as my co-counsel in this matter, Mercedes Montagnes, Steven Scheckman, Jessica Kornberg, and Nilay Vora.

4. The purpose of the Conference was for the parties to meet and confer in relation to various aspects of the implementation of the district court's Order requiring Defendants to immediately implement Defendants' Proposed Heat Remediation Plan (the "Plan"). As part of the Plan, Defendants were required to install a mechanical cooling system to ensure certain levels of a heat index would be maintained for purposes of inmate safety.

5. During the Conference, Mr. Hilburn stated that counsel for Defendants "know [Defendants] have ice chests" and that these ice chests are "in stock." There was an open question as to which death row prisoners, beyond the three Plaintiffs, would receive ice chests.

1

6. There was also an open question as to the temperature range of cooling showers. In the days following the Conference, Plaintiffs' counsel communicated to Defendants that Plaintiffs' experts recommend a range of 90 to 95 degrees.

7. Mr. Hilburn also stated during the Conference that the acquisition and installation of the mechanical cooling mechanisms would take up to four weeks, perhaps less. Mr. Hilburn further indicated that he believed four weeks to be a "comfortable" timeline, and that barring unforeseen circumstances, it could be completed even sooner. Mr. Hilburn stated that the process was "not overly complicated" and "they know exactly what they need to do" because the building is new construction and the HVAC system is familiar.

8. Further, Mr. Hilburn stated that there would be no need to install additional fiberoptic mechanisms to carry out monitoring of temperature and humidity conditions.

9. Mr. Vora specifically asked Mr. Hilburn if Defendants believed that there would be some need for authorization of spending for purposes of the acquisition and installation of the mechanical cooling. Mr. Hilburn also stated in response that the money required to acquire and install the mechanical cooling mechanism was already budgeted and would not require any further authorization.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 5, 2014.


ELIZABETH COMPA

2

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA ·

| | |
|---|---|
| ELZIE BALL, ET AL | CIVIL ACTION NO. 13-CV-368 |
| VERSUS | JUDGE BRIAN A. JACKSON |
| JAMES M. LEBLANC, ET AL | MAGISTRATE JUDGE REIDLINGER |

<u>DEFENDANTS' SUBMISSION OF HEAT REMEDIATION PLAN</u>

**NOW INTO COURT,** through undersigned counsel, come BURL CAIN, Warden, Louisiana State Penitentiary ("LSP"); JAMES LEBLANC, Secretary of the Louisiana Department of Public Safety and Corrections; ANGELIA NORWOOD, Assistant Warden, Louisiana State Penitentiary and LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS; (referred to jointly as "Defendants"), who make the following submission as Defendants' heat remediation plan ("Plan") as ordered by this Court. [Doc. 87, pages 97 and 98.]

**A.      PROCEDURAL HISTORY**

On December 19, 2013, this Court ordered, among other things, that the Defendants prepare and submit a Plan, which will immediately lower and maintain the heat index in the Angola death row tiers at or below 88 degrees Fahrenheit from April 1 through October 31, monitor, record, and report the temperature, humidity, and heat index in each of the death row tiers every two hours on a daily basis from April 1 through October 31, provide Plaintiffs, and other death row inmates who are at risk of developing heat-related illnesses, with at least one "cold" shower per day, and direct access to clean, uncontaminated ice and/or cold drinking water during their tier time and the remainder of their time in which they are confined to their cells. The last section of that portion of the Order was an omnibus provision to cover "any and all relief that is necessary to comply with the Court's order and the prevailing constitutional

1

standards." The order dictated that the Plan shall be submitted to the Court no later than 5:00 p.m. on February 17, 2014.

## B.    HEAT AND HUMIDITY REDUCTION AND MONITORING

Defendants have retained Mr. Frank Thompson, P.E., Thompson Luke & Associates, LLC, to promulgate a plan to maintain the heat index in the Angola death row tiers at or below 88 degrees Fahrenheit from April 1 through October 31, and monitor, record, and report the temperature, humidity, and heat index in each of the death row tiers every two hours on a daily basis from April 1 through October 31. Mr. Thompson's CV is attached hereto as Exhibit "A" and his heat remediation and monitoring plan, with exhibits B1-B4, is attached hereto as Exhibit "B" *in globo*.

