CASE NO. 14-30067

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

———————————

ELZIE BALL; NATHANIEL CODE; JAMES MAGEE,

*Plaintiffs-Appellees,*

v.

JAMES M. LEBLANC, SECRETARY, DEPARTMENT OF
PUBLIC SAFETY AND CORRECTIONS; BURL CAIN, WARDEN,
LOUISIANA STATE PENITENTIARY; ANGELIA NORWOOD,
WARDEN OF DEATH ROW; LOUISIANA DEPARTMENT OF
PUBLIC SAFETY AND CORRECTIONS,

*Defendants-Appellants.*

———————————

Appeal from The United States District Court,
Middle District of Louisiana, Case No. 3:13-cv-00368
Hon. Brian A. Jackson

———————————

**APPELLEES' PRINCIPAL AND RESPONSE BRIEF**

———————————

Mercedes Montagnes, LA Bar
No. 33287 (Lead Counsel)
Elizabeth Compa, LA Bar No. 35004
The Promise of Justice Initiative
636 Baronne Street
New Orleans, LA  70113
Telephone:  (504) 529-5955
Facsimile:  (504) 558-0378
mmontagnes@thejusticecenter.org
bethc@thejusticecenter.org

Steven Scheckman, LA Bar No. 08472
Schiff, Scheckman & White LLP
829 Baronne Street
New Orleans, LA  70113
Telephone:  (504) 581-9322
Facsimile:  (504) 581-7651
steve@sswethicslaw.com

Mitchell A. Kamin, CA Bar No. 202788
Jessica Kornberg, CA Bar No. 264490
Nilay U. Vora, CA Bar No. 268339
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California  90067-2561
Telephone:  (310) 201-2100
Facsimile:  (310) 201-2110
mak@birdmarella.com
jck@birdmarella.com
nuv@birdmarella.com

*Attorneys for Plaintiffs-Appellees*

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 28.2.1, the undersigned counsel of record certifies that the following listed persons have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal:

1. *PLAINTIFFS-APPELLEES*:  ELZIE BALL, NATHANIEL CODE, AND JAMES MAGEE;

2. *ATTORNEYS FOR PLAINTIFFS-APPELLEES*:  MERCEDES MONTAGNES, ELIZABETH COMPA, AND THE PROMISE OF JUSTICE INITIATIVE;

3. *ATTORNEYS FOR PLAINTIFFS-APPELLEES*:  MITCHELL A. KAMIN, JESSICA C. KORNBERG, NILAY U. VORA, AND THE LAW FIRM OF BIRD, MARELLA, BOXER, WOLPERT, NESSIM, DROOKS, LINCENBERG & RHOW, P.C.;

4. *ATTORNEYS FOR PLAINTIFFS-APPELLEES*:  STEVEN SCHECKMAN AND THE LAW FIRM OF SCHIFF, SCHECKMAN & WHITE, LLP;

5. *DEFENDANTS-APPELLANTS*:  JAMES M. LEBLANC, SECRETARY OF THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS; BURL CAIN, WARDEN OF THE LOUISIANA STATE PENITENTIARY; ANGELA NORWOOD, WARDEN OF DEATH ROW; AND THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS;

6. *ATTORNEYS FOR DEFENDANTS-APPELLANTS*:  E. WADE SHOWS, JAMES L. HILBURN, AMY L. MCINNIS, JACQUELINE B. WILSON, AND THE LAW FIRM OF SHOWS, CALI & WALSH, LLP;

7. *ATTORNEYS FOR DEFENDANTS-APPELLANTS*:  THOMAS E. BALHOFF, JUDITH R. ATKINSON, CARLTON JONES III, AND THE LAW FIRM OF ROEDEL, PARSONS, KOCH, BLACHE, BALHOFF & MCCOLLISTER;

8. *ATTORNEYS FOR DEFENDANTS-APPELLANTS*:  S. BROOKE BARNETT BERNAL, LATOYA D. JORDAN, MICHAEL A. PATTERSON, AND THE LONG LAW FIRM, LLP; AND

9. *ATTORNEYS FOR DEFENDANTS-APPELLANTS*:  JOHN LANE EWING, JR., AND THE LAW FIRM OF CAZAVOUX EWING, LLC.

Respectfully Submitted:

*s/ Mercedes Montagnes*
Mercedes Montagnes, LA Bar No. 33287
(Lead Counsel)
Elizabeth Compa, LA Bar No. 35004
The Promise of Justice Initiative
636 Baronne Street
New Orleans, LA  70113
Telephone:  (504) 529-5955
Facsimile:  (504) 558-0378
mmontagnes@thejusticecenter.org
bethc@thejusticecenter.org

Nilay U. Vora, CA Bar No. 268339
Mitchell A. Kamin, CA Bar No. 202788
Jessica Kornberg, CA Bar No. 264490
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California  90067-2561
Telephone:  (310) 201-2100
Facsimile:  (310) 201-2110
mak@birdmarella.com
jck@birdmarella.com
nuv@birdmarella.com

Steven Scheckman, LA Bar No. 08472
Schiff, Scheckman & White LLP
829 Baronne Street
New Orleans, LA  70113
Telephone:  (504) 581-9322
Facsimile:  (504) 581-7651
steve@sswethicslaw.com

*Attorneys for Plaintiffs-Appellees*

**Oral Argument**

The question presented by Plaintiffs-Appellees ("Plaintiffs") with respect to the treatment of thermoregulation as a major bodily function under the Americans with Disabilities Act Amendments Act is one of first impression and appropriate for oral argument.

Plaintiffs are, of course, also prepared to discuss the proper and straightforward analysis that was the basis for the district court's narrow and fact-specific findings on Plaintiffs' successful claims under the Eighth Amendment. Plaintiffs would welcome the opportunity to clarify the incorrect statements of fact included in Defendants-Appellants' brief as well as the discovery misconduct that lead to the district court's credibility findings and monetary sanctions.

# TABLE OF CONTENTS

**Page**

I.   STATEMENT OF JURISDICTION ................................................................1

II.  STATEMENT OF ISSUES ..........................................................................1

III. STATEMENT OF THE CASE .....................................................................2

    A.   Factual Background....................................................................................2

    B.   The Complaint and Motion for Preliminary Injunction ......................6

    C.   The Heat Index Data from Death Row ..................................................7

    D.   The Discovery Sanctions Against Defendants....................................8

    E.   The District Court's Ruling and Order Following Trial ......................9

    F.   The Injunctive Relief................................................................................12

    G.   The Appeal ................................................................................................12

IV.  SUMMARY OF ARGUMENT....................................................................12

V.   STANDARD OF REVIEW..........................................................................15

VI.  RESPONSE ARGUMENT..........................................................................17

    A.   The District Court Correctly Found an Eighth Amendment
         Violation. .................................................................................................17

         1.   The district court, relying on extensive factual evidence,
             correctly concluded that the conditions on Angola's death
             row violate the Eighth Amendment. ........................................18

             a.   The conditions on Angola's death row
                 created substantial risk of serious harm to
                 Plaintiffs' health................................................................18

                 (i)   The heat levels at Angola created
                      a substantial risk of serious harm to
                      Plaintiffs' health. ...................................................18

(ii)    The district court's finding of a substantial risk of serious harm to Plaintiffs' health resulting from the heat is correct...........................21

(iii)    The district court found that the remedial measures previously upheld by this Court were not present at Angola...................................24

b.    The district court based its finding that the conditions on death row create a substantial risk of serious harm to Plaintiffs on proper, reliable evidence. ........................................................................26

(i)    The district court did not clearly err in using the heat index as the measure of conditions consistent with this Court's precedent. ...............26

(ii)    The district court's opinion appropriately referenced reliable secondary sources..................28

2.    The district court did not err in finding that Defendants were deliberately indifferent to the substantial risk of harm to Plaintiffs' health. ........................................................31

a.    Defendants had knowledge of the risk of heat-related illness because the risk was obvious. .........31

b.    Defendants had knowledge of the risk of heat-related illness based on circumstantial evidence. ........................................................................32

B.    The District Court Ordered an Appropriate Remedy to the Eighth Amendment Violation. .........................................................36

1.    The district court did not err in its conclusion that Plaintiffs were entitled to injunctive relief. ..............................36

a.    Plaintiffs' exposure to substantial health risks constituted irreparable harm. ..........................................36

b.    Plaintiffs' irreparable injury outweighed injury to Defendants. ....................................................................37

c.    The public interest was served by an injunction remedying the violation of constitutional rights.............39

2.    The district court complied with the PLRA and did not abuse its discretion when it fashioned the injunctive relief. .......................................................................39

a.    The district court did not misapply the law of *Gates* when it fashioned its injunctive relief. ................40

(i)    Because Eighth Amendment violations are determined by the totality of the circumstances, no single precedent can establish a static test for minimally sufficient conditions. ..........................................................40

(ii)    The district court found that *Gates*-type relief is insufficient...............................................41

(iii)    The district court fashioned its relief based on expert recommendations. ...............................44

3.    The procedure employed by the district court in fashioning the remedy is consistent with Supreme Court precedent and plainly meets the PLRA's requirements of necessary, narrow, and non-intrusive injunctions....................46

VII.   CROSS-APPEAL ARGUMENT ..................................................50

A.   The district court committed reversible error in finding that Plaintiffs were not disabled..............................................50

1.    The ADAAA expanded the definition of disability..................52

2.    The District Court failed to apply the ADAAA definition of disability. ...............................................................55

3.    Under the ADAAA definition, Plaintiffs have disabilities.......56

a.    Plaintiffs' uncontrolled hypertension substantially impairs thermoregulation................................................57

b.  Plaintiffs' medications for hypertension substantially limit their ability to thermoregulate. .........59

c.  Ball's diabetes substantially limits his ability to thermoregulate. ................................................62

d.  Ball's diabetic condition also affects the major bodily function of operation of the endocrine system and seeing. ...........................................63

e.  Magee's psychotropic medication substantially limits his ability to thermoregulate................................65

B.  The district court's error was prejudicial. ...........................................66

1.  Defendant DOC is subject to Title II of the ADA and Section 504 of the RA.................................................66

2.  The DOC discriminated against Plaintiffs and violated the DOC's obligations under the ADA and RA. .....................67

a.  The DOC refused to provide Plaintiffs with a reasonable modification despite Plaintiffs' requests. .......................................................67

b.  The DOC discriminated by applying neutral policies that had a disparate impact on Plaintiffs as a result of Plaintiffs' disabilities....................................71

VIII.  CONCLUSION...........................................................72

ument 00512779550    Page: 10    Date Filed: 09/23/2014

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alberti v. Klevenhagen,*
  790 F.2d 1220 (5th Cir 1986) ...........................................................................15

*Alexander v. Choate,*
  469 U.S. 287 (1985)...........................................................................................68

*Armstrong v. Schwarzenegger,*
  622 F.3d 1058 (9th Cir. 2010) ..............................................................47, 50, 72

*Arthur J. Gallagher & Co. v. Babcock,*
  339 F. App'x 384 (5th Cir. 2009)......................................................................66

*Bennett-Nelson v. Louisiana Bd. of Regents,*
  431 F.3d 448 (5th Cir. 2005) ..................................................................67, 68, 69

*Berry v. T-Mobile USA, Inc.,*
  490 F.3d 1211 (10th Cir. 2007) .........................................................................16

*Blackard v. Livingston Parish Sewer Dist.,*
  No. 12-704, 2014 U.S. Dist. LEXIS 5490 (M.D. La. Jan. 14, 2014) ................58

*Blackmon v. Garza,*
  484 F. App'x 866 (5th Cir. 2012) (unpublished)......................................*passim*

*Bounds v. Smith,*
  430 U.S. 817 (1977)...........................................................................................49

*Bragdon v. Abbott,*
  524 U.S. 624 (1998)...........................................................................................55

*Brown v. Plata,*
  131 S. Ct. 1910 (2011)...............................................................................*passim*

*Canfield v. Movie Tavern, Inc.,* 29 Am. Disabilities Cas.
  (BNA) 430 (E.D. Pa. Dec. 12, 2013)...........................................................53, 54

*Carmona v. Southwest Airlines Co.,*
  604 F.3d 848 (5th Cir. 2010) .............................................................................16

*Chandler v. Crosby*,
   379 F.3d 1278 (11th Cir. 2004) .......................................................25

*Clark v. Prichard*,
   812 F.2d 991 (5th Cir. 1987) ...........................................................36

*Cordova v. Univ. of Notre Dame Du Lac*,
   936 F. Supp. 2d 1003 (N.D. Ind. 2013) ...........................................55

*Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co*,
   704 F.3d 413 (5th Cir. 2013) ...........................................................29

*EEOC v. Agro Distribution, LLC*,
   555 F.3d 462 (5th Cir. 2009) ...........................................................56

*EEOC v. Chevron Phillips Chem. Co., LP*,
   570 F.3d 606 (5th Cir. 2009) ...........................................16, 53, 54

*Elrod v. Burns*,
   427 U.S. 347 (1976)..........................................................................36

*Estelle v. Gamble*,
   429 U.S. 97 (1976)............................................................................26

*Farmer v. Brennan*,
   511 U.S. 825 (1994)..................................................................17, 32

*Figgs v. Quick Fill Corp.*,
   766 F.2d 901 (5th Cir. 1985) ...........................................................30

*Funk v. Stryker Corp.*,
   631 F.3d 777 (5th Cir. 2011) ...........................................................29

*Garner v. Chevron Phillips Chemical Co., L.P.*,
   834 F. Supp. 2d 528 (S.D. Tex. 2011).......................................58, 59

*Garrett v. Thaler*,
   560 F. App'x 375 (5th Cir. 2014) ....................................................67

*Gates v. Collier*,
   501 F.2d 1291 (5th Cir. 1974) .............................................24, 37, 68

*Gates v. Cook,*
    376 F.3d 323 (5th Cir. 2004) .......................................................................*passim*

*Gisclair v. Galliano Marine Serv.,*
    No. 05-5223, 2007 U.S. Dist. LEXIS 99004 (E.D. La. Apr. 30, 2007) .............28

*Gogos v. AMS Mech. Sys., Inc.,*
    737 F.3d 1170 (7th Cir. 2013) ...................................................................58, 59

*Gonzales v. City of New Braunfels, Tex.,*
    176 F.3d 834 (5th Cir. 1999) ...........................................................................71

*Gore v. Turner,*
    563 F.2d 159 (5th Cir. 1977) ...........................................................................40

*Graves v. Arpaio,*
    623 F.3d 1043 (9th Cir. 2010) ....................................................................45, 46

*Hadix v. Caruso,*
    492 F. Supp. 2d 743 (W.D. Mich. 2007) .........................................................19

*Hale v. King,*
    642 F.3d 492 (5th Cir. 2011) ...........................................................................54

*Helling v. McKinney,*
    509 U.S. 25 (1993)............................................................................................26

*Hooven-Lewis v. Caldera,*
    249 F.3d 259 (4th Cir. 2001) ...........................................................................16

*Hudson v. Palmer,*
    468 U.S. 517 (1984)..........................................................................................17

*Ivy v. Jones,*
    192 F.3d 514 (5th Cir. 1999) ...........................................................................15

*Johnson v. Pearson,*
    316 F. Supp. 2d 307 (E.D.Va. 2004) ...............................................................34

*Jones-El v. Berge,*
    374 F.3d 541 (7th Cir. 2004) ...........................................................................46

*Justiss Oil, Co., Inc. v. Kerr-McGee Refining Corp.*,
  75 F.3d 1057 (5th Cir. 1996) ............................................................35