In short, Mr. Thompson's calculations show that the death row building would require approximately nine tons of air conditioning system capacity for each of the eight tiers. Mr. Thompson proposes use of a ten ton capacity system for each tier. A ninth ten ton capacity AC unit would be purchased and stored onsite should a unit fail. The AC units would utilize the existing heating, ventilation, and air conditioning ("HVAC") system in the building. As shown by Mr. Thompson's calculations, the proposed HVAC system would be capable of maintaining the heat index below 88 degrees Fahrenheit for each tier.

In addition, the temperature and humidity would be automatically monitored and recorded by a hard wired climate monitoring system for each tier. The data would be transmitted and stored as part of the LSP computer network system. The heat and humidity sensors will transmit their readings to the building's existing Johnson Control energy management system every 15 minutes. The system is capable of producing graphs showing temperature/humidity

2

conditions over any time period. The reports can be generated on an as-requested basis, such as daily, for example. The data can be accessed and provided to any parties with an interest in same.

The HVAC temperature and humidity monitoring system does not calculate the heat index using the formula established by the National Weather Service ("NWS"). To determine the heat index used by the NWS simply requires taking the recorded temperature and humidity data and utilizing the NWS heat index calculator found on the NWS website at http://www.hpc.ncep.noaa.gov/html/heatindex.shtml. Inputting those numbers into the formula would provide the NWS heat indices at the relevant time periods. LSP can provide the heat index calculations to the Court and other interested parties.

## C.     ONE "COLD" SHOWER PER DAY

From April 1 through October 31 the Defendants submit that each inmate will receive one "cold" shower per day. The Court did not set a benchmark for what temperature a "cold" shower should be. The water temperature is (and has been) regulated by LSP staff by way of a mixing valve. The mixing valve can adjust the water temperature at the shower head. LSP follows facility standards as established by the American Correctional Association ("ACA"). The relevant ACA standard requires that shower head water temperature range from 100 to 120 degrees Fahrenheit. See Exhibit "C," ACA Standard 4-4139, *Showers*, attached hereto.  LSP staff would just need to know what temperature or temperature range the Court requires.

## D.     ICE AND/OR COLD DRINKING WATER

From April 1 through October 31 the Defendants submit that each inmate will receive an ice chest which will be filled and replenished with clean ice as needed by LSP staff during their regular security rounds through each tier.

3

**WHEREFORE,** defendants, BURL CAIN, Warden, Louisiana State Penitentiary; JAMES LEBLANC, Secretary of the Louisiana Department of Public Safety and Corrections; ANGELIA NORWOOD, Warden, Death Row and THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, respectfully pray that this Plan as required by this Court in its December 19, 2013 order be deemed good and sufficient.

Respectfully Submitted:

s/ James L. Hilburn
E. Wade Shows, La. Bar Roll No. 7637
James L. Hilburn, La. Bar Roll No. 20221
Amy L. McInnis, La. Bar Roll No. 29337
Jacqueline B. Wilson, La. Bar Roll No. 31055
**SHOWS, CALI & WALSH, LLP**
628 St. Louis Street (70802)
P.O. Drawer 4425
Baton Rouge, Louisiana 70821
Telephone: (225) 346-1461
Facsimile:  (225) 346-1467

**ROEDEL, PARSONS, KOCH, BLACHE,
BALHOFF & MCCOLLISTER**
Thomas E. Balhoff, Bar Roll No. 2716
Judith R. Atkinson, Bar Roll No. 17240
Carlton Jones, III, Bar Roll No. 25732
Special Assistant Attorneys General
8440 Jefferson Highway, Suite 301
Baton Rouge, Louisiana 70809
Telephone: (225) 929-7033
Facsimile:  (225) 928-4925

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on **February 17, 2014** a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system and notice will be sent to all counsel for Plaintiffs by operation of the court's electronic filing system.


<u>/s/ James L. Hilburn</u>
JAMES L. HILBURN

5