*Koller v. Riley Riper Hollin & Colagreco*,
  850 F. Supp. 2d 502 (E.D. Pa. 2012) ...............................................63

*Kravtsov v. Town of Greenburgh*,
  No. 10-3142, 2012 U.S. Dist. LEXIS 94819 (S.D.N.Y. July 9, 2012) .............54

*Lewis v. Casey*,
  518 U.S. 343 (1996) ...............................................................39, 47

*Little v. Shelby Cnty., Tenn.*,
  No. 96-2520, 2003 WL 23849734 (W.D. Tenn. Mar. 25, 2003) ......................50

*McClain v. Lufkin Indus., Inc.*,
  519 F.3d 264 (5th Cir. 2008) ......................................................16, 46

*McClure v. Ashcroft*,
  335 F.3d 404 (5th Cir. 2003) ...........................................................16

*Moore v. Chilton County Bd. of Educ.*,
  No. 12-424, 2014 U.S. Dist. LEXIS 26631 (M.D. Ala. Mar. 3, 2014) ..............54

*Morales Feliciano v. Calderon Serra*,
  300 F. Supp. 2d 321 (D.P.R. 2004), *aff'd*, 378 F.3d 42
  (1st Cir. 2004), *cert. denied*, 543 U.S. 1054 (2005) ..........................50

*Neely v. PSEG Tex., Ltd. P'ship*,
  735 F.3d 242 (5th Cir. 2013) ...........................................................52

*Nobby Lobby, Inc. v. City of Dallas*,
  970 F.2d 82 (5th Cir. 1992) ............................................................39

*Norton v. Assisted Living Concepts, Inc.*,
  786 F. Supp. 2d at 1185 ............................................................53, 54

*Orduna S.A. v. Zen-Noh Grain Corp.*,
  913 F.2d 1149 (5th Cir. 1990) .........................................................27

*Pa. Dep't of Corr. v. Yeskey*,
  524 U.S. 206 (1998) ...................................................................66

*Pace v. Bogalusa City School Board,*
    403 F.3d 272 (5th Cir.) (en banc) .................................................66, 68

*Pinckney v. Fed. Reserve Bank of Dallas,*
    2013 WL 5461873 (W.D. Tex.)...........................................................63

*Raytheon Co. v. Hernandez,*
    540 U.S. 44 (2003)...............................................................................71

*Reich v. Lancaster,*
    55 F.3d 1034 (5th Cir. 1995) ..............................................................35

*Rhodes v. Chapman,*
    452 U.S. 337 (1981).............................................................................41

*Rico v. Xcel Energy, Inc.,*
    893 F. Supp. 2d 1165 (D.N.M. 2012)..................................................54

*Ruff v. Godinez,* No. 91-7242, 1993 U.S. Dist. LEXIS 8745, at *12
    (N.D. Ill. June 28, 1993) .....................................................................28

*Ruiz v. Estelle,*
    679 F.2d 1115, *amended in part, vacated in part,*
    688 F.2d 266 (5th Cir. 1982) ..........................................15, 27, 39, 44

*School Board of Nassau County v. Arline,*
    480 U.S. 273 (1987).............................................................................69

*Shinseki v. Sanders,*
    556 U.S. 396 (2009).............................................................................30

*Smith v. Sullivan,*
    553 F.2d 373 (5th Cir. 1977) ...............................................24, 37, 45

*Southeastern Community College v. Davis,*
    442 U.S. 397 (U.S. 1979).....................................................................51

*Spaulding v. U.S.,*
    241 Fed. Appx. 187 (5th Cir. 2007).....................................................15

*Spectators' Commc'n Network Inc. v. Colonial Country Club,*
    253 F.3d 215 (5th Cir. 2001) ...............................................................66

*Stewart v. Winter,*
   669 F.2d 328 (5th Cir. 1982) ............................................................37

*Summers v. Altarum Inst., Corp.,*
   740 F.3d 325 (4th Cir. 2014) .......................................................51, 54

*Sutton v. United Air Lines, Inc.,*
   527 U.S. 471 (1999)...........................................................................52

*Swann v. Charlotte-Mecklenburg Bd. of Educ.,*
   402 U.S. 1, 15 (1971).........................................................................15

*Szarawara v. Cnty. of Montgomery,*
   No. 12-5714, 2013 WL 3230691 (E.D. Pa. June 27, 2013) ..............64

*Tillery v. Owens,*
   907 F.2d 418 (3d Cir. 1990) ..............................................................46

*Toyota Motor Mfg., Kentucky Inc. v. Williams,*
   534 U.S. 184 (2002)......................................................................52, 55

*U. S. v. Articles of Device, etc.,*
   481 F.2d 434 (10th Cir. 1973) ...........................................................30

*U.S. v. Georgia,*
   546 U.S. 151 (2006)...........................................................................68

*U.S. v. Jamestown Ctr.-In-The-Grove Apartments,*
   557 F.2d 1079 (5th Cir. 1977) ...........................................................40

*Valigura v. Mendoza,*
   265 Fed. Appx. 232 (5th Cir. 2008) (unpublished) .....................19, 25

*Verser v. Elyea,*
   113 F. Supp. 2d 1211 (N.D.Ill. 2000)................................................34

*Walker v. City of Mesquite,*
   402 F.3d 532 (5th Cir. 2005) .............................................................15

*Williams v. Edwards,*
   547 F.2d 1206 (5th Cir. 1977) .....................................................41, 49

*Willoughby v. Connecticut Container Corp.*,
  No. 11-992, 2013 WL 6198210 (D. Conn. Nov. 27, 2013)................................62

*Wilson v. Seiter*,
  501 U.S. 294 (1991)............................................................................................18

*Woods v. Edwards*,
  51 F.3d 577 (5th Cir. 1995) ...............................................................................23

## Statutes

18 U.S.C. § 3626(a)(1)............................................................................................47

28 U.S.C. § 1291 .......................................................................................................1

Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* .........................*passim*

Americans with Disabilities Act Amendments Act..........................................*passim*

Prison Litigation Reform Act, 18 U.S.C. § 3626.............................................*passim*

Rehabilitation Act, 29 U.S.C. § 701, *et seq.* ..................................................*passim*

## Other Authorities

28 C.F.R. § 35.130(b)(7)..........................................................................................70

28 C.F.R. § 35.152(b)(3)..........................................................................................67

29 C.F.R. § 1630.2 ............................................................................................*passim*

79 Fed. Reg. 4839, 4840 (DOJ Jan. 30, 2014)........................................................54

First Amendment......................................................................................................36

Eighth Amendment .............................................................................................*passim*

Federal Rules of Appellate Procedure .....................................................................2

Federal Rules of Evidence ................................................................................28, 29

Federal Rules of Civil Procedure ..........................................................................46

## I.    STATEMENT OF JURISDICTION

Under 28 U.S.C. § 1291, jurisdiction exists over the cross-appeal of Plaintiffs-Appellees ("Plaintiffs") as a properly noticed appeal from a final judgment of a district court.

## II.    STATEMENT OF ISSUES

1.    Whether the district court clearly erred in finding that prolonged exposure to a heat index exceeding 88º with ineffective remedial measures violates the Eighth Amendment.

2.    Whether the district court clearly erred in finding that Defendants were deliberately indifferent to the substantial risk of serious harm to Plaintiffs' health.

3.    Whether the district court abused its discretion in ordering Defendants to create and implement a plan to mitigate the risk to Plaintiffs' health by ensuring the heat index did not exceed 88º.

4.    Whether the district court applied the incorrect statutory definition of disability in its finding that Plaintiffs were not disabled and protected under the Americans with Disabilities Act and Rehabilitation Act.

## III.   STATEMENT OF THE CASE

Summers in South Louisiana are hot and humid; the heat has caused deaths in Louisiana.[1]  Prisoners on Angola's death row, confined to their cells for 23 hours a day, have limited access to the remedial measures available to the general public.  Those with medical conditions are even more susceptible to heat-related illness.

### A.   Factual Background

Plaintiffs/Cross-Appellants Elzie Ball ("Ball"), Nathaniel Code ("Code"), and James Magee ("Magee") (together, "Plaintiffs") are death row inmates at the Louisiana State Penitentiary in Angola, Louisiana ("Angola").[2]  Ball is 60 and suffers from hypertension and diabetes.[3]  Ball's blood pressure is "uncontrolled" and "spikes" in the summer months.[4]  An Angola physician told Ball that "sooner or later [he is] going to stroke out."[5]  Code is 57 and suffers from hypertension and

---

[1] PLS_EX_127-0019-0021.  Trial Exhibits lodged with the district court, while part of the official record on appeal pursuant to Fed. R. App. Proc. 10(a), are not in the electronic Record on Appeal ("ROA").  Per the Fifth Circuit Clerk's recommendation, Plaintiffs have not sought to supplement the ROA, but have provided citations to Plaintiffs' Trial Exhibits as follows:  PLS_EX_[Exhibit Number]-[Page Number], corresponding to the numbering of the Trial Exhibits.

[2] ROA.4958.

[3] References to age are as of trial date.  ROA.4974.

[4] ROA.4974.

[5] ROA.4974.

hepatitis.[6]  Magee is 35 and suffers from hypertension, high cholesterol, and

depression.[7]  Plaintiffs take various medications to treat their conditions.[8]

In *2006,* the Louisiana Department of Public Safety and Corrections (the

"DOC") constructed a new death row facility at Angola.[9]  The 25,000 square foot

facility includes four housing wings (three in use for death row), each of which

contains two housing tiers (the "tiers") where inmates' cells are located; offices,

visitation rooms, clinic rooms, and a control center where the correctional officers

are stationed.[10]  While there is heating throughout these areas, air conditioning is

provided in all areas *except* the tiers where inmates are housed.[11]  Instead, the tiers

have a ventilation system—with one six-inch-by-eight-inch vent per cell—that

uses "outside air" to ventilate the space.[12]  "Heat alerts" at Angola are issued when

the outdoor temperature exceeds 90º, and according to an Angola Captain, these

alerts are issued daily in the summer.[13]  According to the architect who oversaw

construction of the death row facility, the temperature and humidity in the cells are

---

[6] ROA.4975-4976.

[7] ROA.4977-4978.

[8] ROA.4974-4978.

[9] ROA.4968.

[10] ROA.4968.

[11] ROA.4968-4969.

[12] ROA.4970, ROA.4973, ROA.5732.

[13] ROA.5740:6-9.

"subject to" the conditions outside of the facility, and it "would not be any cooler inside than it is outside."[14]

Plaintiffs are confined to their cells for 23 hours per day.[15]  It is undisputed that Plaintiffs are frequently moved between tiers.[16]  Plaintiffs have limited access to remedial measures.  They have no direct access to ice while confined to their cell.[17]  During their hour outside their cell, Plaintiffs can access ice from a 48- or 64-ounce ice chest located on the tiers.[18]  The ice chest on Plaintiffs' tiers, however, "frequently runs out" of ice over the course of the day, and Plaintiffs cannot access it during the overnight hours when the tiers are locked down.[19]  The drinking water from Plaintiffs' sinks is "lukewarm."[20]  Plaintiffs are allowed one shower each day in water heated between 100º and 120º.[21]  The tiers are equipped with one non-oscillating 30-inch fan for every two inmates.[22]  The fans were not part of the original construction.[23]  When operating, the fans do not provide equal

---

[14] ROA.4973-4974, ROA.5730-5732.

[15] A description of Plaintiffs' cells is in the record at ROA.4968-72, ROA.4970.

[16] ROA.5053.

[17] ROA.4971-4972, ROA.4978.

[18] ROA.4971-4972.

[19] ROA.4972.

[20] ROA.4996.

[21] ROA.4971.

[22] ROA.4970.

air flow to each cell.[24]  The fans occasionally break and are not always immediately fixed.[25]  Further, the "windows" at the facility do not open wide, rather they are louvers which do not provide for the same air flow as traditional windows.[26]

Despite Plaintiffs' efforts to utilize available resources, the existing measures do not provide relief from the heat.[27]  Heat levels at night remain so high that Ball and Code's sleep patterns are disturbed.[28]  Code stated that his cell receives "direct sunlight" through a window, he "languishes" in the heat from "sunrise until approximately 2:00 A.M.," and that he attempts to lie as still as possible to avoid overheating.[29]  Magee described his cell as a "sauna" in the morning and an "oven" in the afternoon.[30]  The heat conditions on the tiers cause Plaintiffs to endure nausea, sweating, swelling of joints, painful inflammation of

---

[23]  ROA.4970.

[24] ROA.4996.

[25] ROA.4975.

[26] ROA.4970.

[27] The district court's site visit confirmed that, "in the Court's observation, the windows, fans, and cell vents did not provide a cooling effect or relief from the heat conditions in the tier."  ROA.4995.

[28] ROA.4975-4978.

[29] ROA.4975-4978.

[30] ROA.4975-4978.

keloid scars, dizziness and lightheadedness, and headaches.[31]

In 2012, Plaintiffs each filed grievances under Angola's administrative remedy procedures describing their medical conditions and medications, symptoms suffered because of the heat, and inability to alleviate the conditions.[32]  Each requested accommodations in the form of "any" effective cooling mechanism and a safer housing environment.[33]  Each grievance was denied by Defendant Norwood and subsequently denied on appeal by Defendant James LeBlanc.[34]  Plaintiffs also attempted to resolve their concerns about the heat through correspondence with Defendants Norwood, Cain, and LeBlanc, but these efforts were fruitless.[35]

## B.    The Complaint and Motion for Preliminary Injunction

In 2013, having exhausted administrative remedies, Plaintiffs filed the complaint alleging violations of the Eighth Amendment, the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*  ("ADA"), and the Rehabilitation Act, 29 U.S.C. § 701 *et seq.* ("RA").[36]  Plaintiffs sought injunctive relief in the form of an order requiring maintenance of the heat index in Plaintiffs' cells at safe, humane

---

[31] ROA.4975-4978.

[32] PLS_EX_39-48.

[33] PLS_EX_39-48.

[34] PLS_EX_39-48.

[35] PLS_EX_32-35, PLS_EX_39-48, ROA.5696-5697, ROA.5714.

[36] ROA.24-35.

levels.[37]  The district court deferred any preliminary injunctive relief pending the collection of heat index data from the tiers.[38]

### C.    The Heat Index Data from Death Row

Between July 15 and August 5, 2013 (the "data collection period"), a neutral expert collected temperature, humidity, and heat index data on the tiers pursuant to the district court's order (the "Data").[39]  The Data confirmed that "the temperature, humidity, and heat index *inside* the tiers were, more often than not, the same or higher than the temperature, humidity, and heat index recorded *outside* the tiers."[40] The heat index on each tier exceeded 104° at various times; some reached 110°.[41]

---

[37] ROA.76-567.

[38] ROA.2558-2560.

[39] ***Defendants' summary of does not reflect the Data submitted to the Court.*** Original Brief of Defendants Appellants ("Def. Br.") at 3, n.5 (citing ROA.4429-4430).  Defendants cite to their own proposed findings filed in the district court, not the Data.  Defendants state that "there [sic] only temperature exceeding 90° (90.6°) was on Tier C" and that "the heat index very rarely exceeded 99°."  ***This is false.***  The data show that the temperature exceeded 90° on all six tiers during the monitoring period; there were extended periods on all tiers of eight hours to several days where the heat index exceeded 99°–in fact, it exceeded 100° on Tier A on five days, Tier B on 10 days, Tier C on 13 days, Tier F on eight days, Tier G on 15 days, and Tier H on seven days.  ROA.4981-4993.

[40] ROA.4979-4980.

[41] The district court's summary of the heat index data is provided at ROA.4979-4993.  The Data is provided in JOINT_EX_1.

There were extended periods where the heat index did not drop below 99º, including five straight days on Tier G and three on Tier C.[42]

### D.     The Discovery Sanctions Against Defendants

The district court sanctioned Defendants for discovery misconduct in two areas.  First, Defendants modified the death row facilities "under cover of darkness" by installing "awnings" to shade tier windows and "soaker hoses" to cool the outside walls while the court ordered data was being recorded. Defendants made these modifications without the district court's permission and without informing Plaintiffs, despite repeated discovery requests.  The district court found that Defendants' actions were in "bad faith," and made "on the two tiers exhibiting the highest recorded temperatures and heat indices," amounting to spoliation.  Ultimately, "although the temperature, humidity, and heat index each remained dangerously high after Defendants' installation of awnings and soaker hoses, the [court could] not be sure that the readings would not have been higher absent Defendants' actions."[43]

Second, Defendants were sanctioned for their "failure to timely disclose information regarding the cost of installation of air-conditioning in Angola's death row tiers."  "Defendants put the cost of installing air-conditioning at issue from the

---

[42] JOINT_EX_1

[43] ROA.5060-5076, ROA.5088-5099.

outset," but "repeatedly refused to answer Plaintiffs' interrogatories" seeking these costs, despite the Magistrate Judge ordering them to do so. Defendants' expert witness "adamantly and repeatedly insisted" that he could not estimate such costs, but after the expert discovery deadline—just one business day before trial— produced an "emailed report" dated several days earlier stating the cost could be "as high as $1,860,000."[44]

The district court sanctioned Defendants, ordering payment of Plaintiffs' fees related to the violations.[45]

### E.    The District Court's Ruling and Order Following Trial

In August 2013, the district court held a three-day trial on the merits. Following the trial, the district court conducted an in-person site visit of the facility.[46]

The district court issued findings of fact and conclusions of law in its Ruling and Order, granting in part and denying in part Plaintiffs' request for relief.[47]  The court found that the heat index levels on the tiers, together with Plaintiffs' medical conditions, caused a substantial risk of serious harm to Plaintiffs' health.[48]  The

---

[44] ROA.5076-5085, ROA.5099-5106.

[45] ROA.5107-5109.

[46] ROA.4994-4996.

[47] ROA.4957-5058.

[48] ROA.5003-5012.

court adopted the conclusion of Plaintiffs' expert Dr. Vassallo[49] that "the heat conditions . . . (1) put all three Plaintiffs at risk of heat-related illnesses, including heat stroke; and (2) worsened Plaintiffs' underlying medical conditions."[50] Dr. Vassallo emphasized that even healthy individuals with controlled blood pressure "are at risk of serious harm in heat conditions like those in the death row tiers."[51]  The symptoms Plaintiffs suffer as a result of the heat are "symptoms that people will describe when they're entering a phase of heat exhaustion."[52]  Plaintiffs are at "imminent risk of severe physical harm due to the heat conditions on death row," and "it's just a matter of time until . . . heat stroke or myocardial infarction or stroke arises because of the temperatures on death row."[53]  The district court noted that her testimony was "largely uncontroverted" and that Defendants "failed to rebut Dr. Vassallo's testimony."[54]

---

[49] Dr. Vassallo was the medical expert at the trial in *Gates v. Cook,* 376 F.3d 323 (5th Cir. 2004).  She testified that the conditions at Angola are worse than those in *Gates*.  ROA.6061:6-7.

[50] ROA.5006.

[51] ROA.5008.

[52] ROA.5008.

[53] ROA.5009.

[54] ROA.5011.

The district court found that Defendants were deliberately indifferent to these risks.[55]  The risks to Plaintiffs' health were obvious, and Defendants had actual knowledge because Defendants walk in death row "regularly" and "closely monitor" the temperature on the death row tiers "every two hours" each day "to ensure that they do not reach unacceptable levels."[56]  Defendants also received Plaintiffs' grievances in which they expressed concern that they were at risk of heat-related illness, but denied any relief.[57]  Defendants "did not take any actions" to remedy the heat conditions.[58]  Further, Defendants "failed to abide by their own policies and regulations when they failed to add Plaintiff Magee, who is on psychotropic medication, to Angola's 'Heat Precautions List.'"[59]

Plaintiffs prevailed on their Eighth Amendment claim.[60]

The district court denied any relief for Plaintiffs' disability claims, finding that Plaintiffs had failed to show that they were disabled.[61]

---

[55] ROA.5019-5044.  The court also found that Defendant Norwood lacked credibility.  ROA.4962-4968.

[56] ROA.5023-5026.

[57] ROA.5020-5021.

[58] ROA.5027-5032.

[59] ROA.5032-5034.

[60] ROA.5032-5034.

[61] ROA.5044-5050.

### F.    The Injunctive Relief

In order to remedy the Eighth Amendment violations, the district court adopted Dr. Vassallo's recommendation that a maximum heat index of 88º be maintained on the tiers.  The district court ordered Defendants to develop a plan within 60 days to achieve this maximum heat level.[62]  After Defendants submitted their proposed plan[63] and Plaintiffs responded without opposition to the proposal,[64] the district court ordered the plan's implementation virtually unchanged.[65]  This Court stayed the district court's order requiring implementation of Defendants' proposed plan pending appeal.[66]

### G.    The Appeal

Defendants filed their Notice of Appeal of the district court's ruling on the Eighth Amendment claims.  Plaintiffs filed their Notice of Appeal of the district court's ruling on the disability claims following entry of final judgment.[67]

## IV.   SUMMARY OF ARGUMENT

**The district court did not err in finding that the conditions of confinement on Angola's death row violate the Eighth Amendment.**  The

---

[62] ROA.5053.

[63] This plan is different than anything discussed at trial.  ROA.5393-5421.

[64] ROA.5488-5491.

[65] ROA.6839.

[66] ROA. 6858.

[67] ROA.6853-6854.

uncontroverted temperature, humidity, and heat index data from Angola's death row revealed an environment that poses significant health risks to inmates who are confined to their cells for 23 hours per day. Not even the remedial measures previously ordered by this Court in *Gates* were present. Faced with this overwhelming evidence in the record, Defendants take a kitchen-sink approach, asserting a variety of errors in the district court's findings. None of these asserted errors is supported by the law nor do they meet the clear error requirement. Most importantly, Defendants fail to show any prejudice resulting from the asserted errors. Plainly, reversal of the district court's findings is unwarranted.

**The district court did not abuse its discretion in fashioning its injunctive relief.** Defendants next assert that the district court abused its discretion in fashioning injunctive relief. This assertion is based on a mischaracterization of the law and the proceedings below. Defendants object that the injunctive relief ordered by the district court exceeds that upheld by this Court in *Gates v. Cook*. This objection ignores Supreme Court precedent making clear that Eighth Amendment requirements cannot be satisfied by meeting any minimal set of standards—such as those set out in *Gates*. Rather, remedies should be fashioned in accordance with the specific circumstances of each case and based on expert recommendations designed to prevent the risks to prisoners' health. In fashioning its injunctive relief, the district court examined the specific circumstances at

Angola's death row and adopted expert testimony that substantial health risks exist whenever Plaintiffs are exposed to heat indices over 88º.

**The district court's order complied with the PLRA.**  Finally, Defendants object that the district court violated the PLRA's requirements that injunctions be narrow, necessary, and non-intrusive.  To the contrary, the district court's procedure in fashioning injunctive relief was consistent with Supreme Court guidance on injunctions in the prison setting and in compliance with the PLRA's requirements.  The district court ordered Defendants to prepare a plan to ensure the heat index does not exceed 88º and then ordered Defendants to implement their proposed plan.  Nothing in the record or in this procedural history suggests an abuse of discretion by the district court.

**The district court erroneously found Plaintiffs did not have disabilities.**  On Plaintiffs' disability claims, however, the district court erred when it concluded that Plaintiffs did not have disabilities and were not protected by the ADA and RA.  The district court based its conclusion on superseded statutory definitions of disability and now-abrogated case law applying those definitions.  Had the district court applied the correct definition of disability, the evidence was clear that Plaintiffs were disabled.  This error by the district court warrants remand for further proceedings on Plaintiffs' disability claims, in the event that this Court reverses the district court with respect to the Eighth Amendment.

14

## V.    STANDARD OF REVIEW

The district court's findings are reviewed for clear error on questions of fact and *de novo* on questions of law. *Ivy v. Jones*, 192 F.3d 514, 516 (5th Cir. 1999). Under the clear error standard, a finding of fact should not be overturned, unless "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Gates*, 376 F.3d at 333 (citing *Alberti v. Klevenhagen*, 790 F.2d 1220, 1224 (5th Cir 1986)). Put differently, "[a] factual finding is not clearly erroneous as long as it is plausible in the light of the record read as a whole." *Walker v. City of Mesquite*, 402 F.3d 532, 535 (5th Cir. 2005) (quotations omitted). *See also Spaulding v. U.S.*, 241 Fed. Appx. 187, 191 (5th Cir. 2007). "Even if the trial judge does commit error, it is presumed harmless until shown to be prejudicial. The complaining party must prove that the error was substantial and that it prejudiced his case." *Ruiz v. Estelle*, 679 F.2d 1115, 1129, *amended in part, vacated in part,* 688 F.2d 266 (5th Cir. 1982).

"A prison official has violated the Eighth Amendment when he 1) shows a subjective deliberate indifference to 2) conditions posing a substantial risk of serious harm to the inmate." *Gates*, 376 F.3d at 333. The district court's findings on each of these elements is subject to review for clear error. *Id.*

The district court's injunction order is reviewed for abuse of discretion. *Id.* (citing *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15-16 (1971)).

A district court abuses its discretion in fashioning injunctive relief if it: "(1) relies on clearly erroneous factual findings; (2) relies on erroneous conclusions of law; or (3) misapplies the law to the facts." *McClure v. Ashcroft*, 335 F.3d 404, 408 (5th Cir. 2003). If this Court finds that the district court erred in fashioning its injunction, the Court should remand for further proceedings as to the remedy. *See, e.g.*, *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 285 (5th Cir. 2008) (finding abuse of discretion in crafting injunction and remanding for further proceedings on details of injunctive relief).

Regarding the Cross-Appeal, under the ADA, the determination of whether an individual has a disability—an impairment that substantially limits a major life activity—is a mixed question of law and fact. *EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 616 (5th Cir. 2009).[68] What constitutes a major life activity is a question of law for the court to determine. *Id.* (determining that sleep is a major life activity as a matter of law and collecting authorities finding the same). *See also Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1216 (10th Cir. 2007) (same); *cf. Hooven-Lewis v. Caldera*, 249 F.3d 259, 268 (4th Cir. 2001) (same).

Whether a major life activity is "substantially limited" by the impairment is a question of fact. *See Carmona v. Southwest Airlines Co.*, 604 F.3d 848, 857 (5th

---

[68] While the *Chevron* definition of disability was overturned by the ADAAA, *Chevron* correctly states that the determination of disability is a mixed question of law and fact.

Cir. 2010) (leaving a determination of whether an activity is substantially limiting to a jury).  Because Plaintiffs appeal the district court's legal conclusions as to what major life activities were substantially impaired, these legal conclusions are reviewed *de novo*.

## VI.    RESPONSE ARGUMENT

### A.    The District Court Correctly Found an Eighth Amendment Violation.

"The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones."  *Gates,* 376 F.3d at 332 (citing *Farmer v. Brennan,* 511 U.S. 825, 832 (1994)).  Defendants must "provide humane conditions of confinement," must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"  *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).  The Eighth Amendment is violated where prison officials "1) show[] a subjective deliberate indifference to 2) conditions posing a substantial risk of serious harm to the inmate."  *Gates*, 376 F.3d at 333.  The district court did not err in its factual findings that Plaintiffs prevailed on both prongs.

1. **The district court, relying on extensive factual evidence, correctly concluded that the conditions on Angola's death row violate the Eighth Amendment.**

   a. **The conditions on Angola's death row created substantial risk of serious harm to Plaintiffs' health.**

      (i) **The heat levels at Angola created a substantial risk of serious harm to Plaintiffs' health.**

It is well-established that extremely hot or cold conditions can create a substantial risk of harm to inmates' health. *See, e.g.*, *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) ("low cell temperature at night combined with a failure to issue blankets" could rise to the level of an Eighth Amendment violation); *Blackmon v. Garza,* 484 F. App'x 866, 869 (5th Cir. 2012) (unpublished) ("Allowing a prisoner to be exposed to extreme temperatures can constitute a violation of the Eighth Amendment.")

This Court overturned the district court's entry of judgment as a matter of law on a Texas inmate's § 1983 claims that the heat levels in his dormitory exposed him to substantial health risks. *Blackmon,* 484 F. App'x at 872 (reasonable jury could find an Eighth Amendment violation where "extreme heat in [plaintiff's] dorm caused substantial health risks to [plaintiff]" and available remedial measures were inadequate). Notably, this decision was not based on heat measurements from the actual facility, relying instead on historical heat levels in

the area, which reached NOAA danger and extreme danger levels during summer months.  *Id.* at 870-71.

*Blackmon* is consistent with precedent including *Gates* which established that heat indexes lower than those recorded at Angola violated the Eighth Amendment.  *Gates*, 376 F.3d at 339-40; *see also Valigura v. Mendoza*, 265 Fed. Appx. 232, 235 (5th Cir. 2008) (unpublished) ("[T]emperatures consistently in the nineties without remedial measures . . . sufficiently increase the probability of death and serious illness so as to violate the Eighth Amendment."); *Hadix v. Caruso*, 492 F. Supp. 2d 743, 753 (W.D. Mich. 2007) ("Eighth Amendment […] violated by housing high-risk inmates in facilities which are routinely at heat index levels above 90 during summer months").

In this case, the Data shows even more extreme conditions,[69] with the temperature, humidity, and heat index remaining high, even at night.  Plaintiffs' expert David Garon noted that the data collection period "coincided with unusually mild weather for this area."  PLS_EX_97-0005.  Still, the court found that the Data "unequivocally established that inmates housed in each of the death row tiers are consistently, and for long periods of time, subjected to high temperatures and heat

---

[69] Plaintiffs' expert confirmed that conditions at Angola were worse than those in the *Gates* case.  Comparing conditions in this matter to those in *Gates*, Dr. Vassallo testified, "Angola is hotter.  So, in that sense I feel that the concerns are more pressing at Angola."  ROA.6061:6-7.

indices in the National Weather Service's ("NWS") 'caution,' 'extreme caution,' and 'danger' zones."  ROA.4994.



"[T]he heat index in all of the tiers exceeded 104 degrees at various times during the data collection period" and was often higher than the heat index outside. ROA.4980.  Even the tier with the lowest recorded data "nonetheless presented an alarming trend."  ROA.4980.[70]  On the hottest tiers, where the heat index reached 110.3°, the data "established that there were multiple, consecutive hours during which inmates . . . were subjected to heat indices up to twenty degrees higher than outside the housing tier."  ROA.4986, ROA.4991.  For example, the Data showed

---

[70] The district court provides an extensive summary of the Data in its opinion. ROA.4979-4994.

that the heat index in cell G16 were consistently in the "extreme caution zone" and

reached the "danger" zone for several days.[71]



On this record, the district court did not err.

**(ii)      The district court's finding of a substantial risk of serious harm to Plaintiffs' health resulting from the heat is correct.**

Plaintiffs presented extensive evidence of the health risks they face as

a result of prolonged exposure to extreme heat—evidence that was largely

uncontroverted.  Plaintiffs' expert Dr. Vassallo testified that Plaintiffs' medical

conditions and prescribed medications increase their susceptibility to heat-related

illness, and why conditions on death row constitute a substantial risk to Plaintiffs'

health and safety.  *See* ROA.5995:24-ROA.6061:7.  Dr. Vassallo also explained

---

[71] Plaintiffs include this graphical representation of the Data for purposes of
argument only.  Plaintiffs do not contend that this graph is part of the record.

the precipitous nature of a heatstroke emergency, ROA.6011:25-ROA.6012:13,

and why the lack of medical records demonstrating elevated body temperature did

not bear on whether Plaintiffs face a substantial risk of serious harm.

ROA.6049:20-ROA.6050:14, ROA.6059:15-ROA.6060:2.  Plaintiffs themselves

testified as to the symptoms they experience due to the summer heat.

ROA.5678:14-17, ROA.5680:16-5683:8 (Code), ROA.5754:7-ROA.5757:17,

ROA.5765:18-ROA.5766:2 (Ball), ROA.6204:2-ROA.6205:1 (Magee).

Dr. Vassallo corroborated that those symptoms are indicative of their heightened

risk of heat-related illness.  ROA.5996:8-ROA.6007:4, ROA.6012:14-

ROA.6013:20, ROA.6028:17-21, ROA.6049:16-ROA.6052:10.

Plaintiffs' environmental health expert, Balsamo, reported that fans are

inadequate because "just pushing around hot air inside the cells doesn't necessarily

help cool the body and may increase the body temperature load if the air is hotter

than the body temperature and evaporative cooling is impaired by high humidity

levels."  PLS_EX_098-0037-0040.  Dr. Vassallo wrote that "[t]he risk for

heat-related illnesses soars when air temperatures exceed 88º."  PLS_EX_99-002.[72]

"In the extremely hot environment reflected in the temperature and humidity

measurements at and near the prison, even individuals without any underlying

---

[72] See ROA.6063:4-14 (Dr. Vassallo confirming that she intended this to mean "heat index" not temperature).

medical conditions would be expected to suffer heat-related illness. However, the

Plaintiffs in this action each have particularly heightened risks of serious

heat-related illness and permanent injury." PLS_EX_99-002. at 5.

Defendants argue that because Plaintiffs have not already suffered

heat-related illness, they cannot prevail. Def. Br. 18. However, an inmate "does

not need to show that death or serious illness has yet occurred to obtain relief. He

must show that the conditions pose a substantial risk of harm to which [prison]

officials have shown a deliberate indifference." *Gates* 376 F.3d at 339.[73]

Dr. Vassallo testified that Plaintiffs had made many complaints of symptoms

which indicate heat-related illness, but that those symptoms were not recognized.

ROA.6002-6006.[74]

Moreover, where "summer temperatures . . . average in the nineties with

high humidity [and] ventilation is inadequate to afford prisoners a minimal level of

---

[73] Defendants' reliance on *Woods v. Edwards*, 51 F.3d 577 (5th Cir. 1995) is similarly misplaced. "The *Woods* court found that Woods had not presented medical evidence sufficient to state an Eighth Amendment violation; *Woods* does not stand for the proposition that extreme heat can never constitute cruel and unusual punishment." *Gates,* 376 F.3d at 339.

[74] Dr. Vassallo also rejected an insinuation that the medical records were proof of a lack of heat related symptoms. ROA.6006:7-ROA.6007:16. Further, the district court noted that Defendants' own sick-call form "supports the conclusion that Plaintiffs were discouraged from submitting 'sick call' requests because of the monetary and potential disciplinary consequences of doing so." ROA.5011-5012 n.76. Further, the prison's intake and documentation system might lead to the underreporting of heat-related illness. ROA.6006:7-ROA.6011:5.

comfort[,] [t]he probability of heat-related illness is extreme [and] the medications often given to deal with various medical problems interfere with the body's ability to maintain a normal temperature." *Gates* 376 F.3d at 334.[75]  Plaintiffs have demonstrated that they faced a substantial risk of serious harm owing to the extreme heat conditions on the tiers.

> **(iii)    The district court found that the remedial measures previously upheld by this Court were not present at Angola.**

In order to determine whether a particular facility violates the Eighth Amendment, Courts use a totality of the circumstances test. *Smith v. Sullivan*, 553 F.2d 373, 378 (5th Cir. 1977) (district judge "was fully justified in finding that the totality of circumstances in the El Paso jail amounted to a violation of the Eighth Amendment."); *Gates v. Collier*, 501 F.2d 1291, 1309 (5th Cir. 1974) (same).

In *Gates*, this Court ordered that Mississippi provide a fan for each cell, ice water, and daily showers. *Gates*, 376 F.3d at 339-40. *See also Blackmon,* 484 F. App'x 866 (not providing regular access to cold water germane to a constitutional

---

[75] Defendants argue that Plaintiffs' personal choices were "quite possibly" or "more probably than not" the cause of their medical ailments. Def. Br. at 18. Leaving aside the irrelevance of this argument, the district court explicitly rejected it, finding that Defendants controlled the vast majority of Plaintiffs' diet and lifestyle choices. ROA.5012.

violation); *Valigura*, 265 F. Appx. at 235 (citing lack of access to fans, ice water, and showers in finding a constitutional violation).[76]

The remedial measures upheld in *Gates* are not available to Plaintiffs.  It is uncontroverted that "Plaintiffs do not have direct access to ice during the twenty-three hours per day that they are confined to their cells" (ROA.5036 n.100); ice "frequently runs out" (ROA.4972); Plaintiffs do not have individual fans (ROA.4970); the fans occasionally break (ROA.4975); drinking water is "lukewarm to the touch" (ROA.4996); Plaintiffs do not have windows in their cells (ROA.4970); and shower temperatures are between 100º and 120º (ROA.4971).

Further, the windows, fans, and cell vents did not provide relief from the heat.  ROA.4995, ROA.5015, ROA.5776, ROA.6033-6035, ROA.6117, ROA.6207-6208.  The district court found, "It is also uncontroverted that the ventilation system does not reduce the temperature, humidity level, or heat index in the housing tiers."  ROA.4973.  Based on the lack of effective remedial measures,

---

[76] These cases can be easily distinguished from the 2004 case, *Chandler v. Crosby,* where the Eleventh Circuit upheld the findings of the district court that heat conditions did not constitute a constitutional violation.  379 F.3d 1278 (11th Cir. 2004).  In *Chandler,* the court based its finding on several factors not present here including: inmate access to "cold running water"; temperatures lower than those found here; and an effective ventilation system which led to "reasonable levels of comfort" for the inmates.  *Id.* at 1286, 1296-1298.

combined with the extreme conditions shown in the Data, the district court

correctly found a substantial risk to Plaintiffs' health.[77]

**b.    The district court based its finding that the conditions on death row create a substantial risk of serious harm to Plaintiffs on proper, reliable evidence.**

**(i)    The district court did not clearly err in using the heat index as the measure of conditions consistent with this Court's precedent.**

Using the heat index as a measurement is not clear error. This standard

measurement incorporates both temperature and humidity, and provides the most

comprehensive measurement of environmental conditions and their effect on the

body. Defendants argue that the heat index is an inappropriate measure because it

is only the "apparent temperature" or a "guideline." Def. Br. at 9. This argument

fails for three reasons.

---

[77] Though not necessary to find a constitutional violation, this Court should consider the evolving standards of decency. In *Gates*, this Court held that "[t]he Supreme Court has made clear that the standards against which a court measures prison conditions are 'the evolving standards of decency that mark the progress of a maturing society' and not the standards in effect during the time of the drafting of the Eighth Amendment." *Gates*, 376 F.3d at 332-33 (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)). In 2011, the Supreme Court found that the conditions in California's prison system violated the Eighth Amendment. In evaluating whether those conditions of confinement constituted an objective substantial risk of serious harm, the Court measured them against the "evolving standards of decency." *Brown v. Plata*, 131 S. Ct. 1910, 1926 n.3 (2011). *Plata* affirmed the Supreme Court's earlier application of this standard in *Helling v. McKinney*, 509 U.S. 25, 29 (1993), where evolving societal standards and greater understanding of the risks associated with cigarette smoke were relevant to determining whether exposure to second-hand smoke amounted to a constitutional violation. For more discussion, *see infra* § VI.B.2.a.i-ii

First, the district court was "unpersuaded that the heat index—which is calculated based on the temperature *and* humidity—is not of critical importance when evaluating the risk of serious harm to Plaintiffs." ROA.5018. The district court rejected Defendants' expert Grymes' assertion that the heat index was not a useful measure of the heat level, finding that Grymes himself uses the heat index to advise his viewers. ROA.6268:15-ROA.6271:18. Grymes also admitted that the "heat index is a measure of the amount of stress from heat that is placed on the human body." ROA.6269:15-21. All of Plaintiffs' experts regularly employ the heat index and rely on it as the appropriate measure here. ROA.5942 (Garon), ROA.6036 (Vassallo), ROA.6074 (Balsamo). Where a finding involves a "classic battle of the experts," there is no clear error in "accepting the testimony [plaintiff's] experts over that of [defendant's]." *Orduna S.A. v. Zen-Noh Grain Corp.*, 913 F.2d 1149, 1154 (5th Cir. 1990).

Second, Defendants' attack on the heat index ignores this Court's consistent reliance on the heat index. *See, e.g., Blackmon,* 484 F. App'x 866 (relying on heat index when evaluating temperature conditions inside a correctional facility); *Gates,* 376 F.3d at 339 (upholding injunction which provided relief "when the heat index is 90 degrees or above").

Third, even assuming that the district court erred in using the heat index, Defendants do not even allege that it was prejudicial. *Ruiz,* 679 F.2d at 1129

("Even if the trial judge does commit error, it is presumed harmless until shown to be prejudicial. The complaining party must prove that the error was substantial and that it prejudiced his case."). Because Defendants failed to show any resulting prejudice, this asserted error cannot be a basis for reversal.

### (ii)    The district court's opinion appropriately referenced reliable secondary sources.

Defendants ask this Court, without support, to overturn the district court's decision based on its references to a series of credible secondary sources.[78] Def. Br. at 11-15. This argument fails for three reasons: (1) the court can properly take judicial notice of the sources; (2) all of the information was admitted, based on the district court's observation, or referenced in the record; and (3) Defendants fail to allege prejudice resulted from the Court's citation to these sources.[79]

First, the district court can properly take judicial notice of the facts in its opinion. While Plaintiffs argue that the Court did not even need to take judicial notice, it has broad discretion to do so. Pursuant to Fed. R. Evid. 201, a court is

---

[78] Defendants mischaracterize two cases to support their position. *Gisclair v. Galliano Marine Serv.*, No. 05-5223, 2007 U.S. Dist. LEXIS 99004 (E.D. La. Apr. 30, 2007) is merely an order **deferring** ruling on the relevance of particular data. *Ruff v. Godinez*, explicitly points out that the court "may take judicial notice" of the temperatures recorded in the almanac but credited contradictory testimony over the almanac. No. 91-7242, 1993 U.S. Dist. LEXIS 8745, at *12 (N.D. Ill. June 28, 1993). Both dealt with pre-trial rulings.

[79] Plaintiffs endeavor to address each alleged infraction cited by Defendants but, since no specific references were included in the brief, are left to guess the content to which Defendants objected.

"entitled to take judicial notice of adjudicative facts from reliable sources 'whose accuracy cannot reasonably be questioned.'" *Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co*, 704 F.3d 413, 422 (5th Cir. 2013) (citations omitted).[80] Further, "a district court's use of judicial notice under Federal Rule of Evidence 201 is reviewed for abuse of discretion." *Funk v. Stryker Corp.,* 631 F.3d 777, 783 (5th Cir. 2011). "The district court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Id.* (citation omitted). Defendants have failed to show the required abuse or error.

Second, while Defendants do not specify what evidence was allegedly outside the record, the citations in the district court's order that are at issue were discussed in expert testimony and reports admitted into evidence; much of the information is contained or cited directly in the record, including the NOAA heat index chart, the EPA Study, and the NWS report *Heat: A Major Killer*. ROA.4510; PLS_EX_ 127, ROA.29.[81]

---

[80] Defendants do not contend that the information is unreliable.

[81] The district court cited to various federal government publications providing that extreme heat can cause health risks to individuals with medical conditions and discussing effectiveness of various remedial measures. ROA.5012-5016. These publications were cited in publications relied upon by Defendants (ROA.5867-5868; PLS_EX_127-0049-0052) and expert reports admitted into evidence (PLS_EX_98-99). These citations were also discussed in expert testimony about CDC recommendations and the limitations of electric fans (ROA.6095, ROA.6117) and Plaintiffs' susceptibility to heat-related illness

Finally, even assuming Defendants showed error, it is not reversible error since they, again, allege no prejudice. *See Figgs v. Quick Fill Corp.*, 766 F.2d 901, 903 (5th Cir. 1985) (harmless error where other evidence in record sufficient to uphold findings). The district court relied on extensive information to make its findings. *See supra* § III.[82] As discussed above, the citations are cumulative to other evidence in the record.[83] The evidence at issue was merely contextual and not essential for the district court's ruling, thus there is no reversible error. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he party that seeks to have a judgment set aside because of an erroneous ruling carries the burden of showing that prejudice resulted.") (citations omitted); *U. S. v. Articles of Device, etc.*, 481 F.2d 434, 436 (10th Cir. 1973) (no reversible error where extrajudicial notice was not essential to court's decision).

---

because of medical conditions and prescription medication (ROA.5995-6006; ROA.6014-6015).

Additionally, the NWS website for definition of heat index in relation to effect on body (ROA.4981-4982) is consistent with Defendants' expert defining heat index as "apparent temperature" and "what the air and humidity combination would feel like to this average person." ROA.6259.

[82] The court made these references on December 19, 2013. Defendants were free to object before that court. Having elected to wait for appeal, Defendants must show prejudice, which they have utterly failed to do.

[83] The district court's observations of the weather on the day of the site visit or references to "average maximum temperatures" in summer 2013 are simply points of comparison to show that the recorded temperatures inside the facility were higher than the weather station. This did not determine the outcome of the court's ruling, but rather gave context to the court's discussion of conditions on the tiers.

**2.  The district court did not err in finding that Defendants were deliberately indifferent to the substantial risk of harm to Plaintiffs' health.**

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Gates*, 376 F.3d at 333.  Here, the district court made extensive findings that Defendants were deliberately indifferent to Plaintiffs' substantial risk of serious harm, both because the risk was obvious, and because of circumstantial evidence.  ROA.5019-5035.

**a.  Defendants had knowledge of the risk of heat-related illness because the risk was obvious.**

The district court based its obviousness finding on "the uncontroverted USRM data . . . , Plaintiffs' ages, Plaintiffs' underlying medical conditions, and Plaintiffs' medications," and concluded that "Defendants' knowledge of the substantial risk of serious harm may be inferred by the obviousness of the risk to Plaintiffs."  ROA.5019-5035.  The district court did not clearly err in finding that the temperatures and humidity on the tiers were open and obvious conditions of which Defendants were aware.  The USRM data established that the heat index on the tiers regularly exceeded 100º.  *See supra* § III.C.  It was uncontroverted that the temperature inside the tiers would be as hot or hotter than the temperature outside the facilities.  ROA.4973-4974.  This evidence, together with Defendants'

admissions that they walk the tiers regularly, was sufficient for the district court to find that the extreme heat and its consequent risks were obvious.  ROA.5026-5027.

### b.    Defendants had knowledge of the risk of heat-related illness based on circumstantial evidence.

"In the alternative," the district court wrote, "Defendants' knowledge of the substantial risk of harm to Plaintiffs may be inferred from circumstantial evidence presented at trial."[84]  The district court correctly pointed to three facts which support this finding:

> (1) Plaintiffs submitted multiple ARPs complaining of the excessive heat conditions to Defendants, prior to filing the instant litigation; (2) Defendants 'closely monitor' the temperature in each of the death row tiers and record such temperatures in tier log books; and (3) Defendants Cain and Norwood walk the death row tiers 'regularly'. . . .

ROA.5026-5027.

Defendants first assert that there was no constitutional violation at all, and that therefore Defendants could never have had knowledge of such a violation.  Def. Br. at 19.  For the reasons described above, the assertion is plainly false.  *See* discussion, *supra* § VI.A.1; ROA.4999-5019.

---

[84] "[I]t is not necessary for an Eighth Amendment claimant to show that a prison official acted or failed to act due to a belief that an inmate would actually be harmed.  It is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."  ROA.5019-5020, citing *Farmer*, 511 U.S. at 825.

Next, Defendants argue that the grievances Plaintiffs submitted through Angola's Administrative Remedy Procedure ("ARPs") should not inform the subjective deliberate indifference inquiry because, "If the mere fact that Plaintiffs followed the requisite administrative procedures prior to filing suit proves that Defendants acted with deliberate indifference . . . no court would ever have to evaluate the subjective element of an Eighth Amendment claim." Def. Br. at 20.[85] Defendants mischaracterize, however, the place of the administrative grievance procedure in the deliberate indifference analysis. It is not the mere fact that Plaintiffs filed ARPs that showed Defendants' deliberate indifference. Rather, it is Defendants' refusal to take action (ROA.5027-5035) despite issuing responses "in which Defendants acknowledged Plaintiffs' claims that it is 'extremely hot on Death Row' and that they are 'more susceptible to heat' because of their underlying medical conditions and medications, and denied Plaintiffs' requests for relief." ROA.5021; PLS_EXS_40, 43, and 47.[86] Where the evidence shows that prison officials had knowledge of, but failed to respond to, prisoners' complaints of conditions causing substantial risk to prisoners' health, this Court has upheld a finding of deliberate indifference. *See, e.g.*, *Gates*, 376

---

[85] ROA.5021-5023. The ARP process at Angola is the only official procedure by which prisoners can raise grievances with prison officials.

[86] Additional evidence showed that Defendants failed to meaningfully respond to Plaintiffs' complaints relating to the extreme heat. *See* ROA.5027-5035.

F.3d at 339.  *See also Blackmon*, 484 F. Appx. at 872-73 (evidence from ARPs was sufficient to allow a jury to conclude that prison officials were deliberately indifferent); *Johnson v. Pearson*, 316 F. Supp. 2d 307, 317–18, 321 n.8 (E.D.Va. 2004) (receipt of grievance form alleging violation and refusal to provide any remedy were sufficient to show deliberate indifference); *cf. Verser v. Elyea*, 113 F. Supp. 2d 1211, 1215–16 (N.D.Ill. 2000) (denying grievance appeal was sufficient to establish personal involvement).[87]

The district court properly considered Plaintiffs' medical conditions and medications in finding that Defendants were deliberately indifferent.  Defendants suggest that Defendant Warden Norwood testified at trial that "none of the Plaintiffs ever complained of any symptoms of heat-related illness," and that Plaintiffs' medical records show that they never exhibited symptoms of heat-related illness.  Def. Br. at 20-21.  The court considered and rejected this argument.  ROA.5011-5012.  The argument fails for at least three reasons.

---

[87] Defendants attempt to distinguish *Blackmon* from the instant case on the basis that the plaintiff "visited the prison infirmary complaining of heat with elevated blood pressure readings."  Def. Br. at 20 n.76.  This attempt fails.  Here, Plaintiffs complained of symptoms of heat-related illness and had high blood pressure during infirmary visits.  ROA.4974-4978, ROA.5021-5022; see also PLS_EX_94-96. *Blackmon* also found that ARPs can serve as a basis for a finding of deliberate indifference.  484 F. App'x at 873.

First, Plaintiffs did complain of symptoms of heat-related illness in their ARPs and in their discussions with Warden Norwood. ROA.5021-5023; PLS_EXS_40, 43, and 47.

Second, the district court determined that Warden Norwood lacked credibility as a witness (ROA.4962-4968), a finding to which this Court should defer. *Justiss Oil, Co., Inc. v. Kerr-McGee Refining Corp.*, 75 F.3d 1057, 1067 (5th Cir. 1996) ("In a non-jury trial, credibility choices and the resolution of conflicting testimony are the province of the judge, subject only to Rule 52(a)'s clearly erroneous standard."); *Reich v. Lancaster*, 55 F.3d 1034, 1045 (5th Cir. 1995) ("The trial judge's 'unique perspective to evaluate the witnesses and to consider the entire context of the evidence must be respected.'") (citation omitted).

Third, there is no requirement that Plaintiffs demonstrate that they have already suffered from a heat-related illness to prevail. Defendants' assertion that "there must be medical evidence of Plaintiffs complaining of or experiencing heat-related symptoms" (Def. Br. at 20 n.76) has been rejected by this Court. *See Gates*, 434 F.3d at 339 (rejecting prison defendants' contention that "no Unit 32–C inmate has ever suffered any serious heat-related illness" and stating there is no requirement that inmates provide medical evidence of heat-related illness to obtain relief).

The district court made extensive findings as to the subjective prong of deliberate indifference and determined that the evidence presented demonstrated Defendants' deliberate indifference.

**B.    The District Court Ordered an Appropriate Remedy to the Eighth Amendment Violation.**

**1.    The district court did not err in its conclusion that Plaintiffs were entitled to injunctive relief.**

To receive injunctive relief, Plaintiffs were required to show:  (1) success on the merits; (2) irreparable injury in the absence of an injunction; (3) that the balance of hardships between the parties justifies injunctive relief; and (4) that the public interest would not be disserved by a permanent injunction.  *See Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987).  The district court properly found Plaintiffs had succeeded on the merits of their Eighth Amendment claim (*see supra* § VI.A.1).  The district court did not err in its findings on the remaining three elements.

**a.    Plaintiffs' exposure to substantial health risks constituted irreparable harm.**

It is well-established that violations of constitutional rights are sufficient to show irreparable harm.  *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (loss of First Amendment freedoms "for even minimal periods of time" was "unquestionably" irreparable harm).  Here, the irreparable harm to Plaintiffs is not

abstract; it is a substantial risk of heat-related illness, which could result in

paralysis or death.  *See supra* § VI.A.1.

> **b.    Plaintiffs' irreparable injury outweighed injury to Defendants.**

The district court correctly found that Plaintiffs' harm outweighed

Defendants' purported harms of time, money, and efforts required to remedy the

constitutional violation.  *See Smith*, 553 F.2d at 378 ("[I]nadequate resources can

never be an adequate justification for depriving any person of his constitutional

rights."); *Collier*, 501 F.2d at 1319 ("Where state institutions have been operating

under unconstitutional conditions and practices, the defenses of fund shortage and

the inability of the district court to order appropriations by the state legislature,

have been rejected by the federal courts."); *Stewart v. Winter*, 669 F.2d 328,

332-33 (5th Cir. 1982) ("state officials cannot disclaim responsibility for cruel and

unusual conditions of confinement of prisoners in their custody on the ground that

it is beyond their power to effect the changes necessary to bring the conditions up

to minimal standards" because of a lack of funds or state legislature approval).

Second, even if the time, money, and energy were relevant, the Defendants

failed to present evidence of what would be required to implement Defendants'

proposed plan.[88] Defendants' expert admitted under oath that he was unqualified to provide cost estimates. ROA.5076-5085, ROA.5099-5106. The assertion that the cost would be "at least $2 million" is without merit or foundation. Def. Br. at 30. First, Defendants claimed the cost would be $1.8 million at trial. ROA. 6304:25. Second, as Defendants' own expert testified, his estimate was the "worst case scenario." ROA.6303-6305. *The plan Defendants submitted post-trial and that the district court ordered implemented was substantially different*,[89] and there is no evidence of its cost on the record.[90]

Moreover, Defendants were sanctioned for their misconduct in discovery as to the costs associated with any potential remedy. ROA.5059-5109.[91] The district

---

[88] The district court noted that Defendants' expert specifically testified that he was unqualified and unable to provide any estimate of the expenses required at his deposition. ROA.5082-5083.

[89] *Compare* ROA.5393-5421 (Heat Remediation Plan) *with* ROA.3280-3282, ROA.3479-3481 (Defendants' expert Eyre's "feasibility study" and separate, untimely "supplemental report"). *See also* ROA.6303:21-ROA.6306:2 (Eyre's testimony regarding his $1.86 million cost estimate being a rough, worst-case-scenario estimate), ROA.6308:25-ROA.6309:20, ROA.6312:9-ROA.6315:19 (Eyre's testimony that his "feasibility study" was only one of "many different systems" available to cool the death row tiers).

[90] Should the Court request such evidence, Plaintiffs are ready to submit credible evidence that the cost would be substantially less than what Defendants purport. However, this Court has refused to consider factual issues not previously presented to the trial court. *Gates*, 376 F.3d at 340, n.10 (refusing to consider argument that relief would cause prison security problems because argument not raised in district court).

[91] Defendants have not appealed the order sanctioning them for this conduct.

court did not abuse its discretion because of its failure to consider the costs of

maintaining a heat index below 88° where Defendants failed to provide that

evidence in discovery and were sanctioned for this failure.[92]

**c.    The public interest was served by an injunction
remedying the violation of constitutional rights.**

The public interest is best served where constitutional rights are protected.

*See, e.g.*, *Nobby Lobby, Inc. v. City of Dallas*, 970 F.2d 82, 93 (5th Cir. 1992).  The

district court did not abuse its discretion in finding that the public interest is served

by injunctive relief remedying the Eighth Amendment violation.

**2.    The district court complied with the PLRA and did not
abuse its discretion when it fashioned the injunctive relief.**

The district court correctly fashioned the remedy in this matter.  Defendants

argue that the court erred in its application of the law to the factual findings.

Specifically, Defendants argue:  (1) that the district court erred by providing

injunctive relief beyond that which was upheld in *Gates*, Def. Br. at 21-22; and

---

[92] In *Ruiz v. Estelle*, this Court noted that when considering remedies, "the cost of
one proposed remedy in comparison with the cost of others and the demonstrable
need for the remedy should both be considered."  *Ruiz*, 679 F.2d at 1146
(considering costs associated with mandate of specific square footage per prison
cell to reduce overcrowding).  Here, the district court's refusal to consider costs
was consistent with *Ruiz*, because the district court specifically found that the heat
index needed to remain below 88° to prevent undue risk of heat-related illness.
Thus, even if the remedy would "impos[e] great cost on a state," it was only
ordered because "its constitutional need has been demonstrated."  *Id.*  Moreover,
where the district court provided an opportunity for Defendants to minimize the
cost consistent with *Plata* and *Lewis v. Casey*, 518 U.S. 343 (1996), it is clear that
there was no prejudice to Defendants on the basis of costs.

39

(2) that the district court's order is inconsistent with the requirements of the Prison Litigation Reform Act, 18 U.S.C. § 3626 ("PLRA"), Def. Br. at 26-27. Neither argument has merit.

### a. The district court did not misapply the law of *Gates* when it fashioned its injunctive relief.

The district court ordered injunctive relief that was tailored to the facts of the case and the constitutional violation at issue. "[F]raming an injunction appropriate to the facts of a particular case is a matter peculiarly within the discretion of the district judge." *Gore v. Turner*, 563 F.2d 159, 165 (5th Cir. 1977). The Supreme Court recently reaffirmed "a district court's equitable powers" in *Brown v. Plata*, 131 S. Ct. 1910, 1944 (2011) ("Once invoked, the scope of a district court's equitable powers . . . is broad, for breadth and flexibility are inherent in equitable remedies" (citations omitted)). *See also U.S. v. Jamestown Ctr.-In-The-Grove Apartments*, 557 F.2d 1079, 1080 (5th Cir. 1977) ("appropriate relief for violations . . . is to be determined on a case-by-case basis with relief tailored in each instance to the needs of the particular situation.") (citations omitted).

### (i) Because Eighth Amendment violations are determined by the totality of the circumstances, no single precedent can establish a static test for minimally sufficient conditions.

Defendants assert that no Eighth Amendment violation can occur if Defendants provide "fans, ice, water, and cool showers." Def. Br. at 21-22. This

argument fails as a matter of law.  While *Gates* upheld the **remedy** that was ordered by the district court, nothing in *Gates* stated that provision of fans, water, ice, and showers constituted *per se* constitutionally sufficient conditions.[93]

Nor would such a standard be consistent with precedent that has directed courts "considering an Eighth Amendment challenge to conditions of confinement [to] examine the totality of the circumstances."  *Rhodes v. Chapman*, 452 U.S. 337, 362-63 (1981).  *See also Williams v. Edwards*, 547 F.2d 1206, 1211 (5th Cir. 1977) (district court "was fully justified in finding that the totality of circumstances as to conditions of confinement at Angola" violated Eighth Amendment).  "[N]o static 'test' can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society."  *Rhodes*, 452 U.S. at 346 (citations omitted).

> **(ii)     The district court found that *Gates*-type relief is insufficient.**

The district court found that the injunctive relief ordered in *Gates* was not present here and would not have been sufficient to reduce the risk of harm to Plaintiffs.  For a discussion of the specific remedial measures not present, *see*

---

[93] Even if *Gates* did provide a *per se* constitutional standard, the district court found that the Defendants provided to Plaintiffs only **limited access** to ice, **lukewarm** water, **shared** fans, and **hot** showers which were insufficient to prevent the substantial risk of harm to Plaintiffs' health, ROA.4968-4978; ROA.4994-4996, and therefore ordered additional relief.

*supra* § VI.A.1.a.iii.  In fact, the court found that some of the remedies ordered in *Gates* ***actually exacerbated*** the heat conditions on death row.  ROA.5015.  Public health guidelines, relied on by Defendants,[94] acknowledge that fans are insufficient to prevent heat-related illness when the heat index exceeds 99º.  PLS_EX_127-0043 ("[U]sing a portable electric fan alone when heat index temperatures exceed 99°F ***actually increases*** the heat stress the body must respond to by blowing air that is warmer than the ideal body temperature over the skin surface" (citing American Medical Association Council on Scientific Affairs and Center for Disease Control)).  This is consistent with the district court's observations during its visit.  ROA.4995-4996.

Finally, the district court's findings that *Gates*-type relief was insufficient was consistent with other evidence of standards for correctional facilities in the record.  The district court took judicial notice of statutes and regulations from 23 states—including the state of Louisiana—that mandate specific climate conditions for correctional facilities and other facilities where individuals are similarly confined.  ROA.4954-4956, ROA.2901-3186.[95]  Two states within the

---

[94] Defendant Norwood relied on the EPA publication in responding to Plaintiffs' grievances.  ROA.5860-5861.

[95] *See, e.g.,* PLS_EX_001-0001 (Alaska DOC standards requiring "temperatures shall be maintained between 65 and 80º Fahrenheit"); PLS_EX_002-0043 (Arkansas Criminal Detention Facility Review Commission's requirements that "temperature shall be between 65° and 85° Fahrenheit" in all facilities);

Fifth Circuit have such regulations: Texas requires county correctional facilities to prevent temperatures over 85º, and Louisiana mandates air-conditioning in juvenile detention facilities. *See* PLS_EX_017-0001, PLS_EX_019-0003.[96]

---

PLS_EX_003-0011 (Colorado DOC requiring "adequate, comfortable temperature"); PLS_EX_004-0004 (District of Columbia requiring "temperature and humidity are mechanically raised or lowered to acceptable comfort levels"); PLS_EX_005-0003 (Illinois requiring detention areas to be "heated and cooled . . . to provide temperatures within the normal comfort zone"); PLS_EX_008-0017 (Kentucky requiring temperatures between 65 and 85º Fahrenheit); PLS_EX_009-0055 (Maine requiring temperatures between 65 and 85º Fahrenheit); PLS_EX_013-0001 (Nevada requiring temperature not exceed 85º); PLS_EX_015-0001 (Ohio requiring temperature not exceed 85º); PLS_EX_016-0001 (Tennessee requiring temperature not exceed 80º); PLS_EX_018-0001 (Virginia requiring use of air-conditioning to ensure temperatures do not exceed 85º).

[96] Other evidence demonstrated present standards of decency for those who are at risk of illness from extreme heat. Plaintiffs' expert David Garon testified that Angola's natural ventilation system lacked important features and that he had never in his career seen a building where humans reside that didn't have mechanical cooling in Louisiana. ROA.5042. Various Louisiana standards of which the district court took judicial notice require maintenance of air conditioning to prevent extreme heat for individuals and even animals. *See, e.g.*, PLS_EX_020-0002 (Louisiana assisted living facility standard requiring air conditioning and maintenance of temperature lower than 80º); PLS_EX_021-0007 (Louisiana adult residential care facility standard requiring air conditioning and maintenance of temperature lower than 80º); PLS_EX_022-0006 (child residential care facilities standard requiring air conditioning and maximum 80º); PLS_EX_023-0002 (substitute family care standard requiring air conditioning and maximum 80º temperature); PLS_EX_024-0004 (adult day-care facilities required maximum 80º temperature); PLS_EX_025-0008 (substance abuse treatment facilities requiring maximum temperature of 85º); PLS_EX_026-0001 (hospital nursery required temperature at 75º); PLS_EX_027-0004 (pediatric health care facilities required maximum temperature of 80º); PLS_EX_028-0004 (renal disease treatment facilities required to be air-conditioned to below 85º); PLS_EX_029-0006 (facilities for developmentally disabled must provide air

### (iii) The district court fashioned its relief based on expert recommendations.

Defendants protest that "the district court, without any support whatsoever, suggests that at some point over the past decade, inmates have obtained a constitutional right to mechanical cooling" and that such a finding is "obviously based on the subjective views of the district judge." Def. Br. at 22. To the contrary, the district court found that confining inmates to cells for 23 hours per day with insufficient access to mitigating measures with extended heat indices over 88º places inmates at substantial risk of serious harm. As a result, the district court ordered Defendants to maintain a maximum heat index of 88º. Far from being "subjective views" devoid of evidentiary support, the district court's relief was fashioned based on the recommendations of experts, as well as current public health standards, correctional facility standards, and other evidence of the present societal standards of decency.[97]

Consistent with the Supreme Court's guidance, the district court established this 88º maximum heat index based on expert recommendations. In *Plata*, 131 S.

conditioning); PLS_EX_030-0002 (animal shelter requirement that air conditioning be provided when temperature exceeds 85º).

[97] Plaintiffs recognize this Court's pre-PLRA admonition that "the remedy should begin with what is absolutely necessary" and that "if these measures later prove ineffective, more stringent ones should be considered." *Ruiz*, 679 F.2d at 1145-46. Here, the district court made specific factual findings that the relief afforded in *Gates* was insufficient and that only by maintaining a maximum heat index of 88º would the unconstitutional risk of harm to Plaintiffs' health be remedied.

Ct. 1910, the Supreme Court found no abuse of discretion in ordering a prison to reduce its population to specific levels where the population reduction was adopted pursuant to expert's recommendations. *Id.* at 1945 ("When expert opinion is addressed to the question of how to remedy the relevant constitutional violations, as it was here, federal judges can give it considerable weight."). Similarly, in *Gates*, this Court held that the district court did not abuse its discretion in fashioning injunctive relief where the injunctive relief was based upon expert testimony. *See Gates*, 373 F.3d at 339-40.

Here, there is no abuse of discretion because the district court's order was based on the recommendations of Plaintiffs' expert who provided uncontroverted testimony indicating that only maintenance of a heat index at or below 88° could ensure minimally safe conditions of confinement that did not pose undue health risks. ROA.4959-4960.[98] The district court adopted Dr. Vassallo's

---

[98] This finding is not inconsistent with *Smith v. Sullivan*, where this Court overturned a requirement that a specific temperature range be maintained. 553 F.2d at 381. Unlike the present case, *Smith* did not introduce evidence that a specific temperature range would cause harm. *Id.* Here, the court tailored its order to ensure that "extremes" of temperature or heat index would not be "injurious to inmates' health" based on expert testimony. ROA.5050-5055. *See also Graves v. Arpaio*, 623 F.3d 1043, 1049 (9th Cir. 2010) ("The district court did not err, therefore, in concluding that dangerously high temperatures that pose a significant risk to detainee health violate the Eighth Amendment. Accepting the district court's factual finding that temperatures in excess of 85°F greatly increase the risk of heat-related illness for pretrial detainees taking psychotropic medications, it follows that the Eighth Amendment prohibits housing such pretrial detainees in areas where the temperature exceeds 85°."). Moreover, the establishment of

recommendation in fashioning its order requiring Defendants to develop a plan to maintain a heat index below 88° during the summer months.  ROA.5053, ROA.6033:7-6036:18.[99]

Finally, the remedy ordered here is consistent with precedent nationwide. See *Graves*, 623 F.3d at 1049-50; *Jones-El v. Berge*, 374 F.3d 541 (7th Cir. 2004) (upholding a district court's order requiring prison officials to cool cells to between 80 and 84° during the summertime); *Tillery v. Owens*, 907 F.2d 418 (3d Cir. 1990) (affirming remedy which required an end to double celling in part because of extreme heat).[100]

> **3.    The procedure employed by the district court in fashioning the remedy is consistent with Supreme Court precedent and plainly meets the PLRA's requirements of necessary, narrow, and non-intrusive injunctions.**

Defendants claim the district court abused its discretion by failing to ensure that the relief was narrow, necessary, and non-intrusive as required by the PLRA,

---

a specific heat index range was necessary to comply with Federal Rule of Civil Procedure 64(d)'s required level of detail.  *See McClain*, 519 F.3d at 283-84 (reversing injunction and remanding for greater specificity in injunction).

[99] Moreover, the American Society of Heating, Refrigeration, and Air-Conditioning Engineers (ASHRAE) defines a comfort range for indoor climate conditions during the summer to have an upper limit of 78° Fahrenheit with 50% relative humidity, which is ***significantly cooler*** than the relief ordered here. PL_EX_97-0004.  *See also* ROA.5941:2-5942:2 (Plaintiffs' expert defining this standard as normal), ROA.6308:6-6309:4 (Defendants' expert identifying the goal temperature for his air conditioning to be 74°).

[100] Though Defendants argue that climate differences make these cases irrelevant, they offer no explanation as to why.

18 U.S.C. § 3626(a)(1). Def. Br. at 26-27. Specifically Defendants object to the "installation of new equipment" in the form of mechanical cooling. Def. Br. at 27. This argument mischaracterizes the proceedings below and the law.

In fashioning injunctions governing prisons, district courts should provide defendants an opportunity to create their own plans to remedy constitutional violations, provide inmate-plaintiffs an opportunity to object, and then order implementation following appropriate findings. *Lewis v. Casey*, 518 U.S. 343, 362-63 (1996). *See also Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1071 (9th Cir. 2010) ("Allowing defendants to develop policies and procedures to meet the ADA's requirements is precisely the type of process that the Supreme Court has indicated is appropriate for devising a suitable remedial plan in a prison litigation case" (citing *Casey*, 518 U.S. at 362-63)). Consistent with the Supreme Court's guidance in *Casey*, the district court directed Defendants to create a plan to remedy the constitutional violations and subsequently ordered implementation of Defendants' proposal. ROA.5053, ROA.5393-5421, ROA.6839.

A similar procedure was recently approved in *Plata*, 131 S. Ct. 1910. In *Plata*, the Court considered whether the district court had violated the PLRA's requirements that any injunctive relief be narrow, necessary, and nonintrusive in concluding, based on expert testimony, that the only way to remedy the Eighth Amendment violations was by capping the population of prisoners in all California

prisons at 137.5% of the design capacity. *Id.* at 1939-46. The district court ordered the California prison officials to create a plan to achieve the population cap of 137.5%, leaving the specific means of achieving the 137.5% cap to prison officials. *Id.* at 1945-46. The Court approved of the district court's imposition of a specific population level based on expert evidence presented at trial. *Id.* at 1939-44 ("The adversary system afforded the court an opportunity to weigh and evaluate evidence presented by the parties. The plaintiffs' evidentiary showing was intended to justify a limit of 130 percent, and the State made no attempt to show that any other number would allow for a remedy.").[101] The Court noted its approval of the district court providing an opportunity for Defendants to propose a plan whereby the prison officials would achieve the specified target population. *Id.* at 1943 ("Courts should presume that state officials are in a better position to gauge how best to preserve public safety and balance competing correctional and law enforcement concerns. The decision to leave details of implementation to the State's discretion protected public safety by leaving sensitive policy decisions to responsible and competent state officials.").

---

[101] *See also Plata*, 131 S. Ct. at 1940 ("The PLRA states that a remedy shall extend no further than necessary to remedy the violation of the rights of a particular plaintiff or plaintiffs . . . . This means *only* that the scope of the order must be determined with reference to the constitutional violations established by the specific plaintiffs before the court.") (emphasis added).

As in *Plata*, the district court here permitted Defendants latitude in determining the means to achieve the necessary remedy.[102]  The "narrow tailoring" requirement of the PLRA merely requires "a fit between the remedy's ends and the means chosen to accomplish those ends."  *Plata*, 131 S. Ct. at 1939 (citations omitted).[103]  There is overwhelming authority that where Defendants propose a plan, the plan should be assumed to be narrowly tailored and nonintrusive.  *See, e.g.*, *id.* at 1939-47; *Bounds v. Smith*, 430 U.S. 817, 832-33 (1977) (pre-PLRA case upholding injunctive relief and approving of procedure whereby district court provided prison with opportunity to propose constitutional remedies and then implemented the plan with minimal changes); *Williams v. Edwards*, 547 F.2d 1206, 1218 (5th Cir. 1977) ("The purpose of the plan is to allow the [prison defendants] and the state the kind of self-determination for which they repeatedly argue in their briefs. . . .  Though we emphasize the policy of minimum intrusion into the details of state prison administration, when constitutional violations of rights of individuals, even prison inmates, are brought to our attention, we are bound to redress them.  The scope of our authority to correct these conditions is as broad as the violations proven, striving where possible to permit self-determination

---

[102] Defendants concede that the 88° maximum heat index was based on Dr. Vassallo's recommendation.  Defs. Brf. at 10-11.

[103] Defendants remediation plan only requires minimal alteration because it uses existing ductwork and infrastructure.  ROA.5399-5400.

to prison officials."). *See also Armstrong*, 622 F.3d at 1071-72 ("Defendants' arguments . . . that the relief ordered . . . is not the narrowest, least intrusive relief possible, are remarkably weak. . . . Intrusiveness is a particularly difficult issue for defendants to argue, as by ordering them to draft and promulgate a plan, the district court left to defendants' discretion as many of the particulars regarding how to deliver the relief as it deemed possible."); *Morales Feliciano v. Calderon Serra*, 300 F. Supp. 2d 321, 334 (D.P.R. 2004), *aff'd*, 378 F.3d 42 (1st Cir. 2004), *cert. denied*, 543 U.S. 1054 (2005) ("The very fact that the defendants chose to join the plaintiffs in selecting this remedy would seem to mean—and must be taken to mean—that they understood it to be precisely tailored to the needs of the occasion, that it is narrowly drawn and least intrusive—in fact not intrusive at all."); *Little v. Shelby Cnty., Tenn.*, No. 96-2520, 2003 WL 23849734, at *2 (W.D. Tenn. Mar. 25, 2003) ("Clearly, the least intrusive means in this case is that advocated by the parties themselves and determined by the parties and the court-appointed experts.").

## VII.  CROSS-APPEAL ARGUMENT

### A.    The district court committed reversible error in finding that Plaintiffs were not disabled.

The district court erred in applying pre-Americans with Disabilities Act Amendments Act (ADAAA) precedent to the definition of disability.  Proof of

a disability is the first requirement for claims under either the ADA or the RA.[104]

To establish disability, an individual must show that he has "a physical or mental

impairment that substantially limits one or more major life activities . . . ." 42

U.S.C. § 12102(1)(A). The ADAAA, enacted in 2008, revised the definition of

disability under the ADA. Pub. L. No. 110-325, 122 Stat. 3553 (2008).

Here, the district court's finding that Plaintiffs did not have disabilities was

based on erroneous application of pre-ADAAA definitions of disability. Having

determined that Plaintiffs did not have disabilities, the district court did not analyze

the other elements of Plaintiffs' disability claims.[105] ROA.5047-5050.

This Court should reverse the district court's application of superseded

statutory definitions and abrogated case law and remand to the district court for

further consideration of the remaining elements of Plaintiffs' disability claims.[106]

*See Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 330-33 (4th Cir. 2014) (district

---

[104] Plaintiffs omit the term "qualified" here because Plaintiffs are clearly qualified to participate in the program. *See Southeastern Community College v. Davis*, 442 U.S. 397, 406 (U.S. 1979).

[105] Under the ADA, Plaintiffs must show that they have been denied the benefits of the services, programs, or activities of a public entity, and that such exclusion or discrimination was by reason of their disability. 42 U.S.C. § 12132. Similarly, under the RA, Plaintiffs must show that they were denied benefits of a public entity's program solely because of their disability, and that the program in question receives federal financial assistance. 29 U.S.C. § 794(a).

[106] Should this Court uphold the district court's ruling and injunctive relief, this error is not prejudicial to Plaintiffs, and the Court need not consider whether the district court erred in its findings on Plaintiffs' disability claims.

court's application of pre-ADAAA case law was reversible error).

### 1.    The ADAAA expanded the definition of disability.

The ADAAA significantly amended the definition of disability under the ADA and abrogated Supreme Court case law interpreting the ADA in favor of a broad standard favoring the finding of a disability.  The ADAAA was passed in response to Supreme Court decisions that "created an inappropriately high level of limitation necessary to obtain coverage under the ADA," and was intended to reinstate "a broad scope of protection . . . available under the ADA."  Pub. L. No. 110-325, 122 Stat. 3553 at 3554 (2008) (codified at 42 U.S.C. § 12101 (Note)) (stating intent to overturn statutory interpretation in *Sutton v. United Air Lines, Inc.,* 527 U.S. 471 (1999) and *Toyota Motor Mfg., Kentucky Inc. v. Williams,* 534 U.S. 184 (2002)).  Congress's purpose was to convey that "the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis."  *Id.  See also Neely v. PSEG Tex., Ltd. P'ship*, 735 F.3d 242, 245 (5th Cir. 2013) (adopting ADAAA).

The ADAAA expanded the definition of disability in two ways integral to this appeal.  First, it made it easier for individuals to show that they are disabled by requiring that "the definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter."  42 U.S.C. § 12102(4)(A).  "The Act

52

emphasizes that the term 'substantially limit' under the actual disability prong shall be interpreted as broadly as possible." *Norton v. Assisted Living Concepts, Inc.*, 786 F. Supp. 2d at 1185 (citing 42 U.S.C. § 12102(4)(A)-(B)).

Second, under the ADAAA and relevant regulations, major life activities were expanded to include the operation of major bodily functions. 42 U.S.C. § 12102(2)(B). The ADAAA empowered the Equal Employment Opportunity Commission (EEOC) to issue revised implementing regulations on the definition of disability for employment cases. Pub. L. 113-36 § 6(a)(2). These definitions are afforded *Chevron* deference when definitions are ambiguous. *Canfield v. Movie Tavern, Inc.*, 29 Am. Disabilities Cas. (BNA) 430 (E.D. Pa. Dec. 12, 2013). The definition of "substantially limited" under the current EEOC regulations specifically rejects a requirement that the individual be "significantly restricted in the ability to perform" a major life activity. *Compare* 29 C.F.R. § 1630.2(j) (2010) with 29 C.F.R. § 1630.2(j) (2012) ("An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be

considered substantially limiting.").[107]

The EEOC regulations are widely used in interpreting the ADAAA.  Courts regularly apply these new regulations in Title I employment cases.  *See, e.g., Summers*, 740 F.3d at 330 (EEOC revised its definition of disability after the ADAAA "pursuant to its delegated authority" by Congress); *Canfield,* 29 Am. Disabilities Cas. (BNA) 430 (same); *Rico v. Xcel Energy, Inc.*, 893 F. Supp. 2d 1165, 1168 (D.N.M. 2012) (same); *Norton*, 786 F. Supp. 2d at 1185-86 (same).

Courts also apply the regulation to Title II cases involving discrimination by state or local governments.  *See Kravtsov v. Town of Greenburgh*, No. 10-3142, 2012 U.S. Dist. LEXIS 94819, at *37-38 (S.D.N.Y. July 9, 2012); *Moore v. Chilton County Bd. of Educ.*, No. 12-424, 2014 U.S. Dist. LEXIS 26631, at *31 (M.D. Ala. Mar. 3, 2014).

Courts also use EEOC regulations to guide interpretation of the ADAAA in cases outside the employment context.  *See, e.g., See Hale v. King,* 642 F.3d 492,

---

[107] The DOJ issued a Notice of Proposed Rulemaking to conform its Title II & III regulations to the ADAAA.  It states that "consistent with Executive Order 13563's instruction to agencies to coordinate rules across agencies and harmonize regulatory requirements where appropriate, the Department is proposing, ***wherever possible, to adopt regulatory language that is identical to the revisions to the Equal Employment Opportunity Commission's (EEOC) Title I regulations implementing the ADA Amendments Act***. See 76 FR 16978 (Mar. 25, 2011).  This will promote consistency in the application of the ADA and prevent confusion among entities subject to both Titles I and II, as well as those subject to both Titles I and III."  79 Fed. Reg. 4839, 4840 (DOJ Jan. 30, 2014) (emphasis added).

500 (5th Cir. 2011) (Court relied on EEOC regulations when evaluating prisoner's claim under the ADAAA); *Bragdon v. Abbott,* 524 U.S. 624, 643–644 (1998) (citing EEOC analysis on issue of disability in a non-employment context).

> **2.      The District Court failed to apply the ADAAA definition of disability.**

The district court erred by applying the definition in *Toyota* to the term "major life activities" and defined them as "those activities that are of central importance to daily life."  ROA.5047.  However, ADAAA redefined "major life activities" and specifically rejects a requirement that the individual be "significantly restricted in the ability to perform" a major life activity.  *See, e.g.*, *Cordova v. Univ. of Notre Dame Du Lac*, 936 F. Supp. 2d 1003, 1008 (N.D. Ind. 2013) ("The ADAAA now provides a specific definition for . . . 'major life activities,' whereas prior to the amendments, courts frequently looked to the regulations. . . for guidance.").  Had the district court applied the correct definition of major life activity, the evidence showed that Plaintiffs suffer from disabilities. See *infra* § VII.A.3.

Additionally, the district court erred in its reliance upon now-superseded implementing regulations defining "major life activity" and "substantially limited." *See* ROA.5047-5048.  These older definitions of "major life activities" excluded major bodily operations and functions of integral organ systems, such as the circulatory system and the endocrine system.  *Compare* 29 C.F.R. § 1630.2(i)

(2010) with 29 C.F.R. § 1630.2(i) (2012). The failure to apply the correct

definition was significant. As discussed below, had the correct definition been

applied, Plaintiffs would have prevailed.

### 3. Under the ADAAA definition, Plaintiffs have disabilities.

Undisputed evidence at trial demonstrated Plaintiffs were impaired in their

circulatory systems, and in their ability to maintain a normal body temperature

through thermoregulation. Thermoregulation is the ability of the body to maintain

the temperature of 98.6° within half a degree. ROA.5993:14-17.[108] Heat-related

illness, including heatstroke, is a result of the failure of the body's

thermoregulation system. ROA.6011:6-ROA.6013:5. Dr. Vassallo testified that

heatstroke is a sudden and catastrophic failure of thermoregulation.

ROA.6049:20-ROA.6050:14. Plaintiffs also testified that they experience

weakness and dizziness in the summertime. ROA.5681:8-ROA.5683:8 (Code),

ROA.5755:25-ROA.5757:17 (Ball), ROA.6204:10-ROA.6205:1 (Magee). Thus,

since maintenance of a normal bodily temperature is critical not just to staying

---

[108] Whether thermoregulation is a major life activity is an issue of first impression
for this Court. However, in *EEOC v. Agro Distribution, LLC*, 555 F.3d 462, 469
n.8 (5th Cir. 2009), this Court assumed that thermoregulation was a major life
activity for the purposes of argument. Furthermore, thermoregulation is consistent
with examples of major bodily functions enumerated in the non-exhaustive list
provided by the legislation.

alive but also to performing the tasks of daily life, it is a major life activity.[109]

As described below, Plaintiffs suffer from impairments that substantially limit their ability to thermoregulate. Additionally, the medications required to treat Plaintiffs' heat-sensitive disabilities further limit their ability to thermoregulate.

### a. Plaintiffs' uncontrolled hypertension substantially impairs thermoregulation.

Plaintiffs' hypertension substantially limits their ability to thermoregulate. It is undisputed in the record that Plaintiffs all suffer from hypertension that is largely uncontrolled. PLS_EX_94-96; ROA.5997:10-18 (Ball); ROA.6002:19-ROA.6003:1 (Code); ROA.6004:10-11 (Magee); ROA.6051:5 (referring to Ball's "uncontrolled hypertension"). Blood pressure is a vascular measure of the pressure in the blood vessels against which the heart has to pump blood, and hypertension is the condition of having high blood pressure. ROA.6334:17-ROA.6335:10.

Dr. Vassallo testified that hypertension requires "the heart . . . to pump much harder" than in a person in the general population, because "the elasticity and the ability of the blood vessels to open and close is decreased in that setting. . . . So that those vessels, those arteries and arterials are not as compliant as they should be. And they can't open like they should and have to in response to heat."

---

[109] "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

ROA.5996:8-5997:18.  By this process, hypertension substantially limits the cardiovascular and circulatory systems of Plaintiffs in a manner that substantially limits their ability to thermoregulate.

Defendants did not dispute that Plaintiffs' hypertension substantially impairs their circulatory system.  Dr. Singh, the medical director for the DOC, testified that hypertension is a "silent killer," that Ball has suboptimal control of his hypertension, and that Ball has other "non-modifiable risk factors," such as his age and race, that put him at increased risk of harm.  ROA.6336:3-15, ROA.6335:23. He testified, "if the blood pressure is high, that means our heart is pumping against a higher pressure.  So, down the road, it's going to be having a significant consequences [sic]."  ROA.6335:7-10.  Dr. Macmurdo, a prison physician who has treated Ball, described Ball's blood pressure as "out of control" and said "sooner or later" Ball was "going to stroke out."  ROA.5755:15-24.

Based on this evidence, it is clear that Plaintiffs' hypertension is a disability under the ADAAA.  *See*, *e.g., Gogos v. AMS Mech. Sys., Inc.*, 737 F.3d 1170, 1173 (7th Cir. 2013) (finding that chronic high blood pressure is a disability because it interfered with Plaintiffs' cardiovascular and circulatory systems); *Garner v. Chevron Phillips Chemical Co., L.P.*, 834 F. Supp. 2d 528, 538-39 (S.D. Tex. 2011) (stating that disability includes hypertension, even if it is episodic or in remission); *cf. Blackard v. Livingston Parish Sewer Dist.*, No. 12-704, 2014 U.S.

Dist. LEXIS 5490, at *5 (M.D. La. Jan. 14, 2014)) (listing "hypertension, asthma, diabetes, major depression, bipolar disorder" as impairments which qualify as disabilities under the ADAAA).[110]

> **b.    Plaintiffs' medications for hypertension substantially limit their ability to thermoregulate.**

Under the ADAAA, while "mitigating measures (such as medications . . .) are ignored when assessing whether an impairment substantially limits a person's major life activities,"[111] "the negative side effects of medication" should be considered when determining substantial limitations on a major life activity.  29 CFR 1630.2(4)(ii); *Garner*, 834 F. Supp. 2d at 539 (citing ADAAA (2008), Pub. L. 110-325, Sec. 4 § 3(4)(E)(1), 122 Stat. 3553, 3556).  Plaintiffs take several prescription medications for their hypertension that negatively affect their ability to thermoregulate.

First, Ball takes a "beta blocker," and all Plaintiffs take a "calcium channel blocker."  Dr. Vassallo testified that both the beta blocker and the calcium channel

---

[110] While noting that it may be that hypertension always constitutes a disability, in this matter, Plaintiffs only contend that their hypertension—which is uncontrolled—causes substantial impairment in their ability to maintain a normal body temperature in the environment to which they are confined for 23 hours per day and thus is a disability.

[111] "Someone who began taking medication for hypertension before experiencing substantial limitations related to the impairment would still be an individual with a disability if, without the medication, he or she would now be substantially limited in functions of the cardiovascular or circulatory system."  *Gogos*, 737 F.3d at 1173 (citing 29 C.F.R. 1630.2(j)(1)(vi)).

blockers "impair[] the ability of the body to cool, because the blood vessels are not able to dilate properly" and because they "decrease the heart's ability to pump as hard and to meet the requirements of heat or exercise."  ROA.5997:19-ROA.6002:18 (Ball is susceptible to heat-related illness and limited in his ability to thermoregulate because of his age, his "not well controlled" blood pressure, and medications he takes to treat his heat-sensitive disabilities; Ball's symptoms like dizziness and weakness are common signs of heat exhaustion); ROA.6002:19-ROA.6004:2 (describing similar concerns and symptoms for Code); ROA.6004:3-ROA.6006:2 (describing similar risks associated with hypertension and additional risks associated with psychotropic medication for Magee).

Second, Dr. Vassallo noted that Plaintiffs Ball and Code are required to take angiotensin receptor blockers (ARBs), which further substantially limit the ability to thermoregulate by preventing the normal acclimatization process where individuals physiologically adjust to changing environmental conditions. ROA.5997:19-ROA.6000:11 (Angiotensin is "involved in thermoregulation [a]nd particularly in climatization [sic].  You cannot climatize [sic] when your angiotensin system is blocked."), ROA.6003:7-8.

Finally, Dr. Vassallo noted that Plaintiffs take diuretic medications, such as Lasix and HydroDiuril, which substantially limit their ability to thermoregulate. ROA.6001:2-17 (diuretics "are important in decreasing the ability to

thermoregulate" and are "one of the most recognized drugs that lessens the ability of the body to thermoregulate"), ROA.6003:7-20.  Dr. Vassallo explained that diuretic medications cause loss of water and salt, thereby decreasing the fluids around which the heart can contract and limiting the heart's ability to pump blood. ROA.6001:2-17.  The heart and the cardiovascular system are integral to the ability to thermoregulate because the heart must have a healthy pump and the blood vessels must be able to dilate.  ROA.5996:22-ROA.5997:1.  Thermoregulation requires a "very healthy squeeze of the heart and very healthy compliant vascular system," neither of which Plaintiffs have as a result of their disabilities and the medications necessary to treat those disabilities.  ROA.6000:6-8.  By affecting the heart and circulatory system in this manner, diuretics inhibit body's ability to thermoregulate more than what would occur without such medications. ROA.6000:6-8.

Plaintiffs are unable to perform the major life activity of thermoregulation. Because of their hypertension and the medications they take to treat it, Plaintiffs have a substantially limited ability to thermoregulate.  ROA.5996:14-ROA.6005:2, ROA.6049:18-ROA.6053:19 (Plaintiffs are at increased risk of heatstroke "because they have underlying health problems, including cardiovascular disease, diabetes, hypertension . . . [and take] medications that are required to treat them, which prevent their ability to respond to heat").

c.     **Ball's diabetes substantially limits his ability to thermoregulate.**

In addition to his hypertension, Ball's diabetic condition also causes a substantial limitation on his major life activity of thermoregulation by impairing his cardiovascular system. The undisputed evidence shows that Ball suffers from diabetes. ROA.6051:5 (describing Ball's "uncontrolled diabetes").

Dr. Vassallo testified that "diabetes causes cardiovascular disease" and that "the ability to maintain temperature is dependent on the cardiovascular system." ROA.5996:19-ROA.5997:9. The specific impairment, as described by Dr. Vassallo, is that the blood vessels lose the ability to move blood to the periphery of the body, which is a critical function in thermoregulation when the body encounters hot environments. ROA.5996:19-ROA.5997:9. In this respect, Ball's diabetes causes further medical complications and symptoms with respect to the cardiovascular system. Courts have found that where diabetes causes substantial impairments on major life activities, diabetes is a disability. *See, e.g.*, *Willoughby v. Connecticut Container Corp.*, No. 11-992, 2013 WL 6198210, at *9 (D. Conn. Nov. 27, 2013) ("[Under] the ADAAA, . . . Plaintiff—who *suffers [from] symptoms due to diabetes,* which is by definition a disease which impacts the functioning of the endocrine system—could indeed easily be found by a jury to

be an individual who . . . has a disability under the ADA.").[112]  Thus, Ball is also

an individual with a disability as a result of the substantial impairment that his

diabetes has on the major life activity of thermoregulation.

> **d.      Ball's diabetic condition also affects the major bodily function of operation of the endocrine system and seeing.**

Ball's diabetic condition is also a disability under the ADAAA because it

affects Ball's major bodily function of operation of the endocrine system and his

major life activity of seeing.  The district court erred by failing to evaluate the

evidence showing the extent to which Ball's diabetes substantially limits his major

life activities *outside of his diabetes' impact on his ability to thermoregulate*.

Under the ADAAA, major life activities include the operation of major

bodily functions such as the endocrine system.  42 U.S.C. § 12102(2); *see supra*

§ VII.A.1.  It is well-established that diabetes as a disease substantially affects the

major bodily function of operation of the endocrine system.  *See, e.g.*, 29 C.F.R.

§ 1630.2 (EEOC regulations stating that "it should be easily concluded" that

"diabetes substantially limits endocrine function").  Courts have found that

diabetes is a disability under the ADAAA, consistent with the EEOC regulations'

---

[112] One of the ADAAA's purposes was to ensure that specific heat-sensitive disabilities including diabetes were within the definition of disability.  *See Pinckney v. Fed. Reserve Bank of Dallas*, 2013 WL 5461873, at *8 (W.D. Tex.) (quoting *Koller v. Riley Riper Hollin & Colagreco*, 850 F. Supp. 2d 502, 513 (E.D. Pa. 2012)).

guidance. *See, e.g.*, *Szarawara v. Cnty. of Montgomery*, No. 12-5714, 2013 WL

3230691, at *3 (E.D. Pa. June 27, 2013) ("The EEOC has advised that diabetes

'will, as a factual matter, virtually always be found to impose a substantial

limitation' on endocrine function.  29 C.F.R. § 1630.2(j)(3)(ii)-(iii).").

Here, Ball's diabetes caused a persistent and sharp spike in his blood glucose

levels, which is evidence of a substantial limitation on the endocrine system.

ROA.5751:14-ROA.5752:21.  Thus, Ball is an individual with a disability because

his diabetic condition substantially limits his endocrine system's operation.

Additionally, Ball's diabetes substantially limits his major life activity of

seeing.  Seeing is a major life activity, according to the ADA, ADAAA, and EEOC

Implementing Regulations, and was recognized by the district court as a "major

life activity."  ROA.5047; 42 U.S.C. § 12102(2)(A); 29 C.F.R. § 1630.2(i).

At trial, Ball testified as to his diabetes-induced vision impairment, stating

he had experienced extreme symptoms for several days before his diabetes

diagnosis.  ROA.5751:14-ROA.5752:21.  These symptoms included blurred vision

to the point that he was barely able to see the television screen.

ROA.5751:14-ROA.5752:21.  The evidence of Ball's visual impairment is

sufficient to substantiate a disability finding.[113]  Since the district court recognized

---

[113] Though Ball received treatment for his diabetes after his diagnosis, this
evidence was still sufficient to find that Ball had a disability, because disability

that seeing is a "major life activity" for ADA purposes, its failure to consider the evidence in the record of Ball's visual impairment resulting from diabetes was reversible error.

> e.    **Magee's psychotropic medication substantially limits his ability to thermoregulate.**

In addition to his hypertension, Magee suffers from depression, for which he is prescribed Fluoxetine, a Selective Serotonin Reuptake Inhibitor ("SSRI") commonly known as "Prozac." ROA.6004:24-ROA.6005:20. This drug inhibits Magee's hypothalamus and its ability to maintain his body temperature to 98.6º. ROA.6004:24-ROA.6005:20. Dr. Vassallo testified that, "One of the major pieces of thermoregulation occurs in the brain. . . . [P]articularly where SSRI's are at work . . . they decrease the ability of the thermacenter, the hypothalmus [sic], to do what it's supposed to do, which is to keep the temperature within half a degree of 98.6 degrees Fahrenheit." ROA.6004:24-ROA.6005:20. Dr. Macmurdo noted that Magee also takes Remeron, another psychotropic drug. ROA.6444:9-12. Thus, the psychotropic medication Magee takes substantially limits his ability to thermoregulate, which qualifies him as an individual with a disability.

---

must be determined without regard to mitigating measures. ADAAA, Pub. L. 110-325, Sec. 4 § 3(4)(E)(i), 122 Stat. 3553, 3556.

**B.     The district court's error was prejudicial.**

The district court, having concluded in error that Plaintiffs were not

qualified individuals with disabilities, did not analyze the remaining elements of

Plaintiffs' disability claims.  This Court should accordingly remand to the district

court for further proceedings.  *See, e.g.*, *Arthur J. Gallagher & Co. v. Babcock*, 339

F. App'x 384, 388 (5th Cir. 2009) (remanding for further consideration of

remaining elements); *Spectators' Commc'n Network Inc. v. Colonial Country

Club*, 253 F.3d 215, 225 (5th Cir. 2001) (same).  Should this Court analyze the

remaining elements, it is clear that the district court's error was prejudicial.

**1.     Defendant DOC is subject to Title II of the ADA and
Section 504 of the RA.**

The district court correctly noted that the DOC did not contest that they are

subject to Title II of the ADA and Section 504 of the RA.  ROA.5044-5045.  The

district court's decision that the DOC was a "public entity" within the purview of

the ADA was consistent with precedent.  *See, e.g.*, *Pa. Dep't of Corr. v. Yeskey*,

524 U.S. 206, 210 (1998) ("[s]tate prisons fall squarely within the statutory

definition of public entity").

The DOC receives federal financial assistance.  *See* PLS_EX_133,

ROA.5044-5055.  Thus, the DOC must comply with the RA.  *Pace v. Bogalusa

City School Board*, 403 F.3d 272, 282-285 (5th Cir.) (en banc) (42 U.S.C.

§ 2000d-7 "conditions receipt of federal funds . . . on the State's waiver of

Eleventh Amendment immunity" for suits under the RA).

> **2.    The DOC discriminated against Plaintiffs and violated the DOC's obligations under the ADA and RA.**

Title II of the ADA and § 504 of the RA govern the DOC's legally required

provision of safe, appropriate housing to all inmates.[114]  The evidence at trial was

sufficient to show that the DOC violated the ADA and RA in at least two ways.

> **a.    The DOC refused to provide Plaintiffs with a reasonable modification despite Plaintiffs' requests.**

Title II of the ADA and § 504 of the RA "impose [on public entities] an

affirmative obligation to make reasonable accommodations for disabled

individuals" to ensure that they are not denied the benefits of government services

or programs.  *Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 454 (5th

Cir. 2005).  *See also Garrett v. Thaler*, 560 F. App'x 375, 382 (5th Cir. 2014)

("Title II imposes an obligation on public entities to make reasonable

accommodations or modifications for disabled persons, including prisoners.").  To

prevail, "discrimination need not be the sole reason" for the exclusion of or denial

of benefits to the plaintiff.  *See, e.g., Bennett-Nelson* 431 F.3d at 454.

---

[114] 28 C.F.R. § 35.152(b)(3) ("Public entities shall implement reasonable
policies . . . so as to ensure that each inmate with a disability is housed in a cell
with the accessible elements necessary to afford the inmate access to safe,
appropriate housing.").

Here, the DOC discriminated against Plaintiffs by failing to provide reasonable accommodations to ensure Plaintiffs were not denied safe housing.[115] Under the ADA and RA, individuals with disabilities "must be provided with meaningful access to the benefit that the [federal] grantee offers." *Alexander v. Choate*, 469 U.S. 287, 301 (1985). "[T]o assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made." *Id.* To show a failure to accommodate, Plaintiffs were required to show that the DOC—despite its awareness of Plaintiffs' disabilities—denied a reasonable accommodation. *See, e.g.*, *Bennett-Nelson*, 431 F.3 at 455 ("[W]hether the failure to accommodate the disability violates the ADA . . . depends on whether . . . the demanded accommodation is in fact reasonable and therefore required. If the accommodation is required, the defendants are liable simply by denying it."). *See also U.S. v. Georgia*, 546 U.S. 151, 157 (2006) (failure to accommodate disability plausibly "constituted exclusion from participation or denial of the benefits of the prison's services, programs, or activities.") (citations omitted).[116]

---

[115] Prisons are legally required under the Eighth Amendment to provide safe housing. *See, e.g.*, *Collier*, 501 F.2d at 1303 (confining inmates "in barracks unfit for human habitation and in conditions that threaten their physical health and safety . . . constitutes cruel and unusual punishment").

[116] This Court has recognized some distinction between the ADA's and the RA's causation language. *See, e.g.*, *Pace*, 403 F.3d at 288-89. However, where a discrimination claim is based on failure to provide a reasonable accommodation, this Court has clarified that there is no fundamental difference in the causation

Here, Defendants were aware of Plaintiffs' disabilities.  Plaintiffs made

requests through grievance procedures describing their disabilities and the

corresponding increased risk of heat-related illness and requesting "any effective

cooling system," but were categorically refused.  PLS_EX_39-48.  Having been

informed of Plaintiffs' disabilities, Defendants had an affirmative obligation to

provide a reasonable accommodation to ensure that they were not exposed to an

increased risk of heat-related illness.  Indeed, Defendants' unjustified denial of

accommodations to Magee is particularly egregious.  Despite knowing that Magee

takes psychotropic medication, Defendants did not place Magee on the Heat

Precaution Lists that Defendants maintain pursuant to their own policies requiring

that prisoners on psychotropic drugs be placed on the list and monitored during

extreme heat conditions.  ROA.5032-5034.

Defendants never explored any of the reasonable accommodations that could

have been provided to Plaintiffs.  An accommodation is unreasonable where it

"would require a fundamental alteration in the nature of the program'" or "would

impose 'undue financial or administrative burdens.'"  *Bennett-Nelson*, 431 F.3d at

455 (citing *School Board of Nassau County v. Arline*, 480 U.S. 273, 288 n.17

---

analysis, since the cause of a failure to accommodate is irrelevant.  *Bennett-Nelson*,
431 F.3d at 454-55 ("[B]oth the ADA and the Rehabilitation Act impose upon
public entities an affirmative obligation to make reasonable accommodations . . . .
Where a defendant fails to meet this affirmative obligation, the cause of that failure
is irrelevant.").

(1987)).  *See also* 28 C.F.R. § 35.130(b)(7).  Plaintiffs requested any effective

cooling system that would lower the heat indices to mitigate the heightened risks of

heat-related illness on the basis of their disabilities.  PLS_EX_39-48.  Ensuring a

maximum heat index of 88º would not have constituted a "fundamental alteration"

to the DOC's services, programs, or activities, because the DOC is already legally

required to provide safe housing.

Nor did Plaintiffs' request for reasonable accommodations impose undue

financial costs or administrative burden.  Any number of cooling mechanisms

could have achieved the reduction in risks of heat-related illness caused by

Plaintiffs' disabilities.  Defendants' expert testified, "There's many, many ways to

skin a cat. . . .  There are many different systems that can be utilized to provide

cooling" that would accommodate Plaintiffs (ROA.6315:6-19), and specifically

stated that "spot coolers" or window units could have lowered the heat index to

a safe level.  ROA.6309:5-20, ROA.6314:13-ROA.6315:5.

Plaintiffs concede that there was no evidence showing the costs of potential

accommodations.  But any lack of evidence was the result of Defendants' refusal

to describe the administrative burden or financial costs during discovery—conduct

for which Defendants were sanctioned by the district court.  ROA.5099-5106.

While Defendants have now created a plan that would lower the heat index in

Plaintiffs' cells and mitigate the risk of heat-related illness, ROA.5393-5421

Case: 14-30067    Document: 00512779550    Page: 87    Date Filed: 09/23/2014


(Defendants' Heat Remediation Plan), there remains no evidence in the record as to the costs of Defendants' proposed plan.[117]  Given Defendants' discovery misconduct the district court's resulting sanctions, this Court should remand for further proceedings on this element.

> **b.    The DOC discriminated by applying neutral policies that had a disparate impact on Plaintiffs as a result of Plaintiffs' disabilities.**

The DOC discriminated against Plaintiffs when it applied facially neutral policies in a manner that disproportionately impacted Plaintiffs.  The application of neutral policies is discriminatory where the facially neutral policy disproportionately negatively impacts persons with disabilities, regardless of intent.  *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003) ("disparate-impact claims are cognizable under the ADA") (citations omitted); *Gonzales v. City of New Braunfels, Tex.*, 176 F.3d 834, 839 & n.26 (5th Cir. 1999) (same).

Here, Defendants confine Plaintiffs to their cells for 23 hours per day with limited access to ice or other ameliorative measures.[118]  Given Plaintiffs'

---

[117] To the extent that testimony on costs exists, that testimony relates to a hypothetical plan that was never ordered to be implemented. ROA.6303:21-ROA.6305:12 (testimony from Defendants' expert Eyre that the cost estimate provided at trial was "very high-end" and a "worst case scenario" and that "it could be considerably less than that").

[118] *See supra* § III.A.  The decision to move Plaintiffs in 2007 from the old death row facility to a "new and modern" facility (ROA.6198:7-8) that did not include mechanical cooling, or even initially fans (ROA.5731:11-24), was itself discriminatory.

71

disabilities, these facially neutral policies force Plaintiffs to endure a higher risk of heat-related illness than the general population would face.[119]  Based on this evidence, the district court could have found that injunctive relief was warranted to prevent this discrimination.  *See, e.g.*, *Armstrong*, 622 F.3d at 1068 (upholding injunctive relief ordered by district court to prevent discriminatory impact on prisoners with disabilities).

## VIII.  CONCLUSION

For the foregoing reasons, this Court should affirm the district court's opinion on the Eighth Amendment and remand with respect to the disability claims for further findings.

Respectfully submitted on September 23, 2014.

*s/ Mercedes Montagnes*
Mercedes Montagnes, LA Bar No. 33287
(Lead Counsel)
Elizabeth Compa, LA Bar No. 35004
The Promise of Justice Initiative
636 Baronne Street
New Orleans, LA  70113
Telephone:  (504) 529-5955
Facsimile:  (504) 558-0378
mmontagnes@thejusticecenter.org
bethc@thejusticecenter.org

Nilay U. Vora, CA Bar No. 268339
Mitchell A. Kamin, CA Bar No. 202788
Jessica Kornberg, CA Bar No. 264490

---

[119] *See supra* § VI.A.1.a.

Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California  90067-2561
Telephone:  (310) 201-2100
Facsimile:  (310) 201-2110
mak@birdmarella.com
jck@birdmarella.com
nuv@birdmarella.com


Steven Scheckman, LA Bar No. 08472
Schiff, Scheckman & White LLP
829 Baronne Street
New Orleans, LA  70113
Telephone:  (504) 581-9322
Facsimile:  (504) 581-7651
steve@sswethicslaw.com


*Attorneys for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

This brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B) because this brief contains 16,421 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii), and charts and graphs.

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 software in Times New Roman 14-point font.

September 23, 2014

*/s/ Mercedes Montagnes*
Mercedes Montagnes
*Attorney for Plaintiffs-Appellees*

74

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 23, 2014, a copy of the foregoing has this date been served upon all parties through their respective counsel of record by operation of the Court's electronic filing system and has been filed electronically with the Clerk of the Court using the CM/ECF system.

<u>*s/ Mercedes Montagnes*</u>
Mercedes Montagnes
*Attorney for Plaintiffs-Appellees*


E. Wade Shows
James L. Hilburn
Amy L. McInnis
Jacqueline B. Wilson
Shows, Cali and Walsh, LLP
628 St. Louis Street
PO Drawer 4425
Baton Rouge, LA  70821
Telephone:  (225) 346-1461
Facsimile:  (225) 346-1467
Emails:      wade@scwllp.com
                  jamesh@scwllp.com
                  amym@scwllp.com
                  jbw@scwllp.com

Thomas E. Balhoff
Judith R. Atkinson
Carlton Jones, III
Roedel, Parsons, Koch, Blache, Balhoff
& McCollister
Special Assistant Attorneys General
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809
Telephone:  (225) 929-7033
Facsimile:  (225) 928-4925
Emails:      tbalhoff@roedelparsons.com
                  jatkinson@roedelparsons.com
                  cjones@roedelparsons.com


*Attorneys for Defendants-Appellants*