**TAB 6**

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **ELZIE BALL, ET AL.** | **CIVIL ACTION** |
| **VERSUS** | |
| **JAMES M. LEBLANC, ET AL.** | **NO.: 13-00368-BAJ-SCR** |

## RULING AND ORDER

## I.     INTRODUCTION

On August 5, 2013, this matter came before the Court for a non-jury trial on the merits and a hearing on Plaintiffs' Motion for a Preliminary Injunction (Doc. 12).[1] Having considered the parties pretrial and post-trial submissions, the evidence introduced at the trial, and the arguments presented by counsel, the Court finds that Plaintiffs have satisfied their burden of proving that Defendants have subjected them to cruel and unusual punishment, in violation of the Eighth Amendment to the United States Constitution.   The Court finds, however, that Plaintiffs did not introduce sufficient evidence to establish that Defendants have violated the Americans with Disabilities Act, as modified by the Americans with Disabilities Act Amendment Act, and Section 504 of the Rehabilitation Act of 1973.   Accordingly, Plaintiffs' request for declaratory and injunctive relief is **GRANTED IN PART** and **DENIED IN PART**, as

---

[1] The Court initially heard Plaintiffs' Motion for a Preliminary Injunction with oral argument on July 2, 2013.  (Doc. 24.)  At the conclusion of the hearing, the Court deferred its ruling on the motion, pending the collection of essential data by a neutral third-party expert, re-set the motion hearing to August 5, 2013, and set the trial on the merits to August 5, 2013.

outlined below.  Further, Plaintiffs' Motion for a Preliminary Injunction (Doc. 12) is

**DENIED AS MOOT**.[2]  The Court's credibility findings, findings of fact and conclusions

of law are set forth below, as required by Federal Rule of Civil Procedure ("Rule") 52(a).

## II.     JURISDICTION

It is uncontested that this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331,

1343, and 2201.

## III.    BACKGROUND

### A.     Plaintiffs' Claims

Plaintiffs Elzie Ball ("Ball"), Nathaniel Code ("Code"), and James Magee

("Magee") (collectively "Plaintiffs") are death row inmates, who are currently

incarcerated at the Louisiana State Penitentiary in Angola, Louisiana ("Angola").

Plaintiffs filed this lawsuit against Defendants James M. LeBlanc[3] ("LeBlanc"), Nathan

Burl Cain[4] ("Cain"), Angelia[5] Norwood[6] ("Norwood"), and the Louisiana Department of

---

[2] Whether to grant or deny a request for a preliminary injunction is within the sound discretion of the district court.  *See Allied Marketing Group, Inc. v. CDL Marketing, Inc.*, 878 F.2d 806, 809 (5th Cir. 1989).  However, the purpose of a preliminary injunction is to prevent irreparable injury so as to preserve the Court's ability to render a meaningful decision on the merits.  *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 627 (5th Cir. 1985) (citing *Canal Authority of Florida v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974)).  Because the Court now issues its ruling and order on the merits, a preliminary injunction is no longer necessary.  Therefore, Plaintiffs' request is denied as moot.

[3] Defendant LeBlanc is the Secretary of the Louisiana Department of Public Safety and Corrections. (Doc. 1, ¶ 10.)  LeBlanc is sued in his official capacity for declaratory and injunctive relief.

[4] Defendant Cain is the Warden of the Louisiana State Penitentiary in Angola, Louisiana.  (Doc. 1, ¶ 8.) Cain is sued in his official capacity for declaratory and injunctive relief.

[5] Plaintiffs identified Defendant Norwood at "Angela" in their complaint.  However, Defendant Norwood's testimony at trial was that her first name is spelled as above.

[6] Defendant Norwood is the Assistant Warden in charge of death row at the Louisiana State Penitentiary in Angola, Louisiana.  (Doc. 1, ¶ 9.)  Norwood is sued in her official capacity for declaratory and injunctive relief.

2

Public Safety and Corrections (collectively "Defendants") pursuant to 42 U.S.C. § 1983[7]

("Section 1983"); the Eighth Amendment to the United States Constitution, U.S. Const.

amend. VIII; Fourteenth Amendment to the United States Constitution, U.S. Const.

amend. XIV, § 1; Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C.

§ 12101, *et seq.*, as modified by the Americans with Disabilities Act Amendment Act

(the "ADAAA"), 42 U.S.C. § 12131, *et seq.*; and Section 504 of the Rehabilitation Act of

1973 (the "Rehabilitation Act"), 29 U.S.C. § 794.    (Doc. 1.)    Plaintiffs allege that

Defendants have violated, and continue to violate, their rights under the Eighth

Amendment, ADA, ADAAA, and Rehabilitation Act by subjecting them to excessive

heat, acting with deliberate indifference to their health and safety, and discriminating

against them on the basis of their disabilities.

Plaintiffs seek a ruling and order from this Court granting their Motion for a

Preliminary Injunction (Doc. 12), and requiring Defendants to take action to decrease

and maintain the heat index in the Angola death row tiers at or below 88 degrees

Fahrenheit.[8]   Plaintiffs further seek a ruling and order: (1) declaring that Defendants

---

[7] As discussed below, the gravamen of Plaintiffs' Section 1983 claim is that Defendants have subjected them to cruel and unusual punishment, in violation of the Eighth Amendment, made applicable to the States by the Fourteenth Amendment.

[8] Plaintiffs request that Defendants be required to decrease and maintain the heat index at or below 88 degrees Fahrenheit based on the recommendations of their expert, Dr. Susan Vassallo, M.D.:

| BY MR. KAMIN: | And do you have an opinion, Dr. Vassallo, on the heat index thresholds that you would recommend for creating a safer environment for the Plaintiffs on death row? |
|---|---|
| BY DR. VASSALLO: | Well, in my report, I have put that temperature at 88 degrees.  That is probably towards the warmer side . . . none of us would tolerate being in a setting at 88 degrees heat index . . . we would get out of that and we |

3

have violated Plaintiffs' rights; (2) requiring Defendants to develop and implement a long-term plan to maintain the heat index in the Angola death row tiers at or below 88 degrees Fahrenheit; (3) appointing a monitor to oversee Defendants' implementation of such plan; (4) requiring Defendants to provide Plaintiffs clean, uncontaminated ice and drinking water at regular intervals during the summer months; (5) requiring Defendants to lower the shower temperature during the summer months; and (6) enjoining Defendants from retaliating against Plaintiffs.[9]     Plaintiffs also seek attorneys' fees, pursuant to 42 U.S.C. §§ 1988 and 12205.

Defendants oppose Plaintiffs' Motion for a Preliminary Injunction and deny all liability. (Docs. 15, 38.) Defendants contend that Plaintiffs have not suffered, nor are they likely to suffer, adverse health effects due to the conditions of confinement at Angola's death row facility. Defendants further contend that they have not violated Plaintiffs' rights under the ADA, ADAAA, or Rehabilitation Act. Thus, Defendants request that the Court deny Plaintiffs' motion, rule in Defendants' favor, and deny Plaintiffs all requested relief.

---

would go into some cooler setting. . . . I derive[d] that based on the [National Oceanic and Atmospheric Administration] charts, as well as the literature, which I have at least five or six articles behind that statement, that show this sort of a U-shape that when it's 88, 90 degrees, the morbidity and mortality from heat rises exponentially. And those are all [in] peer review scientific articles.

Trial Transcript, Testimony of Dr. Susan Vassallo, Aug. 6, 2013.

[9] At the conclusion of the trial on the merits, the Court denied Plaintiffs' request that the Court enjoin Defendants from retaliating against Plaintiffs. Trial Transcript, Aug. 7, 2013. Accordingly, this request for injunctive relief was denied, as Plaintiffs failed to present evidence that Defendants were likely to retaliate against them.

4

14-30067.4960

### B.    Procedural History

The instant litigation was filed on June 10, 2013.  (Doc. 1.)  Eight days later, Plaintiffs filed a Motion for a Preliminary Injunction.  (Doc. 12.)

On July 2, 2013, Plaintiffs' Motion for a Preliminary Injunction was heard with oral argument.  (Doc. 24.)  After considering the parties' arguments, the Court determined that it was necessary to obtain current, accurate temperature, humidity, and heat index data from Angola's death row facility before ruling on Plaintiffs' motion. Accordingly, the Court deferred its ruling, pending the collection of such data by a neutral third-party expert.  (Doc. 24.)  The Court also issued a scheduling order, and set the trial on the merits to begin on August 5, 2013.  (Docs. 24, 28.)  Subsequently, the Court ordered the parties to retain a neutral third-party expert to install the necessary equipment, and record, collect, and disseminate the required data, beginning on July 15 and ending on August 5, 2013.  (Doc. 36.)

From August 5 through August 7, 2013, the Court conducted a hearing on Plaintiffs' Motion for a Preliminary Injunction and the trial on the merits. Fed.R.Civ.P. 65(a)(2).  During the trial, the parties jointly submitted the temperature, heat index, and humidity data collected and analyzed by the neutral third-party expert, United States Risk Management, L.L.C. ("USRM"), to the Court.  During the trial, the parties also presented testimonial evidence regarding the conditions at Angola's death row facility, and Plaintiffs' underlying medical conditions and medications.  Following the trial, the undersigned toured the death row facility and observed the conditions first-hand.  As a result, the Court makes the following

credibility findings, findings of fact, and conclusions of law.

## IV.    CREDIBILITY FINDINGS

1.    "In a non-jury trial, credibility choices and the resolution of conflicting testimony are the province of the judge, subject only to Rule 52(a)'s clearly erroneous standard." *Justiss Oil, Co., Inc. v. Kerr-McGee Refining Corp.*, 75 F.3d 1057, 1067 (5th Cir. 1996) (citation omitted); *Reich v. Lancaster*, 55 F.3d 1034, 1045 (5th Cir. 1995) ("The trial judge's 'unique perspective to evaluate the witnesses and to consider the entire context of the evidence must be respected.'") (citation omitted).

2.    In making its findings of fact, the undersigned relied on the parties' written submissions, the oral testimony presented at trial, and the evidence introduced at trial. Due to the number of disputed facts, it was necessary to consider the demeanor of each witness, his or her interests in the case, and the internal consistency of his or her testimony.  *See Justiss Oil*, 75 F.3d at 1067.

3.    The following are the Court's credibility findings as to Defendant Norwood.

4.    On July 15, 2013 at 4:45 p.m., Defendant Norwood issued an email to all of the death row supervisors regarding the monitors that were installed in the death row tiers by USRM.  Norwood's email ordered the following:

> In order to ensure accurate and consistent temperature recording, all fans and windows are not to be adjusted in any manner.  In addition, no offender and/or employee is to tamper with the recording devices placed on each tier.  Only authorized persons will be allowed inside the cells with the recording devices.

5.    Despite Norwood's issuance of the hold order, Defendants installed awnings over the windows in tiers C and G on or about July 26, 2013.  Such awnings remained on

6

14-30067.4962

the windows from that date until the end of the data collection period. Defendants also attempted to wet and/or mist the ceiling and/or outside walls of certain housing tiers using water hoses. Defendants took such actions without seeking the permission of the Court.

6.     When asked by counsel for Plaintiffs about her understanding as to the purpose of the data collection, Norwood testified as follows:

| | |
|---|---|
| BY MR. VORA: | Ms. Norwood, what was your understanding as to why USRM was installing those monitors? |
| BY MS. NORWOOD: | Because the Judge wants a fair and impartial, objective reading of the temperatures. |
| BY MR. VORA: | And you understood that it was important for you to make sure that he did get fair and impartial readings of the temperatures inside of the death row tiers, correct? |
| BY MS. NORWOOD: | Yes. |
| BY MR. VORA: | In fact, you understood it and you even advised the other death row supervisors to ensure that the correctional officers also understood that they were to ensure that the Judge received fair and impartial numbers for the USRM monitors, correct? |
| BY MS. NORWOOD: | Yes. |
| | . . . |
| BY MR. VORA: | The reason that you asked for all the fans and windows not to be adjusted in any manner was to ensure, in your words, accurate and consistent temperature recordings, correct? |
| BY MS. NORWOOD: | Yes. |

7

Trial Transcript, Testimony of Angelia Norwood, Aug. 5, 2013.

7.      Later, Norwood testified that she understood that: (1) the data was being collected pursuant to a court order; (2) she had an obligation to obey the Court's order; and (3) she had an obligation not to engage in any actions that could possibly interfere with the collection of such data.

> BY MR. VORA:          And you understand that the USRM data was also being collected pursuant to the Court's order, correct?
>
> BY MS. NORWOOD:       Yes.
>
> BY MR. VORA:          And you understood that you had a duty to obey the Court's order and to not engage in any action that might interfere with the Court's collection of that data, correct?
>
> BY MS. NORWOOD:       Yes.
>
>                       . . .
>
> BY MR. VORA:          You understood that the Court wanted accurate and consistent temperature recordings, correct?
>
> BY MS. NORWOOD:       Yes.

Trial Transcript, Testimony of Angelia Norwood, Aug. 5, 2013.

8.      Despite this testimony, Norwood proceeded to testify that it "didn't occur" to her that Defendants' installation of window awnings and use of "soaker" hoses might interfere with the data collection. Trial Transcript, Testimony of Angelia Norwood, Aug. 5, 2013.

> BY MR. VORA:          . . . [D]id it ever cross your mind that the awnings might interfere with this Court's order that the

8

> temperature be accurately consistently recorded and collected?

> BY MS. NORWOOD:     No, it did not.

Trial Transcript, Testimony of Angelia Norwood, Aug. 5, 2013.

9.     Norwood further added that she did not see a problem with Defendants' installation of the awnings or use of the "soaker" hoses.  Thus, she did not question her superiors, nor did she attempt to prevent the installation or use of such devices, after Defendant Cain ordered the installation and use of such.

10.     Norwood's credibility was further undermined by her testimony that it "didn't occur" to her that Defendants' installation and use of such devices was inconsistent with her July 15, 2013 email.  Trial Transcript, Testimony of Angelia Norwood, Aug. 5, 2013.

11.     When questioned by the Court, Norwood testified as follows:

> BY THE COURT:     . . . it didn't dawn on you that [Defendants'] activity was completely inconsistent with your email, the message in your email? . . . and now you are testifying - you're telling the Court that somehow you didn't think there was any problem with the installation, even after you issued this email message to all [of] the supervisors on death row?  You saw nothing wrong, no problem with the installation of the awnings?  You saw no problem with the use of the misters or soaker hoses or anything else?  Is that what you are telling me?

> BY MS. NORWOOD:     Yes, sir.  It is.

Trial Transcript, Testimony of Angelia Norwood, Aug. 5, 2013.

12.     When further questioned by the Court, Norwood testified that she did not

9

14-30067.4965

believe that the awnings or "soaker" hoses would affect the temperature readings.

13.     That testimony, however, was wholly inconsistent with Norwood's later testimony, in which she admitted that the *purpose* of the awnings and "soaker" hoses was to attempt to lower the temperatures inside the death row housing tiers:

| | |
|---|---|
| BY MR. VORA: | Why were the awnings installed on the death row tiers? |
| BY MS. NORWOOD: | To see if it would make a difference as far as providing shade over the windows, to see if it would cool - to see if it would make a difference, as far as the temperature, to bring it down. |
| | . . . |
| BY MR. VORA: | Are you ever in a position to ask Warden Venoit questions? |
| BY MS. NORWOOD: | Yes. |
| BY MR. VORA: | Did you ask him whether installing soaker hoses would affect the gathering of the data consistently and accurately pursuant to this Court's order? |
| BY MS. NORWOOD: | Not in so many words. |
| BY MR. VORA: | Did you ask him in any words? |
| BY MS. NORWOOD: | Yes. |
| BY MR. VORA: | What did you ask him? |
| BY MS. NORWOOD: | I asked him if he seriously thought that wetting the outside of that building would impact the interior temperature. |
| BY MR. VORA: | Why did you ask him about impacting the interior temperature, but you didn't ask him |

10

|  |  |  | about whether or not that would be consistent with this Court's order that accurate and consistent data be recorded? |
|--|--|--|--|

BY MS. NORWOOD:    It didn't occur to me.

. . .

BY MR. VORA:    But your understanding as to why any of these actions with respect to soaker hoses or awnings, your understanding was that it was in order to further the settlement, correct?

BY MS. NORWOOD:    No.

BY MR. VORA:    What was your understanding as to why that was happening?

BY MS. NORWOOD:    My understanding was to - to see if there was anything that would work to reduce the temperature.

Trial Transcript, Testimony of Angelia Norwood, Aug. 5, 2013.

14.    As highlighted above, Norwood's testimony was illogical and riddled with contradictions and inconsistencies.  For example, despite instructing her subordinates to not tamper with the tier windows "to ensure accurate and consistent temperature recording[s]," Norwood attempted to convince the Court that it "didn't occur" to her that Defendants' installation of the window awnings and use of "soaker" hoses may interfere with the data collection.

15.    In another example, Norwood testified that she understood that the purpose of the twenty-one day data collection period was to collect accurate and consistent data.  Yet, she testified that she never questioned Defendants' attempts to alter the temperature, and thus, the data.

16.     In another example, despite testifying that it "didn't occur" to her that Defendants' actions may alter the temperature, and thus, the data, Norwood subsequently testified that the *purpose* of the window awnings and "soaker" hoses was to alter the temperature inside the death row tiers.

17.     In sum, the Court finds that Norwood's testimony on this issue lacked the ring of truth. Accordingly, this Court does not consider Norwood to be a credible witness, particularly as it relates to Defendants' actions during the data collection period. Accordingly, Norwood's testimony regarding Defendants' actions during the data collection period were not relied on by the undersigned.

## V.     FINDINGS OF FACT

The following findings of fact are uncontroverted or supported by the evidence in the record. Where a particular fact was controverted, the Court weighed the evidence and determined that the evidence presented by the party supporting that fact was more persuasive.

### A.     Angola's Death Row

1.     In 2006, the Louisiana Department of Public Safety and Corrections constructed a new facility at Angola to house inmates who have been sentenced to death ("death row" or "death row facility"). The 25,000 square foot death row facility features four housing wings, each of which contains two housing tiers; (2) administrative offices; (3) visitation rooms; (4) a medical clinic; (5) a dental clinic; (6) a control center where the correctional officers are stationed; and (7) an execution chamber. Air conditioning is provided in the administrative offices, visitation rooms, medical clinic, dental clinic,

12

control center, and execution chamber.  Air conditioning is not provided in the tiers where the inmates are housed.

2.    Each of the four housing wings extend from the control center like spokes on a wheel.  Each wing contains two housing tiers, for a total of eight tiers.  Each tier is assigned a letter name: A, B, C, D, E, F, G, and H.  Currently, only tiers A, B, C, F, G, and H house death row inmates.

3.    Between the housing tiers, which sit back-to-back, are a series of pipes, in which are encased the plumbing, electrical wires, and duct work for the entire wing.

4.    Each tier contains between twelve and sixteen cells, which house one inmate each, and a tier walkway.  Tiers A, B, G, and H contain sixteen cells.  Tier C contains twelve cells.  Tier F contains fourteen cells.

5.    The ceiling, floor, and walls of each housing tier are made of concrete.  Similarly, the ceiling, floor, and walls of each inmate cell are made of concrete.

6.    Each inmate cell is separated from the tier walkway by metal security bars.

7.    Approximately nine feet across from the security bars are louver windows. The record is unclear as to how many windows are in each housing tier.  However, the record indicates that each window measures approximately two feet wide by four feet tall.

8.    Each louver window is comprised of a screen and a series of translucent, sloping, overlapping blades or slats that may be adjusted to admit varying degrees of air or

13

14-30067.4969

light.[10]  Like most louver windows, the windows do not open in the traditional method. Rather, to open the window, one must tilt or adjust the horizontal louvers by using a handle.  The maximum degree to which the louvers may be tilted is approximately forty-five degrees.

9.     Above the windows are non-oscillating mounted fans that measure thirty inches in width.[11]  Each fan is shared by two inmates (i.e., the fan services two cells).[12]  The uncontroverted testimony at trial was that the mounted fans were not a part of the original construction.  Rather, they were added to the death row tiers at a later date.

10.     Death row inmates are required to remain in their cells twenty-three hours a day.

11.     Each cell includes a sink, mirror, toilet, bed, desk, and chair.  There are no windows or fans inside the cells.  Rather, each cell contains a vent, measuring approximately six inches by eight inches, through which air from the window on the other side of the tier is drawn into the cell, and then into the vent, and then into the housing wing's exhaust system, and then to the outside.

12.     During the one hour period in which inmates are permitted to leave their cells, inmates may engage in outdoor recreation in the recreation cage[13], or spend time in the tier walkway ("tier time"), and/or take a shower.

_____

[10] It is not clear from the record whether the louvers are made of plastic, glass, or another material.

[11] The parties stipulated to the width of the death row fans.  (Doc. 70.)

[12] Mounted above the windows are televisions, which are also shared by two inmates (i.e., the television services two cells).

[13] Inmates are permitted to engage in outdoor recreation only four times per week.

14

14-30067.4970

Case 3:13-cv-00368-BAJ-SCR   Document 186-19   07/08/14   Page 209 of 403

13.     Each tier has two shower stalls, one standard shower and one handicap accessible shower.  Inmates are permitted one shower per day.  The shower water temperature is maintained between 100 and 120 degrees.[14]

14.     Each housing tier also has a portable, forty-eight ounce or sixty-eight ounce chest cooler ("ice chest") where Angola staff place ice from the death row facility's only ice machine.  The ice chest is located in the tier walkway, at the entrance of the tier. Inmates are permitted access to the ice chest during their tier time only.  Thus, during the twenty-three hours in which the inmates are confined to their cells, they do not have direct access to the ice chest.

15.     Ice is not usually distributed to the inmates by the correctional officers.  Indeed, the correctional officers are not required, and sometimes decline requests from the inmates, to distribute ice to the inmates.[15]  Rather, although they are not required to do so, the inmates who are on tier time usually distribute ice to the inmates who are confined to their cells.  As a result, the inmates who are confined to their cells must rely on other inmates to distribute ice to them during each respective inmate's tier time.

16.     If an inmate chooses to engage in outdoor recreation rather than tier time, or refuses to distribute ice to inmates who are confined to their cell, then the confined inmates do not receive ice during that hour.  Further, if an inmate exhibits habits that

---

[14] The uncontroverted testimony at trial is that the shower water temperature is required to range between 100 and 120 degrees to promote hygienic practices.

[15] During the trial, Defendant Norwood testified that "offender orderlies who are assigned to work death row" "are allowed" to distribute ice to the death row inmates, but only "if it is asked of them" by a correctional officer.  Trial Transcript, Testimony of Angelia Norwood, Aug. 7, 2013.

Case 3:13-cv-00368-BAJ-SCR   Document 87   12/19/13   Page 15 of 102
14-30067.4971

the other inmates consider to be unsanitary, the other inmates will not ask such inmate to distribute ice during his tier time.  As a result, inmates who are confined to their cells do not receive ice during that hour, unless the correctional officers agree to provide it.

17.     Inmates also do not have access to the ice chest during the overnight hours, during which the death row tiers are locked down.[16]  Further, it is uncontroverted that, over the course of a day, the ice in the ice chests, as well as the ice in the facilities' only ice machine, frequently runs out.[17]

18.     While Angola's death row has a facility-wide heating system, none of the housing wings include a mechanical cooling system by which the dry bulb[18] (i.e. ambient temperature) ("temperature"), humidity level[19], or heat index[20] can be lowered.

---

[16] The uncontroverted testimony at trial was that the housing tiers are placed on lock down beginning at 10:30 or 11:00 p.m.  It is not clear from the record what time the housing tiers are re-opened each morning.

[17] During the Court's site visit, Defendants contended that when the ice in the death row facility's only ice machine runs out, the correctional officers retrieve ice from the ice machines in a nearby housing unit.

[18] The dry bulb temperature is the temperature indicated by a dry-bulb thermometer that is the actual temperature of the air.  Merriam-Webster Dictionary (11th ed. 2009).

[19] Relative humidity is a dimensionless ratio, expressed in percent, of the amount of atmospheric moisture present relative to the amount that would be present if the air were saturated.  National Weather Service Glossary, http://forecast.weather.gov/glossary.php (last visited Dec. 17, 2013) [hereinafter "NWS Glossary"].

[20] The heat index, or the "apparent temperature," is an accurate measure of how hot it really feels when relative humidity is factored with the actual air temperature.  NWS Glossary, *supra* note 19.

Case 3:13-cv-00368-BAJ-SCR   Document 186-19   07/08/14   Page 211 of 403

19.     It is uncontroverted that the housing wings were designed without a mechanical cooling system.  Instead, each wing features a ventilation system that consists of the above-mentioned windows and cell vents, as testified to by witness Frank Thompson.[21]

BY MS. COMPA:            Is there any mechanism on the death row tiers to lower the temperature or humidity?

BY MR. THOMPSON:        No.  Just ventilation.

BY MS. COMPA:            What is the relationship between the temperature and the humidity outside and the temperature and humidity inside the death row tiers?

BY MR. THOMPSON:        The ventilation brings the air in from the back of the cells through the windows, across the - across the way - from the windows into the exhaust grill that's in the back of the cell.  So, it just brings it in from the outside.  So basically, you're using the outside air to cool or ventilate the space.

Trial Transcript, Testimony of Frank Thompson, Aug. 5, 2013.

20.     It is also uncontroverted that the ventilation system does not reduce the temperature, humidity level, or heat index in the housing tiers.  Thus, there is no system that will lower or limit the temperature, humidity level, or heat index in the tiers.

BY MS. COMPA:            And would it be any cooler inside than it is outside?

BY MR. THOMPSON:        No.  You would reach about the temperature in the shade would be your goal.

---

[21] During the trial, Thompson testified that his firm, Thompson, Luke & Associates, oversaw the construction of the death row facility.

17

Case 3:13-cv-00368-BAJ-SCR   Document 87   12/19/13   Page 17 of 102
14-30067.4973

BY MS. COMPA:         And humidity wise, is that also true?

BY MR. THOMPSON:      Humidity is similar.

BY MS. COMPA:         And, to your knowledge, is there an upper
                      limit to how hot it can become on the death
                      row tiers temperature wise?

BY MR. THOMPSON:      It's subject to what's outside, the outside
                      temperature.

Trial Transcript, Testimony of Frank Thompson, Aug. 5, 2013.

### B.   Plaintiff Elzie Ball

21.    Plaintiff Ball is sixty years old.  He has been on death row for sixteen years.

Currently, Ball lives in tier H, cell 5.[22]

22.    It is uncontroverted that Ball suffers from hypertension, diabetes, and obesity.

To treat his hypertension and diabetes, Ball takes a variety of medications that make

him more susceptible to heat-related illness.[23]

23.    It is also uncontroverted that Ball's blood pressure is uncontrolled, and that it

spikes during the summer months.  It is further uncontroverted that Defendants' staff

physician, Dr. Hal David Macmurdo, M.D. ("Macmurdo") is of the opinion that "[s]ooner

or later" Ball is "going to stroke out."  Trial Transcript, Testimony of Elzie Ball, Aug.

5, 2013.

---

[22] Ball testified that he has also lived in tiers C, F, and G.

[23] Specifically, Ball takes the following medications on a daily basis: Insulin, Glyburide (brand name: Micronase®), Meteformin Hydrochloride, Simvastatin (brand name: Zocor®), Amlodipine (brand name: Norvasc®), Clonidine (brand name: Catapres®), Losartan Potassium (brand name: Cozaar®), Furosemide (brand name: Lasix®), and Atenolol (brand name: Tenormin®).  Plaintiffs' expert, Dr. Susan Vassallo, M.D.'s uncontroverted testimony at trial was that Plaintiffs' medications "prevent their ability to respond to heat."  As it relates to Ball, Dr. Vassallo testified that his medication "impairs the ability of the body to cool."  Trial Transcript, Testimony of Dr. Susan Vassallo, Aug. 6, 2013.

18

24.    During the trial, Ball also testified that the heat conditions in death row cause him to experience profuse sweating, swelling of his joints, hands, ankles, and keloids[24], tingling in his hands and feet, dizziness, lightheadedness, and headaches. Ball further testified that it is difficult to sleep at night due to the heat in the housing tier.

25.    According to Ball, he copes with the heat by drinking water, lying on the cell floor, creating "cool towels" by wetting his towels or wrapping them in ice, and taking off his shirt.

26.    Ball testified that he does not have direct access to the ice chest during the twenty-three hours in which he is confined his cell, and that he is dependent on other inmates, who are on their tier time, to distribute ice to him.

27.    Ball also testified that the lukewarm sink water, warm showers, and fans do not provide significant relief from the heat.

28.    Ball's uncontroverted testimony was that the mounted fans occasionally break, and are not always immediately fixed by Angola's maintenance staff.

### C.    Plaintiff Nathaniel Code

29.    Plaintiff Code is fifty-seven years old. He has been on death row for twenty-two years. Code currently lives in tier H, cell 16.[25]

---

[24] Ball testified that he has keloid scars that become inflamed and painful due to the heat.

[25] Code testified that he also lived in tier F and tier C.

19

30.     It is uncontroverted that Code suffers from hypertension, obesity and hepatitis. To treat his hypertension, Code takes a number of medications that make him more susceptible to heat-related illness.[26]

31.     During the trial, Code testified that during the summer months he "languishes" in the heat from sunrise until approximately 2:00 a.m. when the tier cools down. According to Code, he is subjected to direct sunlight through the window across from his cell, which prevents him from getting relief from the heat.

32.     During the trial, Code testified that he avoids overheating by lying as still as possible. However, he must avoid lying in one position for too long to prevent that part of his body from getting too hot.

33.     Code also testified that the heat causes him to sweat profusely, feel dizzy and light-headed, and experience headaches. He further testified that the heat conditions disturb his sleep patterns and disorient him, causing him to forget where he placed objects inside his cell. The heat conditions also cause Code to experience a "wave" over his body, which he described as a tingling sensation that moves from his feet to his head.

34.     Code testified that he copes with the heat by wearing light clothing, drinking water, and creating "cool towels" by wrapping ice into his towels.

---

[26] Specifically, Code takes the following medications on a daily basis: Losartan Potassium (brand name: Cozaar®), Hydrochlorothiazide, and Amlodipine (brand name: Norvasc®). Dr. Vassallo's uncontroverted testimony at trial was that Plaintiffs' medications "prevent their ability to respond to heat." As it relates to Code, Dr. Vassallo testified that his medications also impair his body's ability to cool." Trial Transcript, Testimony of Dr. Susan Vassallo, Aug. 6, 2013.

20

35.     Code testified that he does not have direct access to the ice chest during the twenty-three hours in which he is confined to his cell, and that he is dependent on other inmates, who are on their tier time, to distribute ice to him.

36.     According to Code, the lukewarm sink water, warm showers, and fans do not provide adequate relief from the heat.

37.     He further testified that the vent in his cell does not work, and that Angola's maintenance staff has yet to repair it.   This testimony was not contested by Defendants.

38.     According to Code, the only time he has access to air conditioned areas is when he has an attorney visit, personal visit, or when he goes to the doctor.  He testified that he goes to the doctor or has an attorney or personal visit only once every two months:

> BY MS. MONTAGNES:   . . .  Any visits outside of the tier.  How long between vists?
>
> BY MR. CODE:         Oh, okay.  It's at least two months between any of those.  Even if I get some of all of them, some personal visits, doctor visits, and attorney visits, it's at least two months between them.  I can't think of any of them being close[r] than two months.

Trial Transcript, Testimony of Nathaniel Code, Aug. 5, 2013.

### D.   Plaintiff James Magee

39.     Plaintiff Magee is thirty-five years old.  He has been on death row for three years.  Magee lives in tier A, cell 13.[27]

---

[27] Magee also testified that he has also lived in tier C.

21

40.     It is uncontroverted that Magee suffers from hypertension, high cholesterol, and depression.  To treat his hypertension, high cholesterol, and depression, Magee takes a variety of medications that make him more susceptible to heat-related illnesses.[28]

41.     During the trial, Magee described his housing conditions as a "sauna" in the morning and an "oven" in the afternoon.  According to Magee, during the summer months, he is often hot and sweaty, experiences headaches, nausea, dizziness, light-headedness, and has difficulty breathing and sleeping.

42.     Magee testified that he tries to cope with the heat by wetting his t-shirt with the water from his cell sink, standing close to cell bars to get air from the mounted fan, and creating "cool towels."  He further testified that he attempts to cool down his cell by wiping the cell walls and floor with "cool towels."

43.     Magee testified that he does not have direct access to the ice chest during the twenty-three hours in which he is confined to his cell, and that he is dependent on other inmates, who are on their tier time, to distribute ice to him.

44.     Magee further testified that the lukewarm sink water, warm showers, and fans do not provide relief from the heat.

---

[28] Specifically, Magee takes the following medications on a daily basis: Amlodipine (brand name: Norvasc®), Clonidine (brand name: Catapres®), Cholestyramine, Fluoxetine (brand name: Prozac®) and Mirtazapine (brand name: Remeron®).  Dr. Vassallo's uncontroverted testimony at trial was that Plaintiffs' medications "prevent their ability to respond to heat."  As it relates to Magee, Dr. Vassallo testified that his medication "affects his body's ability to adjust to and tolerate the heat."  Trial Transcript, Testimony of Dr. Susan Vassallo, Aug. 6, 2013.

22

### E.     The Data Collected by United States Risk Management

45.     Neither the United States Court of Appeals for the Fifth Circuit, nor any other federal court of appeals, has established a constitutionally precise temperature, humidity level, or heat index that may constitute cruel and unusual punishment, in violation of the Eighth Amendment.  Thus, this Court, like other courts, is left to establish the temperature, humidity level, heat index, and/or physical and/or medical conditions at which there has been a violation of Plaintiffs' constitutional rights. Accordingly, the Court required the parties' to retain a neutral third-party expert to collect, analyze, and disseminate temperature, humidity, and heat index data for a period of twenty-one days.  The following is a summary of the data, which shall serve as the foundation of the Court's conclusions of law.

### 1.     The Data Collection Period

46.     On July 12, 2013, the Court ordered the parties to retain neutral third-party expert, United States Risk Management, L.L.C. ("USRM") to collect temperature and humidity data, and calculate the heat index in the death row tiers for exactly twenty-one days.[29]  (Docs. 36, 24.)  Immediately thereafter, USRM installed seven 3M QUESTemp° 46 Waterless Heat Stress Monitors in tiers A, B, C, F, G, and H.  USRM also installed an external weather station outside of the death row tiers to capture

---

[29] The Court also ordered the parties to collect the wetbulb globe temperature.  The wetbulb globe temperature ("WBGT") is a measure of heat stress in direct sunlight which takes into account temperature, humidity, wind speed, sun angle and cloud cover (solar radiation).  This differs from the heat index, which takes into consideration temperature and humidity and is calculated for shady areas. Military agencies and the Occupational Safety Health Administration use the WBGT as a guide to managing workload in direct sunlight.  *WetBulb Globe Temperature*, National Weather Service Weather Forecast Office, http://www.srh.noaa.gov/tsa/?n=wbgt (last visited Dec. 17, 2013).  Although wetbulb globe temperature data was provided to the Court, it was not used in the Court's analysis.

23

external "weather link" data. The USRM monitors collected data inside each of the six tiers, and outside, once per hour from July 15, 2013 through August 5, 2013 ("the data collection period").

47.     The data collected by USRM established that while the temperature, humidity, and heat index in each tier varied from day-to-day, the heat index in all of the tiers exceeded 104 degrees[30] at various times during the data collection period.

48.     Further, the data collected by USRM established that the temperature, humidity, and heat index *inside* the death row tiers were, more often than not, the same or *higher* than the temperature, humidity, and heat index recorded *outside* of the death row tiers.

### 2.     Tier A

49.     The data collected in tier A proved to be slightly less extreme than the other tiers. However, the temperature, humidity, and heat index data recorded in tier A nonetheless presented an alarming trend.

50.     The first reading was taken on July 15, 2013 at 2:45 p.m.[31] At that time, the monitor recorded a temperature of 84 degrees and a heat index of 89 degrees.[32]

---

[30] All temperature and heat index measurements herein are presented in degrees Fahrenheit.

[31] One monitor was installed in cell 11 of tier A.

[32] Hereinafter, "heat indices" shall refer to multiple heat index recordings. The Court also notes that some temperatures and heat indices were recorded and produced as round numbers, while other were recorded as numbers with one or two decimal points. All temperatures and heat indices presented herein are described in the same manner as produced by USRM.

51.     During the data collection period, the lowest recorded temperature was 80.42

degrees[33] while the highest recorded temperature was 90.68 degrees.[34]  In contrast, the

lowest recorded heat index was 84.2 degrees[35] while the highest recorded heat index

was 104.54 degrees.[36]

52.     On each day of the collection period, the heat index rose to 92 degrees or higher.

In other words, on every single day during the collection period, inmates housed in tier

A were subjected to heat indices in the National Oceanic and Atmospheric

Administration's ("NOAA") National Weather Service's ("NWS") "extreme caution" zone

or higher.[37]  *See* Exhibit 1.

53.     Notably, the heat index in tier A was recorded at 100 degrees or higher on five

days: July 29, July 30, August 2, August 3, and August 4, 2013.  Such heat indices are

in the NWS's "extreme caution" or "danger" zones.  *See* Exhibit 1.

54.     Data from tier A also showed high heat indices for extended periods of time.  For

example, on August 3, 2013, the heat index remained between 99.5 and 102.02 degrees

for thirteen hours, or from 9:13 a.m. to 10:13 p.m.

---

[33] This temperature was recorded on July 20, 2013 at 5:17 a.m.

[34] This temperature was recorded on August 4, 2013 from 4:59 to 6:59 p.m.

[35] This heat index was also recorded on July 20, 2013 at 5:17 a.m.

[36] This heat index was recorded on August 2, 2013 at 7:13 p.m.

[37] The NWS defines heat index as "how hot weather 'feels' to the body." *Heat: A Major Killer*, NWS Office of Climate, Water, and Weather Services, http://www.nws.noaa.gov/om/heat/index.shtml (last visited Dec. 17, 2013) [hereinafter *Heat: A Major Killer*].  The NWS's Heat Index Chart uses relative humidity and air temperature to produce the "apparent temperature" or the temperature the body "feels."  According to the NWS, "[t]hese values are for shady location only.  Exposure to full sunshine can increase heat index values by up to 15 [Fahrenheit].  Also, strong winds, particularly with very hot, dry air, can be extremely hazardous as the wind adds heat to the body." *Id.*

25

55.    As noted above, the highest heat index (104.54 degrees) was recorded on August 2, 2013.  On that day, from 11:13 a.m. to 11:13 p.m., the following heat indices were consecutively recorded: 99.5, 100.4, 100.94, 101.48, 102.92, 100.4, 101.84, 102.92, 104.54, 104, 103.46, 101.48, 101.3, all of which are in the NWS's "extreme caution" or "danger" zones.  *See* Exhibit 1.

56.    In sum, based on the data collected in tier A, the Court concludes that the inmates housed in this tier were consistently subjected to heat indices in the NWS's "extreme caution" and "danger" zones, which, according to the NWS, "may cause increasingly severe heat disorders with continued exposure or physical activity."[38]  *See* Exhibit 1.

### 3.    Tier B

57.    The data collected in tier B reflected *higher* temperatures and heat indices than in tier A.  The first reading in tier B was taken on July 15, 2013 at 2:56 p.m.[39]  At that time, the recorded temperature was 83.6 degrees and the heat index was 90 degrees.

58.    During the data collection period, the lowest recorded temperature was 79.52 degrees[40] while the highest recorded temperature was 90.68 degrees.[41]  In contrast, the

---

[38] *Heat: A Major Killer*, *supra* note 37.

[39] One monitor was installed in cell 8 of tier B.

[40] This temperature was recorded on July 19, 2013 at 6:03 a.m. and again at 7:03 a.m., and on July 20, 2013 a 7:03 a.m.

[41] This temperature was recorded on August 2, 2013 at 4:50 p.m. and again at 5:50 p.m., and again on August 4, 2013 at 6:04 p.m.

26

lowest recorded heat index was 83.84 degrees[42] while the highest recorded heat index was 109.94 degrees.[43]

59.     On each day of the collection period, the heat index rose to 92 degrees or higher. In other words, on every single day during the collection period, inmates housed in tier B were subjected to heat indices in the NWS's "extreme caution" zone or higher.  *See* Exhibit 1.

60.     Indeed, the heat index in tier B was recorded at 100 degrees or higher on ten days: July 22, July 24, July 28, July 30, July 31, August 1, August 2, August 3, August 4, and August 5, 2013.  Such heat indices are in the NWS's "extreme caution" and "danger" zones.  *See* Exhibit 1.

61.     High heat indices for extended periods of time were typical in tier B.  For example, on July 29, 2013, the heat index remained between 98.24 and 102.2 degrees for eights hours, or from 1:23 p.m. to 9:23 p.m.  On July 30, 2013, the heat index remained between 99.14 and 103.28 degrees for nine hours, or from 11:23 a.m. to 8:51 p.m.  On August 1, 2013, the heat index remained between 100.4 and 103.82 degrees for eleven hours, or from 11:51 a.m. to 10:51 p.m.  On August 3, the heat index remained between 100.4 and 105.08 degrees for thirteen hours, or from 8:50 a.m. to 9:50 p.m.

62.     As noted above, the highest heat index (109.94 degrees) was recorded on August 2, 2013.  Indeed, one of the longest periods of heat indices reaching 100 degrees or

---

[42] This heat index was recorded on July 26, 2013 at 6:43 p.m.

[43] This heat index was recorded on August 2, 2013 at 7:50 p.m.

27

14-30067.4983

above was recorded on that day. Specifically, from 11:50 a.m. to 11:50 p.m., the following heat indices were consecutively recorded: 103.82; 104.54; 101.48; 105.8; 102.92; 102.92; 105.08; 107.42; 109.94; 104.36; 102.2; 102.2; and 103.28.

63.    Based on the data collected in tier B, the Court concludes that the inmates housed in this tier were consistently, and for long periods of time over the course of multiple days, subjected to heat indices in the NWS's "extreme caution" or "danger" zones. *See* Exhibit 1.

### 4.    Tier C

64.    The data collected in tier C reflected *higher* temperatures and heat indices than in any of the other tiers. The first reading was taken on July 15, 2013 at 3:05 p.m.[44] At that time, the recorded temperature was 86.4 degrees and the heat index was 92 degrees.

65.    During the data collection period, the lowest recorded temperature was 85.1 degrees[45] while the highest recorded temperature was 92.12 degrees.[46] In contrast, the lowest recorded heat index was 89.96 degrees[47] while the highest recorded heat index was 110.3 degrees[48], which is well within the NWS's "danger" zone. *See* Exhibit 1.

---

[44] One monitor was installed in cell 11 of tier C.

[45] This temperature was recorded on July 20, 2013 at 6:34 a.m., and again at 7:34 a.m.

[46] This temperature was recorded on August 4, 2013 at 6:22 p.m., and again at 7:22 p.m.

[47] This heat index was also recorded on July 20, 2013 at 4:34 a.m.

[48] This heat index was recorded on August 2, 2013 at 7:38 p.m., and again at 8:38 p.m.

28

66.    The data shows that the heat index in tier C rose to, and remained above, 100 degrees for two or more hours on thirteen of the twenty-one days in the collection period.

67.    The Court also notes that, despite Defendants' installation of awnings over the windows in tier C on or about July 26, 2013, the most alarming heat index figures were recorded between July 29 and August 5, 2013.  For example, on July 29, the heat index remained between 99.32 and 103.46 degrees for ten hours, or from 1:16 p.m. to 11:16 p.m.  On July 30, the heat index remained between 100.4 and 107.42 degrees for ten hours, or from 1:16 p.m. to 11:58 p.m.  On August 1, 2013, the heat index remained between 100.04 and 106.88 degrees for fifteen consecutive hours, or from 8:58 a.m. to 11:58 p.m.  The Court notes that, but for the awnings installed by Defendants over the windows in tier C, the heat indices recorded in tier C may have been higher.

68.    As noted above, the highest heat index (110.3 degrees) was recorded on August 2, 2013.  On that day, the heat index remained at 100 degrees or above for fifteen hours, or from 8:58 a.m. to 11:38 p.m.

69.    Further, the data shows that the heat index in tier C did not drop below 100 degrees from August 3 through August 5, 2013.  For example, on August 3, 2013, from 12:38 a.m. to 11:38 p.m., the following heat indices were consecutively recorded: 106.16, 106.16, 105.08, 104.54, 105.08, 104.54, 104, 102.56, 105.8, 105.8, 105.8, 104, 102.92, 102.56, 105.08, 104.54, 105.08, 107.24, 106.52, 108.32, 109.76, 105.62, 105.08, and 104.

29

14-30067.4985

70.    This 100+ degree heat index trend continued until the last reading on August 5, 2013 at 12:22 p.m.

71.    By comparison, on August 3, 2013 from 12:30 a.m. to 11:30 p.m., the following heat indices were recorded by the outside weather monitor: 93.4, 92.4, 90.6, 88.5, 87.6, 86.4, 82.9, 83.6, 92.6, 98.4, 98.8, 104.3, 105.5, 105.2, 110.6, 110.8, 109.2, 109.5, 108.7, 104.7, 95.3, 89.3, 86.4, and 84.3.

72.    This data established that there were multiple, consecutive hours during which inmates housed in tier C were subjected to heat indices up to twenty degrees higher than *outside* the housing tier.

73.    Based on the data collected in tier C, the Court concludes that the inmates housed in this tier were consistently, and for long periods of time over the course of multiple days, subjected to heat indices in the NWS's "extreme caution" or "danger" zones.  *See* Exhibit 1.  The Court also concludes that inmates housed in tier C were subjected to heat indices up to twenty degrees higher than the heat indices recorded outside the housing tier.

### 5.    Tier F

74.    The first reading in tier F was taken on July 15, 2013 at 3:14 p.m.[49]  At that time, the recorded temperature was 81.8 degrees and the heat index was 87 degrees.

---

[49] One monitor was installed in cell 6 of tier F.

30

75.     During the data collection period, the lowest recorded temperature was 80.2 degrees[50] while the highest recorded temperature was 91.04 degrees.[51]  In contrast, the lowest recorded heat index was 85 degrees[52] while the highest recorded heat index was 106.16 degrees.[53]

76.     On each day of the collection period, the heat index rose to 92 degrees or higher. In other words, on every single day during the collection period, inmates housed in tier F were subjected to heat indices in the NWS's "extreme caution" zone or higher.  *See* Exhibit 1.

77.     Notably, the heat index in tier F was recorded at 100 degrees or higher on eight days: July 17, July 29, July 30, July 31, August 1, August 2, August 3, and August 4, 2013.  Such heat indices are in the NWS's "extreme caution" or "danger" zones.  *See* Exhibit 1.

78.     Like the data collected from the other death row tiers, the data collected from tier F showed high heat indices for extended periods of time.  For example, on August 1, 2013, the heat index remained between 100.4 and 105.62 degrees for eight hours, or from 2:15 p.m. to 10:15 p.m.  On August 4, 2013, the heat index remained between 101.3 and 104.54 degrees for 8 hours, or from 12:17 p.m. to 7:17 p.m.  On August 3,

---

[50] This temperature was recorded on July 18, 2013 at 7:14 a.m.

[51] This temperature was recorded on August 4, 2013 at 5:17 p.m.

[52] This heat index was recorded on July 16, 2013 from 3:14 a.m. to 7:14 a.m., and again on July 18, 2013 from 4:14 a.m. to 7:14 a.m.

[53] This heat index was recorded on August 2, 2013 at 7:32 p.m.

31

14-30067.4987

2013, the heat index remained between 99.86 and 105.08 degrees for 12 hours, or from 9:32 a.m. to 9:32 p.m.

79.    As noted above, the highest heat index (106.16 degrees) was recorded on August 2, 2013.  The Court notes that one of the longest periods of heat indices reaching 100 degrees or above was also recorded on this day.  Specifically, from 11:32 a.m. to 11:32 p.m., the following heat indices were consecutively recorded: 101.84, 102.74, 101.3, 103.46, 102.38, 100.94, 102.92, 102.92, 106.16, 103.82, 102.2, 101.3, 102.74.  All of which are in the NWS's "extreme caution" or "danger" zones.  *See* Exhibit 1.

80.    Based on the data collected in tier F, the Court concludes that the inmates housed in this tier were consistently, and for long periods of time over the course of multiple days, subjected to heat indices in the NWS's "extreme caution" or "danger" zones.  *See* Exhibit 1.

### 6.    Tier G

81.    In their submissions to the Court and during the trial on the merits, Plaintiffs argued that the heat indices in cells closest to the tier entrance are lower than the heat indices in cells at the rear of the tier, or furthest from the tier entrance.  Thus, Plaintiffs allege that inmates who are assigned to cells at the rear of the tier are subjected to more extreme conditions of confinement than inmates who are assigned to cells that are close to the tier entrance.

82.    To determine whether Plaintiffs' allegations have merit, two monitors were placed in tier G: one approximately halfway down the tier in cell 8, and one at the very rear of the tier in cell 16.

32

83.    The data collected in both cells revealed an appreciable difference in the recorded temperatures and heat indices in cell 8 versus cell 16.

84.    The first reading in cell 8 was taken on July 15, 2013 at 3:25 p.m.  At that time, the recorded temperature was 86.4 degrees and the heat index was 91.4 degrees.  For reasons that are unknown to the Court, the first reading was not taken in cell 16 until three days later, on July 18, 2013.

85.    During the data collection period, the lowest recorded temperature in cell 8 was 80.06 degrees[54] while the highest recorded temperature was 91.04 degrees.[55]  In contrast, the lowest recorded temperature in cell 16 was 85.46 degrees[56] while the highest recorded temperature was 91.58 degrees.[57]

86.    The lowest recorded heat index in cell 8 was 84.02 degrees[58] while the highest recorded heat index was 107.42 degrees.[59]  In contrast, the lowest recorded heat index in cell 16 was 91.22 degrees[60] while the highest recorded heat index was 110.3 degrees.[61]

---

[54] This temperature was recorded on July 20, 2013 at 5:14 a.m.

[55] This temperature was recorded on August 4, 2013 at 5:11 p.m., and again at 6:11 p.m.

[56] This temperature was recorded on July 19, 2013 at 7:26 a.m.

[57] This temperature was recorded on August 3, 2013 at 6:25 p.m., 7:25 p.m., and 8:25 p.m.  This temperature was also recorded on August 4, 2013 at 5:13 p.m., 6:13 p.m., and 7:13 p.m.

[58] This heat index was recorded on July 19, 2013 at 6:14 a.m.

[59] This heat index was recorded on August 2, 2013 at 12:21 p.m.

[60] This heat index was recorded on July 19, 2013 at 3:26 a.m. and 4:26 a.m.

[61] This heat index was recorded on August 3, 2013 at 8:25 p.m.

33

87.     On each day of the collection period, the heat index rose to 93.2 degrees or higher in cell 8, and 96.44 degrees or higher in cell 16.  In other words, on every single day during the collection period, inmates housed nearer to and furthest from the tier entrance were subjected to heat indices in the NWS's "extreme caution" zone or higher. *See* Exhibit 1.

88.     However, as noted below, the data shows consistently higher heat indices in cell 16, as compared to cell 8.

89.     According to the data collected by USRM, the heat index rose to 100 degrees or above in cell 8 on twelve days: July 22, July 23, July 24, July 26, July 29, July 30, July 31, August 1, August 2, August 3, August 4, and August 5, 2013.

90.     The data also established high heat indices for extended periods of time in cell 8.  For example, on August 2, 2013, the heat index remained between 101.84 and 107.42 degrees for twelve hours, or from 11:21 a.m. to 11:21 p.m.  In another example, on August 3, 2013, the heat index remained between 100.4 and 105.08 degrees for fourteen hours, or from 9:21 a.m. to 11:21 p.m.

91.     Even more alarming, however, are the recorded heat indices further down the tier in cell 16.

92.     In cell 16, the heat index was recorded at 100 degrees or higher on fifteen consecutive days: July 21, July 22, July 24, July 25, July 26, July 27, July 28, July 29, July 30, July 31, August 1, August 2, August 3, August 4, and August 5, 2013.[62]

---

[62] For reasons unknown to the Court, no data was recorded in tier G, cell 16 on July 23, 2013.

34

93.     The data collected from cell 16 also shows high heat indices for extended periods of time.   For example, on five consecutive days during the data recording period (August 1 - 5, 2013), the heat index did not dip below 99.14 degrees.   In other words, inmates assigned to cells at the rear of tier G were subjected to heat indices of 99.14 degrees or above for 120 consecutive hours, while inmates housed in cells at the front of the tier experienced lower heat indices.

94.     As noted above, the highest heat index in cell 16 (110.3 degrees) was recorded on August 3, 2013.   Notably, one of the longest periods of heat indices reaching 100 degrees or above was also recorded on that day.   Specifically, from 12:25 a.m. to 11:25 p.m., the following heat indices were consecutively recorded: 108.68, 107.96, 106.88, 106.16, 103.46, 102.92, 102.56, 103.46, 105.08, 106.34, 109.4, 105.8, 107.42, 104.54, 105.08, 103.46, 104, 104.54, 105.98, 107.24, 110.3, 106.88, 105.62, and 105.08.

95.     By comparison, on August 3, 2013 from 12:30 a.m. to 11:30 p.m., the following heat indices were recorded by the outside weather monitor: 93.4, 92.4, 90.6, 88.5, 87.6, 86.4, 82.9, 83.6, 92.6, 98.4, 98.8, 104.3, 105.5, 105.2, 110.6, 110.8, 109.2, 109.5, 108.7, 104.7, 95.3, 89.3, 86.4, 84.3.

96.     This data established that there were multiple, consecutive hours during which the inmates housed in cells at that rear of tier G were subjected to heat indices that were up to twenty degrees higher than the heat indices recorded outside of the death row facility.

97.     Based on the data collected in tier G, the Court concludes that the inmates housed in this tier were consistently, and for long periods of time over the course of

35

multiple days, subjected to heat indices in the NWS's "extreme caution" or "danger" zones. *See* Exhibit 1. The Court notes that, but for the awnings installed by Defendants over the windows in tier G on or about July 26, 2013, such temperatures and heat index recordings may have been higher.

98.     Based on the data collected in tier G, the Court further concludes that inmates who are housed in cells at the rear of the respective housing tiers, or furthest away from the tier entrance, are subjected to more extreme conditions of confinement than inmates who are housed in cells closer to the entrance of each respective tier.

### 7.   Tier H

99.     The data collected from tier H reveals slightly lower temperatures and heat indices than tiers C and G. However, as noted below, during the undersigned's tour of tier H, the undersigned noted that the tier is partially shaded by another tier.

100.    The first reading was taken in this tier on July 15, 2013 at 3:32 p.m.[63] At that time, the recorded temperature was 82.1 degrees and the heat index was 87 degrees.

101.    During the data collection period, the lowest recorded temperature was 78.26 degrees[64] while the highest recorded temperature was 92.66 degrees.[65] In contrast, the lowest recorded heat index was 81.5 degrees[66] while the highest recorded heat index was 107.78 degrees.[67]

---

[63] One monitor was installed in cell 8 of tier H.

[64] This temperature was recorded on July 19, 2013 at 6:23 a.m.

[65] This temperature was recorded on August 4, 2013 5:53 p.m.

[66] This temperature was recorded on July 19, 2013 at 6:23 a.m.

[67] This heat index was recorded on August 2, 2013 at 6:43 p.m.

36

102.    On each day of the collection period, the heat index rose to 90 degrees or higher. In other words, on every single day during the collection period, inmates housed in tier H were subjected to heat indices in the NWS's "caution" or "very warm" zone (hereinafter "caution" zone) or higher.  *See* Exhibit 1.

103.    The data also shows that the heat index rose to 100 degrees or higher on seven consecutive days: July 29, July 30, July 31, August 1, August 2, August 3, and August 4, 2013.

104.    The data further established high heat indices for extended periods of time.  For example, on August 1, 2013, the heat index remained between 99.32 and 105.08 degrees for nine hours, or from 1:41 to 10:41 p.m.  On August 3, 2013, the heat index remained between 99.5 and 104.54 degrees for nine hours, or from 1:43 to 10:43 p.m.

105.    As noted above, the highest heat index (107.78 degrees) was recorded on August 2, 2013.  Notably, one of the longest periods of heat indices reaching 100 degrees or above was also recorded on this day, and the following morning.  Specifically, from 12:43 p.m. on August 2 to 1:43 a.m. on August 3, the following heat indices were consecutively recorded: 101.3, 100.94, 104, 104, 103.64, 105.44, 107.78, 107.42, 104.54, 102.92, 100.76, 102.2, 100.4, 100.4.  Such heat indices fall squarely within the NWS's "extreme caution" or "danger" zones.  *See* Exhibit 1.

106.    Although the data collected from tier H is less alarming than the data collected from tiers C and G, based on the data, the Court concludes that the inmates housed in this tier were also consistently, and for long periods of time over the course of multiple

37

days, subjected to heat indices in the NWS's "extreme caution" or "danger" zones. *See* Exhibit 1.

107. In sum, the data collected by USRM during the data collection period unequivocally established that inmates housed in each of the death row tiers are consistently, and for long periods of time, subjected to high temperatures and heat indices in the NWS's "caution," "extreme caution," and "danger" zones. *See* Exhibit 1.

108. The data also established that inmates in at least two of the tiers are frequently subjected to heat indices that are up to twenty degrees higher than the heat indices recorded outside the death row facility.

109. Further, the data established that inmates who are housed in cells at the rear of the respective housing tiers, or furthest away from the tier entrance, are subjected to more extreme conditions of confinement than inmates who are housed in cells closer to the entrance of each respective tier.

### F.    The Court's Observation of the Death Row Tiers

110. On August 12, 2013 from approximately 2:15 p.m. to 3:00 p.m., the undersigned observed Angola's death row facility, including the administrative offices, visitation rooms, control center, and housing tiers A, C, G, and H.  Counsel for both parties, as well as Defendant Norwood, accompanied the undersigned during the site visit.

111. During the undersigned's tour of the death row facility, which was conducted after the data collection period, the Court made factual observations which support the Court's findings of fact.

112.   Approximately one and one half hour before the undersigned's tour, Angola, Louisiana and the surrounding areas sustained thunderstorms and heavy rain.  By 2:15 p.m., the thunderstorms and rain had ceased.  However, the sky was densely overcast and the temperature had noticeably decreased from a high of 91 degrees at 12:42 p.m.[68]

113.   During the site visit, the Court observed that despite the decreased outside temperature and overcast sky, the temperature inside the housing tiers was appreciably higher than the temperature outside.  For example, according to Defendants' mercury-in-glass thermometers[69], the temperature in tiers A, C, G, and H were 88 degrees, 89 degrees, 94 degrees, and 89 degrees, respectively.  However, weather data collected from the closest weather station indicates that the outside weather temperature was only 77 degrees at 2:00 p.m.

114.   The Court also observed that tier H is shaded by one of the other housing tiers.

115.   The Court also observed the windows, fans, and cell vents in tiers A, C, G, and H.  In the Court's observation, the windows, fans, and cell vents did not provide a cooling effect or relief from the heat conditions in the tier.

116.   During the site visit, the undersigned detected the cool air that blew into the tiers from the central corridor each time a tier entrance was opened.  The Court noted

---

[68] According to a Climatological Report obtained from National Weather Service Forecast Office, the maximum temperature recorded at the Baton Rouge Regional Airport on August 12, 2013 was 91 degrees.  That temperature was recorded at 12:42 p.m.  Climatological Report (Daily), http://www.nws.noaa.gov/view/validProds.php?prod=CLI (last visited Aug. 13, 2013).

[69] Each of Defendants' mercury-in-glass thermometers were located at the rear of each tier, or on the wall furthest away from the tier entrance.

14-30067.4995

that cool air could be detected for the few seconds that a tier entrance remained open, while standing near the entrance of the tier, but that the cool air could not be detected while standing at the rear of the tier.

117.    While the Court did not attempt to measure the temperature of the cold and hot water from the in-cell faucets, the undersigned noted that the cold water was lukewarm to the touch.

118.    The Court further observed that although each fan was positioned to be shared by two cells, the fans did not provide equal amounts of air flow to each cell.

119.    The undersigned did not observe dirt, debris, or insects in the ice chests or in the water from the in-cell faucets.

120.    The Court observed, however, that the walls of the housing tiers were hot to the touch, and that the security bars separating the cells from the tier walkway were very warm to the touch.

## VI.    CONCLUSIONS OF LAW

### A.    42 U.S.C. § 1983

1.    "Section 1983 imposes liability on anyone who, under color of state law, deprives a person 'of any rights, privileges, or immunities secured by the Constitution and laws.' . . . [T]his provision [also] safeguards certain rights conferred by federal statutes." *Blessing v. Freestone*, 520 U.S. 329, 340 (1997) (citing *Maine v. Thiboutot*, 448 U.S. 1 (1980)).

2.    Here, the gravamen of Plaintiffs' Section 1983 claim is that Defendants have subjected them to cruel and unusual punishment, in violation of the Eighth

40

Amendment to the United States Constitution, made applicable to the States "by reason of the Due Process Clause of the Fourteenth Amendment." *Robinson v. California*, 370 U.S. 660, 675 (1962).

3.   Specifically, Plaintiffs allege that by subjecting them to "extreme conditions of confinement, specifically excessive heat, with full knowledge of the dangerousness of those conditions, Defendants [ ] are acting and have acted with deliberate indifference to Plaintiffs' serious health and safety needs, in violation of their rights under the Eighth and Fourteenth Amendments to the United States Constitution."  (Doc 1, ¶¶ 12, 67-68.)

### 1.   The Eighth Amendment

4.   The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.

5.   It is well settled that the United States Constitution does not require comfortable prisons.  *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981).  However, it is equally well established that conditions of confinement "must not involve the wanton and unnecessary infliction of pain." *Rhodes*, 452 U.S. at 347.

6.   The Eighth Amendment's prohibition against cruel and unusual punishment requires that prisoners be afforded "humane conditions of confinement," including adequate food, clothing, shelter, and medical care. *Farmer*, 511 U.S. at 832; *Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004) (holding that a prison official's obligation

41

includes "ensur[ing] that inmates receive adequate food, clothing, shelter, and medical care," as well as "reasonable measure[s] to ensure the safety of the inmates").

7.     Thus, "[t]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Gates*, 376 F.3d at 332; *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) ("[C]onditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need.").

8.     Such "conditions of confinement" that are subject to review include temperature conditions. *Wilson*, 501 U.S. at 303 (stating that "the temperature [a prisoner] is subjected to in his cell" is "a condition of his confinement") (quotation marks omitted); *Gates*, 376 F.3d at 333 (same).

9.     An Eighth Amendment claim has two components. *Wilson*, 501 U.S. at 298.

10.     First, the deprivation alleged must be sufficiently serious. *Wilson*, 501 U.S. at 298. "[O]nly those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave" to constitute cruel and unusual punishment. *Id.* (quoting *Rhodes*, 452 U.S. at 347).

11.     A court must measure a prison's conditions against "'the evolving standards of decency that mark the progress of a maturing society,' and not the standards in effect during the time of the drafting of the Eighth Amendment." *Gates*, 376 F.3d at 332-33 (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)).  Further, the Supreme Court of the United States has noted that "the length of confinement cannot be ignored in

deciding whether the confinement meets the constitutional standards. A filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months." *Hutto v. Finney*, 437 U.S. 678, 686-87 (1978).

12.     Second, the prison official must have acted with a sufficiently culpable state of mind. *See Farmer*, 511 U.S. at 838*; Wilson*, 501 U.S. at 305. In condition of confinement cases, the Court is required to determine if the prison official acted with deliberate indifference, which the Supreme Court has defined as knowing of and disregarding an excessive risk to inmate health or safety. *Farmer*, 511 U.S. at 836 ("It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.").

13.     Thus, to demonstrate that prison conditions violate the Eighth Amendment, an inmate must meet the following requirements: (1) an objective requirement showing that the condition is "so serious as to 'deprive prisoners of the minimal civilized measure of life's necessities,' as when it denies the prisoner some basic human need;" and (2) a subjective requirement, which mandates a showing that prison officials have been "'deliberately indifferent' to inmate health or safety." *Woods v. Edwards*, 51 F.3d 577, 581 (5th Cir. 1995) (citing *Farmer*, 511 U.S. at 834).

> ### a.     The Conditions of Confinement at Angola's Death Row Constitute a Substantial Risk of Serious Harm to Plaintiffs

14.     It is axiomatic that a prison official's failure to provide inmates relief from extreme temperatures may constitute an Eighth Amendment violation. *Wilson*, 501

U.S. at 304 ("low cell temperature at night combined with a failure to issue blankets" could constitute an Eighth Amendment violation); *Smith v. Sullivan*, 553 F.2d 373, 381 (5th Cir. 1977) ("If the proof shows the occurrence of extremes of temperature that are likely to be injurious to inmates' health relief should be granted . . . ."*); Blackmon v. Garza*, 484 F. Appx. 866, 869 (5th Cir. 2012) (unpublished) ("Allowing a prisoner to be exposed to extreme temperatures can constitute a violation of the Eighth Amendment."); *Valigura v. Mendoza*, 265 F. Appx. 232, 235 (5th Cir. 2008) (unpublished) ("[T]emperatures consistently in the nineties without remedial measures, such as fans, ice water, and showers, sufficiently increase the probability of death and serious illness so as to violate the Eighth Amendment.").

15.     Further, the Fifth Circuit has held that "extreme heat" coupled with a failure to provide cooling devices such as "fans, ice water, and daily showers" is a "condition [that] presents a substantial risk of serious harm to the inmates," particularly where such conditions are "open and obvious," and where "inmates ha[ve] complained of symptoms of heat-related illness." *Gates*, 376 F.3d at 339-40 (determining that an Eighth Amendment violation justified an "injunction direct[ing the Mississippi Department of Corrections] to provide fans, ice water, and daily showers when the *heat index* is 90 degrees or above, or alternatively to make such provisions during the months of May through September") (emphasis added).

16.     A survey of the opinions from various Circuit Courts of Appeals reveals that other courts have also recognized that a prison official's failure to provide relief from extremely high temperatures may constitute an Eighth Amendment violation.  *See*

44

*Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. 2013) ("[I]t is well settled that exposing prisoners to extreme temperatures without adequate ventilation may violate the Eighth Amendment."); *Graves v. Arpaio*, 623 F.3d 1043, 1049 (9th Cir. 2010) ("The district court did not err . . . in concluding that dangerously high temperatures that pose a significant risk to detainee health violate the Eighth Amendment."); *Chandler v. Crosby*, 379 F.3d 1278, 1294 (11th Cir. 2004) ("[T]he Eighth Amendment applies to prisoner claims of inadequate cooling and ventilation.").

17.    In *Jones'El v. Berge*, 374 F.3d 541 (7th Cir. 2004), the United States Court of Appeals for the Seventh Circuit affirmed a district court's enforcement order requiring air-conditioning of plaintiffs' cells during summer heat waves following "the plaintiffs assert[ions] that they were subjected to extreme temperatures in violation of the Eighth Amendment." *Id.* at 543-45.

18.    In *Tillery v. Owens*, 907 F.2d 418 (3d Cir. 1990), the U.S. Court of Appeals for the Third Circuit affirmed a district court's determination that prison conditions were unconstitutional because, among other things, "[v]entilation [was] grossly inadequate" and "[t]here [were] no systems to control temperature or humidty, causing excessive odors, heat and humidity." *Id.* at 423.

19.    Indeed, Defendants do not contest this well established principle.

20.    The Court notes that prior to the Fifth Circuit's decision in *Gates*, the Fifth Circuit rejected a prisoner's claim that the conditions in extended lockdown at Angola were unconstitutional because, among other things, his lockdown cell was inadequately cooled and the high temperature aggravated his sinus condition. *Woods*, 51 F.3d at

45

14-30067.5001

581. In reaching its determination, the Court noted that the plaintiff "failed to present medical evidence of any significance," and went on to state: "[w]hile the temperature in extended lockdown may be uncomfortable, that alone cannot support a finding that the plaintiff was subjected to cruel and unusual punishment in violation of the Eighth Amendment." *Id.*

21.     The Fifth Circuit has since clarified that "[t]he *Woods* court found that Woods had not presented medical evidence sufficient to state an Eighth Amendment violation; *Woods* does not stand for the proposition that extreme heat can never constitute cruel and unusual punishment." *Gates*, 376 F.3d at 339.

22.     The Court further notes that *Woods* is distinguishable from the case at bar.  As noted above, Woods did not present medical evidence.  Here, Plaintiffs have introduced credible medical evidence in the form of medical records and sworn testimony. Further, in *Woods*, the plaintiff failed to provide temperature data for his lockdown cell.  *Woods*, 51 F.3d at 581 (indicating that the plaintiff complained of "high temperature . . . uncomfortable in itself," but provided no data as to the actual temperatures in the extended lockdown cell).  Here, temperature, humidity, and heat index data were collected, analyzed, and submitted to the Court by a neutral third-party expert.

46

### 1.)    The    Uncontroverted    Temperature, Humidity and Heat Index Data

23.    According to the NWS, the average maximum temperature in July 2013 in Baton Rouge, Louisiana was 90.5.[70]  In August 2013, the average maximum temperature in Baton Rouge was 90.9 degrees.[71]

24.    However, as summarized above, the uncontroverted USRM data established that, during July and August 2013, inmates housed in each of the death row tiers were frequently subjected to temperatures above 90.5 degrees.  The uncontroverted USRM data also established that inmates housed in each of the death row tiers were frequently subjected to heat indices above 100 degrees.  The data collected by USRM established that the temperature, humidity, and heat index recorded *inside* the death row tiers was, more often than not, the same or *higher* than the temperature, humidity, and heat index recorded *outside* of the death row facility.[72]

25.    For example, as noted above, inmates housed in tiers C and G were frequently subjected to heat indices that were up to twenty degrees higher than the heat indices recorded outside.  Indeed, the uncontroverted USRM data established that inmates housed in these two tiers were subjected to heat indices as high as 110.3 degrees.

---

[70]   National Weather Service Forecast Office, New Orleans/Baton Rouge, LA, http://www.nws.noaa.gov/climate/index.php?wfo=lix (last visited Dec. 17, 2013).

[71]   *Id.*

[72]   For example, as summarized above, inmates in tier C were subjected to heat indices up to twenty degrees higher than outside of the death row facility for multiple hours on August 3, 2013.  Inmates housed at the rear of tier G were also were subjected to heat indices up to twenty degrees higher than outside of the death row facility for multiple hours on that day.

47

26.     As it relates to Plaintiffs, the data shows that inmates housed in tier A, including Plaintiff Magee, were subjected to heat indices at 100 degrees or higher on five days during the data collection period.  Such heat indices fall squarely within the NWS's "extreme caution" or "danger" zones.  *See* Exhibit 1.  Indeed, the data established that on each day of the collection period, the heat index rose to 92 degrees or higher in tier A.

27.     The data also shows that inmates housed in tier H, including Plaintiffs Ball and Code, were subjected to heat indices at 100 degrees or higher on seven consecutive days during the data collection period.  Such heat indices fall squarely within the NWS's "extreme caution" or "danger" zones. *See* Exhibit 1.  The data established that on each day of the collection period, the heat index rose to 90 degrees or higher in tier H.

28.     According to the NWS, "higher risk" individuals are at risk of sunstroke, heat cramps, or heat exhaustion with prolonged exposure to heat indices in the "extreme caution" or "danger" zones[73]:

---

[73] *Heat: A Major Killer, supra* note 37.

| Heat Index | Possible Heat Disorders for Individuals in Higher Risk Groups |
|---|---|
| 130° or higher | Heat Stroke/Sun Stroke Highly Likely with Continued Exposure |
| 105° - 130° | Sunstroke, Heat Cramps, or Heat Exhaustion Likely, and Heatstroke Possible with Prolonged Exposure and/or Physical Activities |
| 90° - 105° | Sunstroke, Heat Cramps, or Heat Exhaustion Possible with Prolonged Exposure and/or Physical Activities |
| 80° - 90° | Fatigue Possible with Prolonged Exposure and/or Physical Activities |

In other words, sunstroke, heat cramps, or heat exhaustion are "possible" among high risk individuals who are subjected to prolonged exposure to heat indices in the "extreme caution" zone, and "likely" among high risk individuals who are subjected to prolonged exposure to heat indices in the "danger" zone. *See also* Exhibit 1.

### 2.) The Risk of Harm to Plaintiffs Given Their Medical Conditions and Medications

29.     The substantial risk of serious harm to Plaintiffs was further underscored by the sworn testimony of Plaintiffs' expert, Dr. Susan Vassallo, M.D. ("Vassallo").

30.     Vassallo, who has been on the faculty of the New York University School of Medicine since 1993, is an attending physician in emergency medicine at Bellevue Hospital Center in New York, New York.  Vassallo is a certified correctional heath

49

professional and an expert on the effects of drugs and illness on an individual's ability to thermoregulate (or regulate one's own body temperature).[74]

31.     After observing the conditions in the death row facility, reviewing the USRM data, and reviewing Plaintiffs' medical records and Administrative Remedy Program ("ARP") requests[75], Vassallo concluded that the heat conditions in the death row facility: (1) put all three Plaintiffs at risk of heat-related illnesses, including heat stroke; and (2) worsened Plaintiffs' underlying medical conditions:

> BY MR. KAMIN:          . . . And based upon your review of the information that you looked at, have you reached an opinion on that matter?
>
> BY DR. VASSALLO:     Yes.  My opinion is that the temperatures on death row are excessively hot, and put the prisoners there at risk of heat stroke, as well as worsening of their underlying medical conditions.  In addition [ ], maybe death from those conditions, that is, cardiovascular disease, particularly.

Trial Transcript, Testimony of Dr. Susan Vassallo, Aug. 6, 2013.

---

[74] During the trial, the parties stipulated that Vassallo qualified as an expert "on the effect of drugs and [ ] illness on thermoregulation, including [the] effect of temperature on prisoners." According to Vassallo, ". . . it's not until your body loses [the] ability to regulate that the [body] temperature starts to rise and [it] becomes an emergency." Trial Transcript, Testimony of Dr. Susan Vassallo, Aug. 6, 2013.

[75] According to the Louisiana Department of Public Safety and Corrections' website, "[t]he Department and all local jails housing state offenders have established Administrative Remedy Procedures (ARP) through which an offender may, in writing, request a formal review of a complaint related to any aspect of his incarceration.  Such complaints include actions pertaining to conditions of confinement, personal injuries, medical malpractice, time computations, or challenges to rules, regulations, policies, or statutes. Through this procedure, offenders shall receive reasonable responses and where appropriate, meaningful remedies." *Frequently Asked Questions*, Louisiana Department of Public Safety and Corrections, Corrections Services, http://www.doc.la.gov/quicklinks/offender-info/faq/ (last visited Dec. 17, 2013).

50

32.     Vassallo testified that each of Plaintiffs' underlying medical conditions (i.e. diabetes, hypertension, uncontrolled blood pressure) inhibit their ability to thermoregulate.

33.     Vassallo further testified that the Plaintiffs' medications (i.e. beta blockers, diuretics, antidepressants) also inhibit their ability to thermoregulate.

> BY DR. VASSALLO:     Well, the reason that [there is] increased risk is because they have underlying health problems, including cardiovascular disease, diabetes, hypertension.     Those are the problems that cause [increased risk]. Secondly, the medications that are required to treat them, which prevent their ability to respond to heat, which [are] well accepted to be risks.     So those are some of the problems that the Plaintiffs have that make th[ese] conditions dangerous for them.

Trial Transcript, Testimony of Dr. Susan Vassallo, Aug. 6, 2013.

34.     Vassallo also testified about the increased risk to Plaintiffs Ball and Code, who are over the age of fifty-five:

> BY MR. KAMIN:     . . . Mr. Ball is actually sixty years old.  Is that a factor in your assessment of his risk?

> BY DR. VASSALLO:     Well, it is.  Because, when you look at the CDC, which publishes something called an MMWR, which is the morbidity and mortality weekly report - it's probably one of the most respected journals and publications in America today - [ ] you see very clearly that the people who are above the age of fifty-five to sixty are the ones who most commonly die during heat - during heat episodes.  They're much more at risk.  And so, the risk with age is shown in experimental    studies.    It's    shown    in

51

epidemiological studies of heat waves.    We
have a plethora of knowledge about that.

Trial Transcript, Testimony of Dr. Susan Vassallo, Aug. 6, 2013.

35.    When asked about the symptoms that Plaintiffs testified they experience during

the summer months, Vassallo testified as follows:

> BY MR. KAMIN:    During his testimony yesterday at trial, Mr.
> Ball testified about symptoms including
> dizziness, sweating, light-headedness and
> weakness, all when it's hot.    Do those
> symptoms have any significance to you?
>
> BY DR. VASSALLO:    Well, those are common temperatures -
> symptoms that people will describe when
> they're entering a phase of heat exhaustion.

Trial Transcript, Testimony of Dr. Susan Vassallo, Aug. 6, 2013.

36.    Vassallo further emphasized that even heathy individuals, and individuals

whose blood pressure is being controlled by medication are at risk of serious harm in

heat conditions like those in the death row tiers:

> BY MR. KAMIN:    Okay.    Does blood pressure control, due to
> medication, alleviate the risk of heat-related
> illness?
>
> BY DR. VASSALLO:    No.    I mean, the problem with these
> temperatures is that everybody is at risk in
> these temperatures.    So, although the young,
> healthy individual who is not exercising is at
> less risk than an older individual with medical
> problems, like these three Plaintiffs.    But
> every - this is - these temperatures are
> dangerous when you're confined in this
> setting.
>
> BY MR. KAMIN:    I just want to be clear for the Court's benefit.
> That - does someone with hypertension - let's

52

take Mr. Magee as an example. Even though his hypertension is in the best state of the three Plaintiffs due to medication, does the hypertension itself still put him at risk for heat-related illness that he would not face if he did not have hypertension?

BY DR. VASSALLO:         The - my answer is yes. . . .

Trial Transcript, Testimony of Dr. Susan Vassallo, Aug. 6, 2013.

37.     Vassallo's expert opinion was further informed by her review of the USRM data:

BY MR. KAMIN:            And, so, Dr. Vassallo, based upon the data received from the neutral third party, USRM, has your opinion changed in any way from the report that you previously submitted?

BY DR. VASSALLO:         No.

BY MR. KAMIN:            What is your opinion, based upon the data submitted by USRM?

BY DR. VASSALLO:         My opinion is that the temperatures on death row are a health hazard to everybody, particularly to those individuals with health problems, such as cardiovascular disease, diabetes, hypertension. And that . . . it's just a matter of time until there is a health emergency, such as heat stroke or myocardial infarction or stroke arises because of the temperatures on death row.

BY MR. KAMIN:            It is your opinion that the Plaintiffs, Nathaniel Code, Elzie Ball, and James Magee, are at imminent risk of severe physical harm due to the heat conditions on death row?

BY DR. VASSALLO:         Yes, it is.

Trial Transcript, Testimony of Dr. Susan Vassallo, Aug. 6, 2013.

53

38.    During cross-examination, Vassallo testified as to how quickly one can have a

heat stroke:

| | |
|---|---|
| BY MR. JONES: | Wouldn't you expect in the medical records of Mr. Ball, for instance, who's been on death row for fifteen years, to see some medical evidence of the effects of heat on him over that period of time? |
| BY DR. VASSALLO: | Well, no sir.  The heat strokes that happened in Dallas, the heat strokes I've had in my entire career, I've had hundreds where I've been at the bedside of 110 degrees.  Those people don't have warning.  The - they don't have - there's no warning with heat stroke.  You don't feel hot for five days or before or even one day.  So, heat stroke is a failure of thermoregulation which is dramatic and catastrophic.  It occurs suddenly. . . . |

Trial Transcript, Testimony of Dr. Susan Vassallo, Aug. 6, 2013.

39.    When further questioned by counsel for Defendants about the risk of heat

stroke, Dr. Vassallo testified as follows:

| | |
|---|---|
| BY DR. VASSALLO: | . . . There are two pieces to the stress of the heat and the temperatures on death row.  One is the worsening of their underlying medical conditions.    And their risk of stroke, myocardial infarction, which is a heart attack, and et cetera.  So, that is well supported in the literature.  But you don't have to have heat stroke for heat to do its - to be bad for you.  And a sustained temperature such as they're undergoing.  The second piece is this issue of heat stroke.  And that's the piece that I don't want to be misunderstood.  That people can suffer suddenly from heat strike without ever having complained about the weather. . . . |

54

Trial Transcript, Testimony of Dr. Susan Vassallo, Aug. 6, 2013.

40.     The Court notes that Defendants failed to rebut Dr. Vassallo's testimony regarding the risk of harm to Plaintiffs.  Indeed, as noted above, Dr. Vassallo was subject to cross-examination.  Yet, her testimony was largely uncontroverted.

41.     Defendants point to evidence in the record that, prior to the instant litigation, Plaintiffs did not submit any formal written complaints, ARPs, or "sick call" requests as a result of the heat conditions.  Defendants further contend that Plaintiffs' medical records do not contain evidence of prior heat-related illnesses.

42.     The record, however, is replete with evidence that Plaintiffs filed multiple ARPs complaining of the excessive heat conditions, prior to filing the instant litigation.  *See*, *e.g.*, Trial Transcript, Testimony of Angelia Norwood, Aug. 5, 2013.

43.     Further, prior complaints of heat-related illness are not a predicate for a finding that the conditions in Angola's death row facility present a substantial risk of serious harm to Plaintiffs.  "That the Eighth Amendment protects against future harm to inmates is not a novel proposition."  *Helling v. McKinney*, 509 U.S. 25, 33 (1993).  "It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."  *Id.*  Accordingly, Plaintiffs need not establish that death or serious illness has occurred in order to establish a substantial risk of serious harm.[76]

---

[76] Further, assuming, *arguendo*, that prior requests for medical assistance or complaints of heat-related illness are required, there is sufficient evidence in the record to support the conclusion that Plaintiffs were discouraged from submitting "sick call" requests because of the monetary and potential disciplinary consequences of doing so.  Indeed, it is uncontested that Defendants' "Health Care Request Form" includes the following acknowledgment above the signature and date lines:

44.     Additionally, the Court is not persuaded by Defendants' argument that Plaintiffs' lifestyle or diet choices - and not the heat conditions - are what increase Plaintiffs' risk of harm.  *See* Trial Transcript, Dr. Hal David Macmurdo, Aug. 7, 2013. It is uncontested that Plaintiffs' conditions of confinement, including Plaintiffs' food, beverage, and exercise options, are in the exclusive control of Defendants.  While it is unclear from the record how often Plaintiffs are permitted to purchase beverages and snacks from the penitentiary canteen, even assuming, *arguendo*, that Plaintiffs are permitted to do so regularly, it belies logic to conclude that such beverages and snacks compose the *majority* of Plaintiffs' diet.  Rather, the majority of Plaintiffs' diet is composed of beverages and food that are in the exclusive control of *and provided by* Defendants.  *See* Trial Transcript, Testimony of Dr. Raman Singh, M.D., Aug. 7, 2013.[77] Thus, Defendants' argument is unavailing.

### 3.)     Multiple Federal and State Agencies Have Recognized the Risk of Harm to Individuals Subjected to Extreme Heat

45.     According to the Federal Emergency Management Agency ("FEMA"), "[m]ost heat disorders occur because the victim has been overexposed to heat or has over-

---

I understand that in accordance with Dept. Reg. No. B-06-001, I will be charged $3.00 for routine request [*sic*] for health care services, $6.00 for emergency request [*sic*] and $2.00 for each new prescription written and dispensed to me, with the exceptions noted in the referenced regulation.  I am aware that if I declare myself a medical emergency and the health care staff finds that and [*sic*] emergency does not exist, I may be given a disciplinary report for malingering.

[77] During the trial, Dr. Singh testified that his the Chief Medical and Mental Health Director for the all ninety of the Louisiana Department of Public Safety and Corrections' correctional facilities, including Angola.

56

exercised for his or her age and physical condition.  Older adults, young children and those who are sick or overweight are more likely to succumb to extreme heat."[78]

46.    Multiple federal agencies and the Louisiana Office of Public Health recognize that the following human factors inhibit an individual's ability to regulate temperature: age, certain medical conditions, and use of certain medications.[79]

47.    According to the Centers for Disease Control and Prevention ("CDC"), individuals sixty-five years old or older, individuals who are physically ill, especially those with heart disease or high blood pressure, and individuals with mental illness are at greater risk to develop heat-related illnesses.[80]  Additional risk factors include: "obesity, fever, dehydration, . . . poor circulation, . . . and prescription drug . . . use."[81]

---

[78] *Extreme Heat*, FEMA, http://www.ready.gov/heat (last visited Dec. 17, 2013) [hereinafter *Extreme Heat*]; *see also Heat Wave - A Major Summer Killer*, Louisiana Office of Emergency Preparedness, http://www.gohsep.la.gov/factsheets/heatwave.aspx (last visited Dec. 17, 2013) [hereinafter *Heat Wave*] ("Ranging in severity, heat disorders share one common feature: the individual has overexposed or over exercised for his age and physical condition in the existing thermal environment.").

[79] *Heat*, NWS, http://www.weather.gov/bgm/heat (last visited Dec. 17, 2013) [hereinafter *Heat*]; *Frequently Asked Questions About Extreme Heat*, Centers for Disease Control and Prevention, Emergency Preparedness and Response, http://www.bt.cdc.gov/disasters/extremeheat/faq.asp (last visited Dec. 17, 2013) [hereinafter *Frequently Asked Questions About Extreme Heat*] ("Those at greatest risk for heat-related illness include infants and children up to four years of age, people 65 years of age and older, people who are overweight, and people who are ill or on certain medications."); *Excessive Heat Events Guidebook*, June 2006, United States Environmental Protection Agency, http://www.epa.gov/hiri/about/pdf/EHEguide_final.pdf (last visited Dec. 17, 2013) [hereinafter *Excessive Heat Events Guidebook*]; *DHH and DCFS Remind Residents to Stay Safe in Summer Heat: High Temperatures Put Louisianans at Risk*, State of Louisiana Department of Health & Hospitals, Office of Public Health, http://dhh.louisiana.gov/index.cfm/newsroom/detail/2844 (last visited Dec. 17, 2013) [hereinafter *High Temperatures Put Louisianans at Risk*].

[80] *Tips for Preventing Heat-Related Illness*, CDC, Emergency Preparedness and Response, http://www.bt.cdc.gov/disasters/extremeheat/heattips.asp (last visited Dec. 17, 2013) [hereinafter *Tips for Preventing Heat-Related Illness*].

[81] *Extreme Heat: A Prevention Guide to Promote Your Personal Health and Safety*, CDC, Emergency Preparedness and Response, http://www.bt.cdc.gov/disasters/extremeheat/heat_guide.asp (last visited Dec. 17, 2013) [hereinafter *Extreme Heat: A Prevention Guide*].

48.     The CDC further advises, "[t]he risk for heat-related illness and death may increase among people using the following drugs: (1) psychotropics, which affect psychic function, behavior, or experience (e.g. haloperidol or chlorpromazine); (2) medications for Parkinson's disease, because they can inhibit perspiration; (3) tranquilizers such as phenothiazines, butyrophenones, and thiozanthenes; and (4) diuretic medications or "water pills" that affect fluid balance in the body."[82]

49.     In addition to human risk factors, several environmental factors also increase the risk of heat-related illnesses and deaths.  For example, according to FEMA, "[c]onditions that can induce heat-related illnesses include stagnant atmospheric conditions and poor air quality . . . [a]lso, asphalt and concrete store heat longer and gradually release heat at night, which can produce higher nighttime temperatures . . ."[83]

50.     According to the NWS, successive days of heat with high nighttime temperatures also increases the likelihood that heat-related illnesses and deaths may occur.[84]  The NWS further advises that a building's "overnight minimum heat index" is a factor that increases the impact of heat: "houses and buildings that do not have air conditioning will not cool down if the overnight minimum heat index remains above 75-80° and the area goes into a second hot day."[85]

---

[82] *Frequently Asked Questions About Extreme Heat*, *supra* note 79.

[83] *Extreme Heat*, *supra* note 78.

[84] *Heat*, *supra* note 79 ("Successive days of heat with high nighttime temperatures is *really* bad - fatalities *will* occur.") (emphasis added).

[85] *Heat*, *supra* note 79.

58

51.    The CDC further cautions that electric fans will not prevent heat-related illnesses when the temperature is in the high 90s.[86]  Specifically, the CDC warns that "[e]lectric fans may provide comfort, but when the temperature is in the high 90's, fans will not prevent heat-related illness."[87]

52.    Instead, the CDC contends that "[a]ir conditioning is the strongest protective factor against heat-related illness."[88]  Indeed, according to the CDC, "[e]xposure to air conditioning for a few hours a day will reduce the risk of heat-related illness."[89]

53.    Given the substantial risk of serious harm due to extreme heat, which has been recognized by multiple federal and state agencies, and the CDC's recommendations, the Court is also not persuaded by Defendants' argument that the conditions of confinement in the death row tiers are no different than the conditions in a "free" person's home in which there no mechanical cooling or air conditioning is installed. While the Court recognizes that there are residents of this State who do not have air conditioning in their homes, it cannot be said that such conditions are analogous to the conditions of confinement at issue here.  Indeed, when the temperature rises, "free" people are urged to take the precautions recommended by multiple federal and state agencies, and if need be, seek refuge in air conditioned buildings *at will*.  In contrast, Plaintiffs are not permitted to take many of the precautions recommended by federal

---

[86] *Frequently Asked Questions About Extreme Heat*, *supra* note 79.

[87] *Id.*

[88] *Id.*

[89] *Id.*

and state agencies, nor are they permitted to seek refuge in air conditioned buildings *at will*.

54.    In sum, the information published by multiple federal and state agencies supports the conclusion that, considering Plaintiffs' ages[90], underlying medical conditions and/or medications, the conditions of confinement in Angola's death row tiers create a substantial risk of serious harm to Plaintiffs.

### 4.)    Multiple Federal and State Agencies Have Recognized the Importance of the Heat Index

55.    During the trial, Defendants' witness John "Jay" Grymes[91] attempted to minimize the importance of the heat index by characterizing it as merely a derived number.

| BY MR. HILBURN: | . . . What about the heat index?  Can you explain what heat index means? |
|---|---|
| BY MR. GRYMES: | The heat index is a derived guideline estimate of the impact of the combination of temperature and atmospheric moisture on, 'an average person.' |
| | . . . |
| BY MR. HILBURN: | Okay.  Are there any issues with respect to using particular heat index values without taking into account various environmental and physical factors? |

---

[90] The Court acknowledges that Plaintiff Magee is only thirty-five years old.  However, the evidence supports the conclusion that his underlying medical conditions and medications place him in a higher risk category.

[91] By stipulation of the parties, Grymes was accepted an as expert in the field of meteorology.  He has worked as a meteorologist and climatologist for approximately thirty years.

| BY MR. GRYMES: | Well, the first thing you have to remember - and this sometimes gets lost in this concept of heat index - it is a derived number.  It's not a real number.  It, in fact, is sometimes called the apparent temperature.  It's what the air and humidity combination would feel like to the average person. . . . But it's simply a guideline number. |

Trial Transcript, Testimony of Jay Grymes, Aug. 6, 2013.

56.     However, when further questioned by counsel for Plaintiffs, Grymes admitted that when the heat index is high, he advises his television viewers so that they can take the proper precautions.

| BY MR. VORA: | Mr. Grymes, when you provide, and when your colleagues, who are weather persons, provide information about temperatures in South Louisiana during the summertime, you provide the heat index as well as the temperatures, generally, correct? |
| BY MR. GRYMES: | Often.  Correct. |
| BY MR. VORA: | And when you say often, you mean more often than not?  Is that a fair statement? |
| BY MR. GRYMES: | I can't speak for the others on my team, but I would say I probably mention the heat index probably every other weathercast. |
| BY MR. VORA: | And the reason you provide the heat index every other weathercast is because you believe that it is important [to] your job [of] informing the public as to what they can expect the ambient conditions [to] which they are about to be exposed - in the event they go outside - to be, so that they can go on with their lives in a predictable fashion, correct? |

61

| BY MR. GRYMES: | I provide heat index as a guideline to our viewers for them to make better decisions. |
| BY MR. VORA: | And it is a guideline that you would expect your viewers to make decisions pursuant to, correct? |
| BY MR. GRYMES: | I would hope so. |

Trial Transcript, Testimony of Jay Grymes, Aug. 6, 2013.

57.  The Court notes that reputable meteorology organizations agree that the heat index is critical to human safety.  For example, the NOAA's heat alert procedures "are based mainly on Heat Index Values."  *See, e.g., Heat: A Major Killer, supra* note 37; *Heat, supra* note 79.

58.  Finally, the Fifth Circuit itself has recognized heat index as a valid measure for determining the constitutionality of prison conditions.  *See Gates*, 376 F.3d at 334, 336.

59.  Thus, the Court is unpersuaded that the heat index - which is calculated based on the temperature *and* humidity - is not of critical importance when evaluating the risk of serious harm to Plaintiffs.

60.  In sum, based on the USRM data summarized above, the testimony presented at trial, and the advisories issued by numerous federal and state agencies, the Court concludes that Plaintiffs have met their burden of establishing that the conditions of confinement at Angola's death row constitute a substantial risk of serious harm to plaintiffs.  The Court's conclusion is consistent with previous rulings by the Fifth Circuit.  *See, e.g., Valigura*, 265 F. Appx. at 236 (unpublished) ("requiring an inmate to remain on his bunk almost twenty-four hours a day for several days in a row in

temperatures into the nineties and hundreds are allegations that are sufficiently serious to implicate the minimal civilized measure of life's necessities."). Accordingly, the Court shall evaluate the second element of Plaintiffs' Eighth Amendment claim.

### b. The Evidence Establishes that Defendants Acted with Deliberate Indifference to the Substantial Risk of Serious Harm to Plaintiffs

61.    Prison officials violate the Eighth Amendment when they act with deliberate indifference to a prisoner's serious medical needs. *Estelle*, 429 U.S. at 105-106.

62.    To establish that a prison official was deliberately indifferent to an inhumane condition of confinement, the plaintiff bears the burden of showing that the official knew of and disregarded an excessive risk to inmate health or safety.

63.    "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Gates*, 376 F.3d at 332. *See also Farmer*, 511 U.S. at 837 (the evidence must show that "the official [was] both . . . aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [that] he . . . also [drew] the inference.")*; Reeves v. Collins,* 27 F.3d 174, 176 (5th Cir. 1994) ("[u]nder exceptional circumstances, a prison official's knowledge of a substantial risk of harm may be inferred by the obviousness of the substantial risk.").

64.    As established by the Supreme Court in *Farmer*, it is not necessary for an Eighth Amendment claimant to show that a prison official acted or failed to act due to

a belief that an inmate would actually be harmed.  It is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.  511 U.S. at 842.

### 1.) The Evidence Establishes that Defendants Had Knowledge of the Substantial Risk of Serious Harm to Plaintiffs

65.    Considering the uncontroverted USRM data summarized above, Plaintiffs' ages, Plaintiffs' underlying medical conditions, and Plaintiffs' medications, the Court concludes that Defendants' knowledge of the substantial risk of harm may be inferred by the obviousness of the risk to Plaintiffs.[92]

66.    In the alternative, the Court concludes that Defendants' knowledge of the substantial risk of harm to Plaintiffs may be inferred from circumstantial evidence presented at trial.

67.    In cases asserting deliberate indifference by prison officials where there is excessive heat, the Fifth Circuit has found deliberate indifference where prison officials ignored complaints "of heat stroke or some other heat-related illness." *Gates*, 376 F.3d at 339; *Blackmon*, 484 F. Appx. at 872-73 (evidence was sufficient to allow a jury to conclude that prison officials were deliberately indifferent to significant risks to prisoner's health where prisoner "filed numerous grievances complaining about the heat, its effect on his health, and prison officials' failure to address his concerns").

---

[92] Indeed, there is nothing in the record to suggest that the temperature, humidity, and heat index data collected, analyzed, and disseminated by USRM from July 15 - August 5, 2013 was higher than the average temperature, humidity, and heat index normally experienced during the summer months in south Louisiana.  Further, the record establishes that Defendants have been in possession of Plaintiff's medical records throughout the duration of their incarceration at death row.

68.    Here, it is uncontroverted that Plaintiffs submitted multiple ARPs to Defendants complaining of the excessive heat conditions, prior to filing the instant litigation.

69.    During the trial, the Court admitted into evidence multiple ARPs submitted by Plaintiffs to Defendants between July 24 and October 17, 2012.  The Court also admitted into evidence Defendants' responses to Plaintiffs' ARPs, in which Defendants acknowledged Plaintiffs' claims that it is "extremely hot on Death Row" and that they are "more susceptible to heat" because of their underlying medical conditions and medications, and denied Plaintiffs' requests for relief.[93]

---

[93] Defendants' receipt of and response to Plaintiffs' ARPs was also summarized in the parties' Statement of Undisputed Facts (Doc. 53-1), which states:

Plaintiff Ball submitted a Request for Administrative Remedy ("ARP") on July 28, 2012 to Warden Cain, describing among other things the excessive heat conditions, the adverse symptoms he was experiencing due to the heat, his inability to alleviate the conditions, and his medical diagnoses and medications.  Plaintiff Elzie Ball requested that the prison accommodate his illness by providing a safer environment.  Angola, through Warden Norwood, issued a Response denying the ARP on October 12, 2012.  Plaintiff Ball appealed Warden Norwood's response on October 17, 2012. The DOC denied the appeal December 14, 2012.  Plaintiff Ball's grievance process was thereby exhausted.

Plaintiff Code submitted Request for Administrative Remedy ("ARP") on July 24, 2012, describing the excessive heat conditions, the adverse symptoms he was experiencing due to the heat, his inability to alleviate the conditions, and his medical diagnoses and medications.  Plaintiff Nathaniel Code requested that the prison accommodate his illness by providing a safer environment.  Angola, through Warden Norwood, issued a Response denying the ARP on September 5, 2012.  Plaintiff Code appealed Warden Norwood's response on September 13, 2012, reasserting his grievances and outlining why LSP's First Step Response was inadequate.  The DOC denied the appeal on November 21, 2012. Plaintiff Code's grievance process was thereby exhausted.

Plaintiff Magee submitted a Request for Administrative Remedy ("ARP") on August 28, 2012, describing the excessive heat conditions, the adverse symptoms he was experiencing due to the heat, his inability to alleviate the conditions, and his medical diagnoses and medications.  Plaintiff James Magee requested that the prison accommodate his illness by providing a safer environment.  Angola, through Warden Norwood, issued a Response denying the ARP on November 6, 2012.  Plaintiff Magee appealed Warden Norwood's response on November 7, 2012.  The DOC denied the appeal

65

70.     During the trial, Defendant Norwood, who has been the Assistant Warden responsible for the death row tiers since February 2011, testified that she received thirteen ARPs related to the heat conditions in the death row tiers:

| BY MR. VORA: | You received the ARP request that was filed by Mr. Elzie Ball, correct? |
|---|---|
| BY MS. NORWOOD: | Yes. |
| BY MR. VORA: | And you received the ARP request that was filed by Mr. Code? |
| BY MS. NORWOOD: | Yes. |
| BY MR. VORA: | You received the ARP request that was filed by Mr. Magee? |
| BY MS. NORWOOD: | Yes. |
| BY MR. VORA: | You received all of those ARP requests? |
| BY MS. NORWOOD: | I did, among others. |
| BY MR. VORA: | And you received - the ARP requests that I'm referring to, Mr. Code, Mr. Ball, Mr. Magee, were related to what they described as extreme heat or hot conditions. Is that accurate? |
| BY MS. NORWOOD: | Yes. |
| | . . . |
| BY MR. VORA: | You received many, many ARPs being filed since February, end of February, 2011, correct? |

---

on January 3, 2013. Plaintiff Magee's grievance process was thereby exhausted.

(Doc. 53-1, pp. 2-3.)  Despite these undisputed facts, Norwood later attempted to characterize Plaintiffs' ARPs as nothing more than Plaintiffs' complaints that "they were hot and [that] they wanted air conditioning."  Trial Transcript, Testimony of Angelia Norwood, Aug. 5, 2013.

66

| BY MS. NORWOOD: | Actually, no.  I have received the most on this subject. |
| BY MR. VORA: | And when you say this subject, you mean - |
| BY MS. NORWOOD: | The heat. |
| BY MR. VORA: | - with respect to the heat, correct? |
| BY MS. NORWOOD: | Right. |
| BY MR. VORA: | And with respect to those, how many would you approximate there would be, how many requests? |
| BY MS. NORWOOD: | Thirteen. |

Trial Transcript, Testimony of Angelia Norwood, Aug. 5, 2013.

71.     Norwood also testified that she talked with Plaintiffs Ball and Code regarding the heat conditions on multiple occasions:

| BY MR. VORA: | And did you speak to Mr. Ball and Mr. Code prior to the filing of the ARP? |
| BY MS. NORWOOD: | I did. |
| BY MR. VORA: | Did you speak to them after they filed the ARP? |
| BY MS. NORWOOD: | I did. |
| BY MR. VORA: | Did you speak to them after they filed this lawsuit? |
| BY MS. NORWOOD: | Yes, sir. |

72.     During the trial, Defendant Cain, who oversees the entire penitentiary, including the death row facility[94], testified regarding Defendants' knowledge of a

---

[94] Cain testified as follows:

| BY MR. VORA: | How long have you been the Warden at Angola? |

67

substantial risk of serious harm to Plaintiffs.

73.    For example, according to Cain, correctional officers assigned to the death row

facility "closely monitor" the temperature in the death row tiers and record such

temperatures in tier log books.

| | |
|---|---|
| BY MR. VORA: | You state here in this letter that we do understand their concern and would like to assure you that the temperature, and all the main areas, is closely monitored.  Do you see that, sir? |
| BY MR. CAIN: | Yes. |
| BY MR. VORA: | And when you say 'closely monitored' you mean in the logs that are required by the correctional officers to be filled out with the air temperatures at various times throughout the day.  Is that correct? |

| | |
|---|---|
| BY MR. CAIN: | Eighteen and a half years. |
| BY MR. VORA: | And during the eighteen and a half years that you have been Warden at Angola, you have been the top official at Angola? |
| BY MR. CAIN: | Yes. |
| BY MR. VORA: | You would also, therefore, exercise control and responsibility over what happens at death row, correct? |
| BY MR. CAIN: | Yes. |

According to Cain, he also is responsible for enforcing policies and/or regulations related to inmates who have been prescribed medications that increase their risk of developing heat-related illnesses:

| | |
|---|---|
| BY MR. VORA: | Sir, my question is, you are responsible for enforcing any policies that would have to deal with medications that could create the risk of an adverse effect to somebody's health, an inmate's health, as a result of rising temperatures - is that a fair statement? |
| BY MR. CAIN: | Yes. |

Trial Transcript, Testimony of Nathan Burl Cain, Aug. 6, 2013.

68

BY MR. CAIN:                    Yes.

BY MR. VORA:                    Those logs are monitored by individuals who are to monitor them to ensure that the temperatures do not reach unacceptable levels, correct?

BY MR. CAIN:                    Yes, correctional officers.

Trial Transcript, Testimony of Nathan Burl Cain, Aug. 6, 2013.

74.     Defendant Norwood also testified as to Defendants' constant monitoring of the

internal temperature[95]:

BY MR. VORA:                    . . . Correctional officers then, pursuant to policies that are in place on the death row tiers, are required to record temperatures in log books.  Is that accurate?

BY MS. NORWOOD:                 Yes.

BY MR. VORA:                    And that temperature is supposed to be recorded indoors as well as outdoors, correct?

BY MS. NORWOOD:                 Indoors daily.

BY MR. VORA:                    It is recorded indoors daily, correct?

BY MS. NORWOOD:                 Yes.

BY MR. VORA:                    It is recorded multiple times per day, correct?

BY MS. NORWOOD:                 Yes.

BY MR. VORA:                    It is recorded more or less every two hours indoors, correct?

---

[95] Norwood further testified that the mercury in-glass thermometers in each of the death row tiers are "hard to read."  However, both she and Cain testified that Defendants have not attempted to replace the thermometers nor taken any action to make the current in-mercury thermometers easier to read.  Trial Transcript, Testimony of Angelia Norwood, Aug. 5, 2013; Trial Transcript, Testimony of Nathan Burl Cain, Aug. 6, 2013.

| BY MS. NORWOOD: | Yes. |
| BY MR. VORA: | Its your responsibility to ensure that the correctional officers properly record that temperature? |
| BY MS. NORWOOD: | Ultimately, yes. |
| BY MR. VORA: | And it's your responsibility not just that they record it, but that they record it accurately, correct? |
| BY MS. NORWOOD: | Ultimately, yes. |

Trial Transcript, Testimony of Angelia Norwood, Aug. 5, 2013.

75.    Defendant Cain further testified that he visits the death row facility regularly and is aware of the heat conditions in the tiers:

| BY MR. CAIN: | . . . I go to death row regularly.  So I walk in there.  So I know what it feels and how hot it is and inmates talk to me.  So, evidently I didn't have anyone talk to me about being too hot. |

Trial Transcript, Testimony of Nathan Burl Cain, Aug. 6, 2013.

76.    Despite Cain's contention that Plaintiffs did not verbally complain about the heat conditions, the Court concludes that Defendants had knowledge of the heat conditions in the death row tiers, and thus, the substantial risk of serious harm to Plaintiffs.  Considering the uncontroverted USRM data, Plaintiffs' ages, Plaintiffs' underlying medical conditions, and Plaintiffs' medications, the Court concludes that Defendants' knowledge of the substantial risk of harm may be inferred by the obviousness of the risk to Plaintiffs.  In the alternative, based on the evidence that: (1) Plaintiffs submitted multiple APRs complaining of the excessive heat conditions to

70

Defendants, prior to filing the instant litigation; (2) Defendants "closely monitor" the temperature in each of the death row tiers and record such temperatures in tier log books; and (3) Defendants Cain and Norwood walk the death row tiers "regularly," the Court concludes that Defendants' knowledge of the substantial risk of harm to Plaintiffs may be inferred.

### 2.) The Evidence Establishes that Defendants Disregarded the Substantial Risk of Serious Harm to Plaintiffs

77. Despite "know[ing] what it feels and how hot it is," Cain testified that he did not take any actions to reduce the heat conditions in the death row tiers, prior to the data collection period.[96]

78. Indeed, according to Cain, he often "thought" of ways to reduce the heat in the death row tiers, yet failed to take any action, even after the instant litigation was filed:

| | |
|---|---|
| BY MR. VORA: | Warden Cain, between the June date on which this complaint was filed to July 2nd, did you ever consider taking any remedial measures to address the issue of heat on the death row tiers? |
| BY MR. CAIN: | I don't recall the specific dates and times, but we always have thought and tried to figure any way to have the ice on the tiers, any way - and to add extra fans. We've got a building with no fans. Inmates know that. Anything we can come up with and make that building cooler or any other building at Angola, we would do it. And we will - it was always on our mind how to overcome the heat. Because their comfort means less problems for me. I'm sure |

---

[96] Defendants' attempts to "lower the temperatures" in the death row tiers during the data collection period will be addressed in a separate order by this Court.

|  |  |
|---|---|
|  | during that period of time, as all of the time almost, we're thinking about how to get this place cooler. |
| BY MR. VORA: | Did you actually do anything to try to make the death row tiers cooler between the June time frame that the complaint was filed and July 2nd? |
| BY MR. CAIN: | I don't know that I did or didn't.  I know that we made a mistake after the Judge gave the [July 2nd] order.  Is that what you're talking about? |
| BY MR. VORA: | No, sir.  I'm trying to refer to the time before the order was issued but after the complaint, in which the lawsuit against you was filed.  During that time frame, did you take any actions in order to remedy the heat that the inmates were complaining about in this case? |
| BY MR. CAIN: | I don't think so.   I think we were already giving the ice.  We thought about doing buckets at some point in there.  So, I don't know exactly when.   So, I can't answer accurately, because I don't remember in your dates.  But we were thinking about ice and thinking about other things all through that period of time. Specifically, I don't want to say I did when I don't know for sure that I did exactly during those dates. |
| BY MR. VORA: | Warden Cain, you never provided a[n] [ice] bucket that you referred to in your previous answer to any of the inmates on the death row tiers at any point in time since this lawsuit was filed against you, correct? |
| BY MR. CAIN: | No, we haven't done that yet.  I thought about it. |

Trial Transcript, Testimony of Nathan Burl Cain, Aug. 6, 2013.

72

79.    Cain conceded, however, that once the Court-ordered data collection period

began, he took action to attempt to reduce the temperature in tiers C and G, the tiers

with the highest recorded temperatures and heat indices:

| | |
|---|---|
| BY MR. VORA: | But you ordered the awnings to be procured, correct? |
| BY MR. CAIN: | Well, this is a homemade thing.  Where we had wood in the warehouse and the 2 x 4's, and we used, I think, mattress material that we would normally make mattresses with. And this was just a really thrown together thing, just to see if it would shade.  We were trying to shade the windows to see what would happen.  To see if the temperature would fall. |
| | . . . |
| BY MR. VORA: | You had tried other measures in order to try to lower the temperature and address the issue of heat that had been raised by Mr. Ball, Mr. Magee, and Mr. Code, right? |
| BY MR. CAIN: | I haven't tried other measures.  I've only given them ice. |
| BY MR. VORA: | You never tried to do - you never tried to do something with soaker hoses? |
| BY MR. CAIN: | I had never before, but I did during this [data collection period], but it didn't work. |
| BY MR. VORA: | And during this time, when did you try to use soaker hoses? |
| BY MR. CAIN: | At the same time that we were putting the awnings up.  I would think the next day or two.  And there was, I mean, that didn't work at all.  It was not, it was never up, really.  It was up, but the water all ran out as soon as you put it on.  We didn't have enough power. |

73

14-30067.5029

|  | It was a half inch of line going into a three-quarter inch hose. |
|---|---|
| BY MR. VORA: | Who gave the order to install the soaker hoses and try to use them? |
| BY MR. CAIN: | Me. |
|  | . . . |
| BY MR. VORA: | Outside of misting, using soaker hoses and awnings, have you ever attempted to do anything else in order to address the issues that Mr. Ball, Mr. Code, and Mr. Magee have raised with respect to what they consider to be prolonged exposure to heat, sir? |
| BY MR. CAIN: | I've just ensured - the only thing I would do is ensure that the system put in the building was working, that the belts were there, that they kept it operating, and it didn't, it didn't falter. Because it did a time or two. And so we had to keep the belt on there because the belts would break off. And they turned the fans that worked in the duct work that make air moves through the, through the little vents that go into the cells. So yes, keep it, keep it up. Maintain it well. What we do have, make it work the best we can. And add the additional fans. |
| BY MR. VORA: | Did you ever consider doing anything that would not have manipulated the USRM data, that would have provided some relief for Mr. Ball, Mr. Code, or Mr. Magee? |
| BY MR. CAIN: | I just told you what I did. That's all I've ever done. |
| BY MR. VORA: | You had considered previously, though, providing them with larger buckets in which they could store ice, correct? |

74

| | |
|---|---|
| BY MR. CAIN: | We've never given them buckets.  We thought about that, about using the soft-type ice chests. |
| BY MR. VORA: | But you never provided the soft-type ice chest that you had considered to Mr. Ball, Mr. Code, or Mr. Magee.  Is that correct? |
| BY MR. CAIN: | Correct. |
| BY MR. VORA: | To this day, you do not have a soft-type ice chest, correct? |
| BY MR. CAIN: | No. We don't have one. |

Trial Transcript, Testimony of Nathan Burl Cain, Aug. 6, 2013.

80.     While the Court questions Cain's motivation for taking such actions *for the first time* during the Court ordered data collection period, it defies logic to conclude that Cain would have taken such actions if he *did not* have knowledge of the heat conditions in the death row tiers.  Indeed, prior to the filing of the instant litigation, Cain acknowledged the heat conditions in the death row tiers and the need for remedial action.  *See* Trial Transcript, Testimony of Nathan Burl Cain, Aug. 6, 2013 ("Anything we can come up with and make that building cooler or any other building at Angola, we would do it.  And we will - it was always on our mind how to overcome the heat.").  Nevertheless, Cain failed to take any remedial action *until* USRM began collecting, analyzing, and disseminating the *alarming* temperature, humidity, and heat index data.

81.     Further, during the trial, Cain testified about the importance of even one-half of a degree decrease in the death row tiers:

75

BY MR. CAIN:        And if it were a half degree, we would know it.  And
                    the half a degree is a half a degree.  And we would
                    put the awnings up, if we could save a half a degree.

Trial Transcript, Testimony of Nathan Burl Cain, Aug. 6, 2013.

82.    Additionally, the evidence establishes that Defendants failed to abide by their

own policies and regulations when they failed to add Plaintiff Magee, who is on

psychotropic medication, to Angola's "Heat Precautions List."[97]

BY MR. VORA:        . . . Do you recognize this document as being
                    an email that you sent to the death row
                    supervisors on July 24, 2013 at 9:19 a.m.?  Do
                    you recognize that?

BY MS. NORWOOD:     Yes.

BY MR. VORA:        And that is an email that relates to the heat
                    precaution list for the week of July 22nd,
                    correct?

BY MS. NORWOOD:     Yes.

BY MR. VORA:        This goes out to all of the death row
                    supervisors because there are [inmates who]
                    belong on the heat precautions list that [the
                    supervisors are] supposed to monitor, correct?

BY MS. NORWOOD:     Yes.

BY MR. VORA:        And that is pursuant to a prison policy and
                    applies to the death row tiers in which
                    [inmates] are to be monitored because of their
                    risk of heat-related illness.  Is that correct?

BY MS. NORWOOD:     Yes.

---

[97] During the trial, the Court admitted into evidence Louisiana Department of Public Safety and Corrections Health Care Policy No. HC-45 and Louisiana State Penitentiary Department Regulation No. B-06-001.  It is undisputed that both the policy and regulation require Defendants to, *inter alia*, identify, and monitor "offenders prescribed psychotropic medication."

76

. . .

BY MR. VORA:            You were the recipient of this email, correct?

BY MS. NORWOOD:      Yes.

BY MR. VORA:            This was July 23, 2013, correct?

BY MS. NORWOOD:      Yes.

BY MR. VORA:            You did not ask for Mr. Ball, Mr. Magee, or Mr. Code to be put on a list, or this list, correct?

BY MS. NORWOOD:      No.

BY MR. VORA:            Meaning that you did not ask at any time? That is your statement?

BY MS. NORWOOD:      That's true.

. . .

BY MR. VORA:            Warden Norwood, there is, in fact, a list of offenders who are placed on a list because they are perceived to be at risk of heat-related illness, correct?

BY MS. NORWOOD:      If they are on any type of psychotropic medication, yes.

. . .

BY MR. VORA:            This list was distributed then weekly to you, who then in turn provide[d] it to the relevant death row supervisors to ensure [that] the policies of the prison [ ], with respect to the death row tiers [and] with respect to monitoring, [were] properly followed and enforced, is that correct?

BY MS. NORWOOD:      Yes.

<center>77</center>

14-30067.5033

| BY MR. VORA: | And this is an example of the list that you did not put Mr. Ball, Mr. Magee, or Mr. Code on, despite the fact that they had complained of their concern about being affected by the heat that they had been exposed to, correct? |
| --- | --- |
| BY MS. NORWOOD: | They are not on any psychotropic, except for Mr. Magee.[98] |
| | . . . |
| BY MR. VORA: | Warden Norwood, the lists that get sent out every week of the [inmates] who are at risk for heat-related illness, with respect to that list that goes out every week, at no time did you ask that Mr. Code, Mr. Magee, or Mr. Ball be placed on that list, is that a true statement? |
| BY MS. NORWOOD: | Yes. |

Indeed, Defendants failed to introduce any evidence that Magee is on, or was ever placed on, the "Heat Precautions List."

83.    In sum, the Court concludes that Defendants disregarded the substantial risk of serious harm to Plaintiffs' health and safety.  Accordingly, the Court concludes that Plaintiffs have met their burden of proving that Defendants  acted with deliberate indifference.  Thus, the Court concludes that the conditions of confinement at Angola's death row do not meet constitutional standards, and Defendants have violated the

---

[98] Defendants' staff physician, Dr. Macmurdo, also acknowledged this fact:

| BY MS. MONTAGNES: | Do you consider Remeron® to be a psychotropic drug? |
| --- | --- |
| BY DR. MACMURDO: | Yes. |
| BY MS. MONTAGNES: | And Mr. Magee is on Remeron®, isn't he? |
| BY DR. MACMURDO: | Yes. |

Trial Transcript, Testimony of Dr. Hal David Macmurdo, Aug. 7, 2013.

Eighth Amendment.[99]

84.   This conclusion is consistent with determinations made by other District Courts addressing similar prison conditions, and affirmed by various Courts of Appeals.

85.   For example, in *Russell v. Johnson*, No. 02-261, 2003 WL 22208029 (N.D. Miss. May 21, 2003) a magistrate judge in the Northern District of Mississippi determined that prison officials at the Mississippi State Penitentiary ("Parchman") violated death row inmates' Eighth Amendment rights by, among other things, forcing them to endure summer cell temperatures exceeding a heat index of 90 degrees without access to "extra showers, ice water, or fans" where the ventilation in death row was otherwise "inadequate to afford prisoners a minimal level of comfort during the summer months." *Id.* at *2, *5, *aff'd in part, vacated in part sub nom. by Gates*, 376 F.3d 323.   After a bench trial, the magistrate judge found:

> The probability of heat-related illness is extreme [on death row], and is dramatically more so for mentally ill inmates who often do not take appropriate behavioral steps to deal with the heat.  Also, the medications commonly given to treat various medical problems interfere with the body's ability to maintain a normal temperature.

*Id.* at *2.  Based on these findings of fact, the court determined that the inmates' cell conditions were unconstitutional, and ordered the defendants to "insure that each cell is equipped with a fan, that ice water is available to each inmate, and that each inmate may take one shower during each day when the heat index is 90 degrees or above."  *Id.* at *5.  As an alternative, the magistrate judge ordered that "the defendants may

---

[99] The Court notes that the fact that Angola has attained accreditation from the American Correctional Association (ACA) does not moot the issues in this matter, nor does it automatically ensure that the conditions of confinement at death row meet constitutional standards.  *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 190 (2002).

provide fans, ice water, and daily showers during the months of May through September."[100]  *Id.*

86.   On appeal, the Fifth Circuit agreed that the magistrate judge's findings were sufficient to support the injunction, to the extent that it applied to Parchman's death row unit.[101]  *Gates*, 376 F.3d at 340.  In particular, the Fifth Circuit noted that the magistrate judge's findings supported a determination that "the probability of heat-related illness [was] extreme" on Parchman's death row and, therefore, the heat index "present[ed] a substantial risk of serious harm to the inmates."  *See id.*  Thus, "based on the open and obvious nature of these conditions and the evidence that inmates had complained of symptoms of heat-related illness," the Fifth Circuit affirmed "the trial court's finding regarding MDOC's deliberate indifference" and held that the injunction was "justified by an Eighth Amendment violation."  *Id.  See also Valigura*, 265 F. Appx. at 235-36 (affirming the district court's denial of summary judgment to prison officials at Texas's Beeville State Prison on an inmate's prison conditions claim where poor ventilation in the bunk area resulted in "temperatures above the eighties and into the

---

[100] In contrast, here, Plaintiffs' cells are not equipped with fans.  Rather, each housing tier includes non-oscillating fans, which are mounted approximately nine feet away from the inmate cells.  Each fan is shared by two cells.  However, during the Court's site visit, the undersigned observed that the fans did not provide equal amounts of air flow to each cell, nor did the fans provide a detectable cooling effect or relief from the heat conditions in the tier.  Further, it is uncontroverted that Plaintiffs do not have direct access to ice during the twenty-three hours per day that they are confined to their cells.  Rather, Plaintiffs are largely dependant on other death row inmates to distribute ice to them during that inmate's tier time.  Further, while the Court did not attempt to measure the temperature of the water from the in-cell faucets, the undersigned noted that the cold water was lukewarm to the touch.  Additionally, it is uncontroverted that Plaintiffs are permitted only one shower per day, and that the shower water temperature is maintained between 100 and 120 degrees.

[101] The Fifth Circuit invalidated the injunction to the extent that it purported to apply to cell blocks beyond Parchman's death row because "the class represented by [the plaintiff] consists entirely of Parchman's Death Row prisoners."  *Gates*, 376 F.3d at 339.

hundreds," because temperatures consistently in the nineties without remedial measures, such as fans, ice water, and showers, sufficiently increase the probability of death and serious illness so as to violate the Eighth Amendment) (citing *Gates*, 376 F.3d at 339-40).

87.     The district court for the Western District of Wisconsin addressed a similar situation in *Jones'El v. Berge*, No. 00-421, 2003 WL 23109724 (W.D. Wis. Nov. 26, 2003), *aff'd Jones'El*, 374 F.3d at 545.   After prisoners confined at the Supermax Correctional Institution in Boscobel, Wisconsin ("Supermax") sued prison officials alleging unconstitutional conditions of confinement based, in part, on having to endure "extreme" summer temperatures in their cells, *Jones'El*, 374 F.3d at 542-43, the defendants entered into a settlement agreement requiring them to "investigate and implement as practical a means of cooling the cells during summer heat waves." *Jones'El*, 2003 WL 23109724, at *1.  Later, when the defendants failed "to cool the cells to temperatures between 80 degrees and 84 during the hot months," the prisoners sought an enforcement order from the district court.  *See id.*  Noting the defendants' admission that "air conditioning [was] the only viable way to cool the cells to the required temperatures," *id.*, the district court ordered the defendants "to take steps immediately to air condition the cells."  *Id.* at *2.

88.     On appeal, the Seventh Circuit affirmed the district court's enforcement order, and rejected the prison officials' arguments that the order failed under the Prison Litigation Reform Act because it was not narrowly drawn, and that installing air conditioning at Supermax was otherwise impractical and/or would cause undue strife

between prisoners and guards. *Jones'El*, 374 F.3d at 545.

89.    Likewise, in *Graves v. Arpaio*, 623 F.3d 1043 (9th Cir. 2010), the Ninth Circuit affirmed a district court order requiring the Sheriff of Maricopa County, Arizona to "provide pretrial detainees taking psychotropic medications with housing in which the temperature does not exceed 85° F." *Id*. at 1045.  The district court's order came in the wake of ongoing litigation in which pretrial detainees argued that "harsh conditions of confinement at [county] jails," which included "dangerously high [cell] temperatures," violated their constitutional rights. *Id*. at 1046.  After a hearing on the defendants' Motion to Terminate a previous order requiring remedial relief, *see id*. at 1046, "[t]he district court found that air temperatures above 85° F greatly increase the risk of heat-related illnesses for individuals who take psychotropic medications and found further that pretrial detainees taking psychotropic medications [were] held in areas [of the jails] where the temperature . . . exceeded 85° F." *Id*. at 1048-49.  Based on these findings, "[t]he district court ordered Sheriff Arpaio to house all detainees taking psychotropic medications in temperatures that do not exceed 85° F."  *Id*. at 1049.

90.    On appeal, the Ninth Circuit determined that "the district court reasonably concluded that temperatures in excess of 85° F are dangerous for pretrial detainees taking psychotropic medications," and agreed with its legal conclusion that the "Eighth Amendment requires that the temperature of the areas in which pre-trial detainees are held or housed does not threaten their health or safety." *Id*.  Thus, "the Eighth Amendment prohibits housing such pretrial detainees in areas where the temperature

exceeds 85° F."

91.     Finally, this Court's conclusion that the conditions in Angola's death row tiers are unconstitutional is *not* inconsistent with the Eleventh Circuit's reasoning in *Chandler v. Crosby*.  In that case, death row inmates at Florida's Union Correctional Institution ("UCI") also alleged unconstitutional conditions of confinement based on "the high temperatures in their cells during the summer months." *Chandler*, 379 F.3d at 1282.  After a bench trial, the district court rejected the inmates' claims, determining that they failed to establish the objective prong for proving an Eighth Amendment violation.[102]  *See id.* at 1297 n.27.  This determination was based on evidence showing that during the period in question: (1) the typical temperature in the inmates' cells was "between approximately eighty degrees at night to approximately eighty-five or eighty-six degrees during the day," *id.* at 1285 (quotation marks omitted); (2) the inmates' experienced temperatures over ninety degrees only nine percent of the time and never experienced temperatures exceeding 100 degrees, *id.* (quotation marks omitted); and (3) the ventilation system on UCI's death row exceeded industry standards for air circulation and was working properly, *see id.* at 1285-86 n.14.

92.     On appeal, the Eleventh Circuit affirmed the district court's ruling.  Before discussing the evidence, the Court clarified three points of law: "[f]irst, the Eighth Amendment applies to prisoner claims of inadequate cooling and ventilation.  Cooling and ventilation are distinct prison conditions, and a prisoner may state an Eighth

---

[102] The district court also determined that the inmates failed to satisfy the subjective prong. *Chandler*, 379 F.3d at 1297 n.27.

83

14-30067.5039

Amendment claim by alleging a deficiency as to either condition in isolation or both in combination," *id.* at 1294; "[s]econd, the Eighth Amendment is concerned with both the 'severity' and the 'duration' of the prisoner's exposure to inadequate cooling and ventilation," *id.* at 1295; and "[t]hird, a prisoner's mere discomfort, without more, does not offend the Eighth Amendment," *id.* However, despite acknowledging that under the right circumstances an excessive heat claim could make out an Eighth Amendment violation, the Eleventh Circuit agreed with the district court that the inmates "failed to meet their burden under the objective component" of the test. *Id.* at 1297. First, the summertime heat, averaging "between approximately eighty degrees at night to approximately eighty-five or eighty-six degrees during the day," was simply "not unconstitutionally excessive." *Id.* "Second, [UCI was] equipped with a ventilation system that effectively manage[d] air circulation and humidity." *Id.* at 1298. Finally, "apart from the ventilation system, numerous conditions at [UCI] alleviate[d] rather than exacerbate[d] the heat," including that "[t]he cells [were] not exposed to any direct sunlight"; the inmates were allowed to wear "only shorts in the summer months"; every cell had a sink with "cold running water, and every inmate possesse[d] a drinking cup"; the inmates were not compelled to engage in strenuous activity; and, finally, the inmates had "limited opportunities to gain relief in air-conditioned areas, e.g., during visitation time."

93.    As discussed, the facts in the instant matter are materially different than the facts addressed by the district court and the Eleventh Circuit in *Chandler*. First, and most obvious, the temperatures, humidity, and heat index endured by Plaintiffs here

are substantially higher than those at issue in *Chandler*. Second, it is uncontroverted that Plaintiff Code is subjected to direct sunlight through the window across from his cell. Third, whereas the prison officials in *Chandler* produced extensive evidence regarding the ventilation system at UCI and its functional capacity, *see id.* at 1283-85, the record here is void of any evidence regarding the instant ventilation system's ability to lower the temperature, humidity, and heat index in the tiers. Rather, Plaintiffs produced testimonial evidence from David Garon[103], which was uncontroverted, that the ventilation system at Angola is incapable of cooling or dehumidifying the death row tiers:

| | |
|---|---|
| BY MS. COMPA: | . . . Can you describe the system that's in place in the death row tiers? |
| BY MR. GARON: | It's a - there's a heating only system for winter conditions. And there's an exhaust system for ventilation. That's basically all there is. |
| BY MS. COMPA: | And were there - |
| BY MR. GARON: | There's some prop fans mounted on the walls also. |
| BY MS. COMPA: | And with respect to the exhaust system that you just mentioned, what is that designed to do? |
| BY MR. GARON: | Its designed to exhaust air from the facility and its toilets and each cell. And there's - so there's an exhaust system for the cell block, each individual cell. There's exhaust fans to take care of that. And there is a separate exhaust system for the showers, basically just |

---

[103] The parties stipulated that Garon is an expert in the field of testing and balancing, who tests, adjusts, and analyzes mechanical heating, ventilation, and air conditioning systems.

85

14-30067.5041

<div style="padding-left: 40%">to remove odors and provide some ventilation.</div>

| | |
|---|---|
| BY MS. COMPA: | And what - what is it designed to do, if I can ask it that way?  What are the limitations of the serta system? |
| BY MR. GARON: | Its just to remove odors and ventilate the cell. |
| BY MS. COMPA: | And is [the ventilation system] designed to cool or dehumidify the air in any way? |
| BY MR. GARON: | No.  You can't dehumidify with exhaust. |

Trial Transcript, Testimony of David Garon, Aug. 5, 2013.  Garon further testified that Angola's "natural" ventilation system, which is not recommended in hot, humid climates, does not include features that are essential to a sound natural ventilation system:

| | |
|---|---|
| BY MS. COMPA: | Is building a building in south Louisiana with natural ventilation typical for this region? |
| BY MR. GARON: | I have never seen a naturally ventilated building that didn't have mechanical cooling. |
| BY MS. COMPA: | Have you seen a naturally ventilated building that did have mechanical cooling? |
| BY MR. GARON: | Yes. |
| | . . . |
| | The exhaust system would qualify under naturally ventilated.  As long as it doesn't have the mechanical cooling, it will qualify as naturally ventilated. |
| | . . . |
| BY MS. COMPA: | Does the death row building, based on your inspection of the premises, include features |

<div style="text-align:center">86</div>

|                    | that are considered part of a sound natural ventilation system? |
| BY MR. GARON:      | No. |
| BY MS. COMPA:      | And what - what are some features that might describe such a system that are lacking in death row? |
| BY MR. GARON:      | As I described before, usually you would want to have cross - some sort of cross ventilation. Windows on both sides.  Orientation of the building geographically, and the geometry of the building. . . . |

Trial Transcript, Testimony of David Garon, Aug. 5, 2013.  Thus, according to the uncontroverted testimony of Plaintiffs' expert, a building designed and built to house human beings for twenty-four hours per day should have included a mechanical cooling system *or* a cross-ventilation system *at the very least*.  The death row tiers have *neither*. Fourth, whereas the UCI inmates each had sinks with cold running water in their cells, the uncontroverted evidence here is that Plaintiffs do not have unfettered access to ice.  Further, as noted above, during the Court's site visit, the undersigned noted that the "cold" water was lukewarm to the touch.  Fifth, it is uncontroverted that Plaintiffs' opportunities to gain relief in air-conditioned areas is limited to once every few months.

94.    Additionally, the medical records and uncontroverted testimonial evidence establish that, due to their underlying medical conditions and medications, which interfere with their ability to maintain a normal temperature, the probability of Plaintiffs developing heat-related illness in such extreme heat conditions is high.

14-30067.5043

95.     As noted above, "the Supreme Court has made clear that the standard against which a court measures prison conditions are 'the evolving standards of decency that mark the progress of a maturing society,' and not the standards in effect during the time of the drafting of the Eighth Amendment."  *Gates*, 376 F.3d at 332-33 (quoting *Estelle*, 429 U.S. at 102) ("The [Eighth] Amendment embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency'. . . against which we must evaluate penal measures.") (citations omitted).  Given the overwhelming evidence in the record and our nations' current standards of decency, it cannot be said that the conditions of confinement in Angola's death row facility pass constitutional muster.

96.     In sum, the Court concludes that the conditions of confinement at Angola's death row constitute cruel and unusual punishment, in violation of the Eighth Amendment.

## B.     Title II of the Americans with Disabilities Act, the Americans with Disabilities Act Amendment Act, and Section 504 of the Rehabilitation Act of 1973

97.     Plaintiffs also allege that Defendants have violated their rights under the ADA, as modified by the ADAAA, and the Rehabilitation Act, by "fail[ing] and refus[ing] to reasonably accommodate their disabilities while in custody," and that this "failure and refusal put them at substantial risk of serious harm"  (Doc. 1, ¶ 73.)

98.     The ADA and related statutes afford certain rights to incarcerated individuals in state facilities.[104]

---

[104] Here, Defendants do not contest that they are subject to Title II of the ADA, the ADAA, and Section 504 of the Rehabilitation Act of 1973:

> BY MR. VORA:               And you understand that the Louisiana State Penitentiary is subject to the requirements of Title II of the Americans with Disabilities Act.  Correct, sir?

99.    Title II of the ADA provides: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

100.    A "public entity" includes "any State or local government" and "any department, agency, . . . or other instrumentality of a State."  42 U.S.C. § 12131(1)(A)-(B).

101.    State agencies, including Defendant Louisiana Department of Public Safety and Corrections, can be sued under Title II.  *See United States v. Georgia*, 546 U.S. 151, 159 (2006) (holding that Title II "validly abrogates state sovereign immunity" and

---

| BY MR. CAIN: | Yes. |
|---|---|
| BY MR. VORA: | . . . You also understand as a recipient of public federal funds, the Louisiana Department of Public Safety and Corrections is subject to Section 504 of the Rehabilitation Act, correct? |
| BY MR. CAIN: | Yes. |

Trial Transcript, Testimony of Nathan Burl Cain, Aug. 6, 2013.  Defendants also do not contest that they had an obligation, under the ADA, to provide eligible inmates with an accommodation:

| BY MR. VORA: | And your officers, after receiving this training, then would understand that depression is one of the types of mental illnesses, correct? |
|---|---|
| BY MR. CAIN: | I would hope. |
| BY MR. VORA: | And you would also hope that the correctional officers working under you at Angola would understand that these types of mental illnesses would be the types of things for which accommodations should be provided pursuant to Title II of the Americans with Disabilities Act, correct? |
| BY MR. CAIN: | Yes. |

Trial Transcript, Testimony of Nathan Burl Cain, Aug. 6, 2013.

89

14-30067.5045

Case 3:13-cv-00368-BAJ-SCR   Document 186-19   07/08/14   Page 284 of 403

authorizes suits against States, including complaints concerning conditions of confinement in state prisons).

102.    Title II of the ADA followed in the footsteps of Section 504 of the Rehabilitation Act, which provides: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." 29 U.S.C. § 794(a).  The Fifth Circuit has observed:

> The language of Title II generally tracks the language of Section 504 of the Rehabilitation Act of 1973, and Congress' intent was that Title II extend the protections of the Rehabilitation Act "to cover all programs of state or local governments, regardless of the receipt of federal financial assistance" and that it "work in the same manner as Section 504."

*Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000) (quoting H.R. Rep. No. 101-485, pt. III at 49-50 (1990)) (footnotes omitted).

103.    Indeed, Title II of the ADA specifically provides that "[t]he remedies, procedures and rights" available under Section 504 shall be the same as those available under Title II.  42 U.S.C. § 12133.  Thus, cases interpreting either Title II of the ADA or Section 504 of the Rehabilitation Act are applicable to both.  *Hainze*, 207 F.3d at 799.

104.    The tests for determining success under the Rehabilitation Act and Title II of the ADA are substantially similar.   To prove a claim under Section 504 of the Rehabilitation Act, a plaintiff must prove: (1) that he is a qualified individual with a disability; (2) that he was excluded from participation in, denied benefits of, or subjected to discrimination under the defendant's program solely because of his

Case 3:13-cv-00368-BAJ-SCR   Document 87   12/19/13   Page 90 of 102

14-30067.5046

disability; and (3) that the program in question receives federal financial assistance. 29 U.S.C. § 794(a).  Similarly, to prove discrimination under Title II of the ADA, a plaintiff must show: (1) that he is a qualified individual with a disability; (2) that he has been excluded from participation in, or denied the benefits of the services, programs, or activities of a public entity, or that he was otherwise discriminated against by such entity; and (3) that such exclusion or discrimination was by reason of his disability. 42 U.S.C. § 12132; *Lightbourn v. County of El Paso, Tex.*, 118 F.3d 421, 428 (5th Cir. 1997).

### 1.    Plaintiffs Failed to Introduce Evidence into the Record to Establish that They are Qualified Individuals with Disabilities

105.    The ADA and the Rehabilitation Act each define disability to mean "a physical or mental impairment that substantially limits one or more major life activities of such individual."  42 U.S.C. § 12102(1)(A); 29 U.S.C. § 705(9)(B) ("The term 'disability' means . . . the meaning given it in section 12102 of Title 42.").[105]

106.    "Major life activities" are "those activities that are of central importance to daily life." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002).

107.    The Equal Employment Opportunity Commission's regulations implementing the ADA provide a non-exhaustive list of "major life activities."  Such activities include, but are not limited to "caring for oneself, performing manual tasks, seeing, hearing,

---

[105] In 2008, the ADA was modified by the ADAAA, Pub. L. No. 110-325, 122 Stat. 3553, which, among other things, clarified that "[t]he definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter," 42 U.S.C. § 12102(4)(A), and that "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as . . . medication, [or] medical supplies."  42 U.S.C. § 12102(4)(E)(i)(I).

91

eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working." 29 C.F.R. § 1630.2(i).  *See also* 42 U.S.C. § 12102(2)(A)(1).

108.   "[T]o be substantially limited means to be unable to perform a major life activity that the average person in the general population can perform, or to be significantly restricted in the ability to perform it." *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 614 (5th Cir. 2009) (citing 29 C.F.R. § 1630.2(j)).

109.   In making that determination, the EEOC has advised that courts consider: "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *Id.* at 614-15 (citing 29 C.F.R. § 1630.2(j)).

110.   The evidence in the record establishes that Plaintiffs suffer from several chronic diseases.  As previously noted, it is uncontroverted that Plaintiff Ball suffers from uncontrolled blood pressure, hypertension, diabetes, and obesity; Plaintiff Code suffers from hypertension, obesity, and hepatitis; and Plaintiff Magee suffers from hypertension, high cholesterol, and depression.

111.   While the Court has no doubt that such diseases may limit one or more of Plaintiffs' major life activities, the record is void of any *evidence* to support such a conclusion.

112.   Indeed, Plaintiffs failed to introduce evidence into the record to establish that Plaintiffs chronic diseases substantially limit their ability to care for themselves,

perform manual tasks, walk, see, hear, speak, breath, learn, working, eat, sleep, stand, lift, bend, read, concentrate, think, or communicate. Rather, the evidence introduced by Plaintiffs was limited to how the *heat conditions* in the death row tiers limit Plaintiffs' major life activities, and how Plaintiffs' underlying medical conditions put them at increased risk of developing heat-related illnesses.

113.    During the trial and in their submissions to the Court, Plaintiffs described the chronic diseases that each Plaintiff suffers, and the medications that each Plaintiff is required to take. *See, e.g.*, Doc. 53-9, pp. 11-15. However, "[m]erely having an impairment . . . does not make one disabled for purposes of the ADA." *Chevron Phillips Chem. Co.*, 570 F.3d at 614. Here, Plaintiffs simply failed to introduce evidence that their chronic diseases and/or medications impede their ability to perform major life activities.

114.    In their submissions to the Court, Plaintiffs describe themselves as "disabled" and allege that they are "qualified individuals regarded as having physiological impairments that substantially limit one or more of their major life activities." (Docs. 1, ¶73; 53-9, p. 11.) However, such conclusory statements and/or allegations are insufficient to establish that Plaintiffs have physical or mental impairments that substantially limit one or more major life activities. Nor are such conclusory statements and/or allegations sufficient to establish that Plaintiffs are regarded as having a physical or mental impairment that substantially limits one or more of their life activities.

115.    In sum, the Court concludes that Plaintiffs have failed to establish that they are

93

14-30067.5049

qualified individuals with a disability. *See Chevron Phillips Chem. Co.*, 570 F.3d at 614.

116.    Absent evidence in the record that Plaintiffs' underlying medical conditions substantially limit one or more of their life activities, Plaintiffs have failed to establish a prima facie case for discrimination under Title II of the ADA, as modified by the ADAAA, and the Rehabilitation Act. *Blanks v. SW Bell Communs., Inc.*, 310 F.3d 398, 400 (5th Cir. 2002) ("To establish a prima facie case for discrimination under the ADA, a plaintiff must be a qualified individual with a disability."). Accordingly, Plaintiffs' claims under the ADA and the Rehabilitation Act must be denied.

## VII.    CONCLUSION

### A.    Declaratory and Injunctive Relief

1.    "According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that he has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (citing cases).

2.    Here, as discussed at length above, Plaintiffs have met their burden of proving that Defendants have violated, and continue to violate, their Eighth Amendment rights. Undoubtedly, remedies available at law, such as monetary damages, are

Case 3:13-cv-00368-BAJ-SCR    Document 186-19    07/08/14    Page 289 of 403

inadequate to compensate Plaintiffs for such injury. To support their argument that the "harm" to Defendants outweighs the injury to Plaintiffs, Defendants introduced testimonial evidence regarding the Louisiana Department of Public Safety and Corrections' "reduced budget." *See* Trial Transcript, Testimony of James M. LeBlanc, Aug. 7, 2013. However, Defendants' purported financial hardships "can never be an adequate justification for depriving any person of his constitutional rights." *Udey v. Kastner*, 805 F.2d 1218, 1220 (5th Cir. 1986). Finally, it is beyond dispute that a permanent injunction against Defendants serves the public interest in that it will enforce the fundamental rights enshrined in the United States Constitution. In sum, the Court concludes that Plaintiffs have met the test and shown "a clear threat of continuing illegality portending immediate harmful consequences irreparable in any other manner." *Posada v. Lamb County*, 716 F.2d 1066, 1070 (5th Cir. 1983). Accordingly, the Court concludes that it has a "duty and obligation to fashion effective relief." *Gates v. Collier*, 501 F.2d 1291, 1320 (5th Cir. 1974); *see also Swann v. Board of Educ.*, 402 U.S. 1, 15 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.").

3.      Because this case concerns conditions of confinement, the Court must abide by the standards set out in the Prison Litigation Reform Act ("PLRA"). The PLRA narrowly limits the relief that a federal court may impose in prisoner suits. *See* 18 U.S.C. § 3626.

Case 3:13-cv-00368-BAJ-SCR    Document 87    12/19/13    Page 95 of 102

14-30067.5051

4.    According to the PLRA, injunctive relief "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least instrusive means necessary to correct that harm."  18 U.S.C. § 3626(a)(2).

5.    The PLRA further prohibits a federal court from ordering any prospective relief "unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."  18 U.S.C. § 3626(a)(1)(A).

6.    According to the parties' Statement of Undisputed Facts: "Plaintiffs have each exhausted their administrative remedy proceedings as required under the Prison Litigation Reform Act[,] 42 U.S.C. § 1997(e) . . ."  (Doc. 53-1, p. 3.)  *See also supra* note 93.

7.    The Fifth Circuit has held that "[i]ntrusion of federal courts into state agencies should extend no further than necessary to protect federal rights of the parties. An injunction, however, is not necessarily made overbroad by extending benefit[s] or protection to persons other than prevailing parties in the lawsuit - even if it is not a class action - if such breadth is necessary to give prevailing parties the relief to which they are entitled."  *Prof'l Assoc. of College Educators v. El Paso County Cmty. College Dist.*, 730 F.2d 258, 273-274 (5th Cir. Tex. 1984) (citing *Meyer v. Brown & Root Const. Co.*, 661 F.2d 369, 374 (5th Cir.1981)); *accord Gregory v. Litton Systems, Inc.*, 472 F.2d 631, 633-34 (9th Cir.1972).

8.     Here, it is uncontested that Defendants may move any death row inmate to a different tier and/or cell at any time. Accordingly, the Court finds that a remedy aimed at ameliorating the heat conditions throughout the death row facility is necessary to adequately vindicate Plaintiffs' rights, and is not overbroad.

9.     Having found that the conditions of confinement at Angola's death row constitute cruel and unusual punishment, in violation of the Eighth Amendment, the Court grants Plaintiffs request for declaratory and injunctive relief, and directs the following immediate remedial actions:

10.     Defendants are hereby ordered to immediately develop a plan to reduce and maintain the heat index in the Angola death row tiers at or below 88 degrees Fahrenheit.

11.     Defendants shall submit their plan to the Court **no later than February 17, 2014 at 5:00 p.m.**

12.     Defendants' plan shall include a step-by-step description as to how Defendants will: (1) immediately lower and maintain the heat index in the Angola death row tiers at or below 88 degrees Fahrenheit; (2) maintain the heat index in the Angola death row tiers at or below 88 degrees Fahrenheit **from April 1 through October 31**; (3) monitor, record, and report the temperature, humidity, and heat index in each of the death row tiers every two hours on a daily basis **from April 1 through October 31**; (4) provide Plaintiffs, and other death row inmates who are at risk of developing heat-related illnesses, with (a) at least one cold shower per day; (b) direct access to clean, uncontaminated ice and/or cold drinking water during their "tier time" *and* the twenty-

97

three hours in which the inmates are confined to their cell; and (c) any and all relief that it is necessary to comply with this Court's order and the prevailing constitutional standards.

13.     Defendants are advised that financial considerations will **not** be considered a legitimate reason for Defendants' failure to comply with this Court's order.  As noted above, "inadequate resources can never be an adequate justification for depriving any person of his constitutional rights."  *Udey*, 805 F.2d at 1220; *Smith v. Sullivan*, 553 F.2d 373, 378 (5th Cir. 1977) (rejecting the defendants' argument that "lack of funds to implement the trial court's order" justified the defendants' failure to remedy ongoing constitutional violations); *Gates v. Collier*, 501 F.2d 1291, 1319 (5th Cir. 1972) ("Where state institutions have been operating under unconstitutional conditions and practices, the defense[ ] of fund shortage . . . ha[s] been rejected by the federal courts.").

14.     Defendants are further ordered to comply with Louisiana Department of Public Safety and Corrections Health Care Policy No. HC-45 and Louisiana State Penitentiary Department Regulation No. B-06-001 and immediately add Plaintiff James Magee to Angola's "Heat Precautions List."

15.     Plaintiffs shall file a response to Defendants' proposed plan **no later than March 10, 2014 at 5:00 p.m.**

16.     Given Defendants' deliberate indifference to the substantial risk of harm to Plaintiffs, and Defendants' actions throughout the data collection period, the Court will retain jurisdiction and monitor Defendants' implementation of the plan.  Accordingly, the Court shall also appoint a Special Master to oversee Defendants' implementation

of the plan, and report on Defendants' progress on a weekly basis.  Fed.R.Civ.P. 53.

Defendants shall bear all costs associated with the duties of the Special Master.

17.     Plaintiffs and Defendants shall jointly or separately recommend candidates for

appointment as Special Master **no later than March 10, 2014 at 5:00 p.m.**  The

parties' recommendations shall be filed into the record of this matter and shall set out

the qualifications of the persons so recommended.

18.     Prior to the trial on the merits, the United States Department of Justice

submitted a Statement of Interest of the United States (Doc. 64), advising the Court

as to the additional relief available to Plaintiffs.   Accordingly, Plaintiffs and

Defendants shall jointly or separately file a response to the United States Department

of Justice's submission **no later than March 10, 2014 at 5:00 p.m.**.

### B.     Attorneys' Fees and Costs

19.     42 U.S.C. § 1988 states in pertinent part:

> (b) Attorney's fees
>
> In any action or proceeding to enforce a provision of section [ ] . . . 1983
> . . . the court, in its discretion, may allow the prevailing party, other than
> the United States, a reasonable attorney's fee as part of the costs . . .
> including attorney's fees, unless such action was clearly in excess of such
> officer's jurisdiction.

42 U.S.C. § 1988(b).

20.     Accordingly, Plaintiffs are awarded reasonable attorneys' fees and costs.

Counsel for Plaintiffs shall file their motion for attorneys' fees and costs **on a date to**

**be fixed by the Court**.  Plaintiffs' motion shall comply with the Federal Rules of Civil

Procedure and the Local Rules for the United States District Court for the Middle District of Louisiana.

## VIII. JUDGMENT

Accordingly,

**IT IS ORDERED** that Plaintiffs' **Motion for a Preliminary Injunction (Doc. 12)** is **DENIED AS MOOT**.

The Court concludes that the conditions of confinement at Angola's death row constitute cruel and unusual punishment, in violation of the Eighth Amendment.

The Court further concludes that Plaintiffs have failed to establish a prima facie case for discrimination under Title II of the Americans with Disabilities Act, as modified by the Americans with Disabilities Act Amendment Act, and Section 504 of the Rehabilitation Act of 1973.

Accordingly,

**IT IS FURTHER ORDERED** that Plaintiffs' request for declaratory and injunctive relief is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that Defendants shall immediately develop a plan to reduce and maintain the heat index in the Angola death row tiers at or below 88 degrees Fahrenheit.

**IT IS FURTHER ORDERED** that Defendants shall submit their plan to the Court **no later than February 17, 2014 at 5:00 p.m.**

**IT IS FURTHER ORDERED** that Defendants' plan shall include a step-by-step description as to how Defendants will: (1) immediately lower and maintain the

100

heat index in the Angola death row tiers at or below 88 degrees Fahrenheit; (2) maintain the heat index in the Angola death row tiers at or below 88 degrees Fahrenheit **from April 1 through October 31**; (3) monitor, record, and report the temperature, humidity, and heat index in each of the death row tiers every two hours on a daily basis **from April 1 through October 31**; (4) provide Plaintiffs, and other death row inmates who are at risk of developing heat-related illnesses, with (a) at least one cold shower per day; (b) direct access to clean, uncontaminated ice and/or cold drinking water during their "tier time" *and* the twenty-three hours in which the inmates are confined to their cell; and (c) any and all relief that it is necessary to comply with this Court's order and the prevailing constitutional standards.

*Defendants are advised that financial considerations will **not** be considered a legitimate reason for Defendants' failure to comply with this Court's order.*

**IT IS FURTHER ORDERED** that Defendants shall immediately add Plaintiff James Magee to Angola's "Heat Precautions List."

**IT IS FURTHER ORDERED** that Plaintiffs shall file a response to Defendants' proposed plan **no later than March 10, 2014 at 5:00 p.m.**

**IT IS FURTHER ORDERED** that Plaintiffs and Defendants shall jointly or separately recommend candidates for appointment as Special Master **no later than March 10, 2014 at 5:00 p.m.** The parties' recommendations shall be filed into the record of this matter and shall set out the qualifications of the persons so recommended.

**IT IS FURTHER ORDERED** that Plaintiffs and Defendants shall jointly or

101

14-30067.5057

separately file a response to the United States Department of Justice's submission **no later than March 10, 2014 at 5:00 p.m.**

**IT IS FURTHER ORDERED** that Plaintiffs are awarded reasonable attorneys' fees and costs.  Plaintiffs shall file their motion for attorneys' fees and costs **on a date to be fixed by the Court**.  Plaintiffs' motion shall comply with the Federal Rules of Civil Procedure and the Local Rules for the United States District Court for the Middle District of Louisiana.

**IT IS FURTHER ORDERED** that the Clerk of Court shall serve a copy of this Ruling and Order on the United States Attorney for the Middle District of Louisiana and the Assistant Attorney General for the Civil Rights Division of the United States Department of Justice.

Baton Rouge, Louisiana, this 19th day of December, 2013.

**BRIAN A. JACKSON, CHIEF JUDGE
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**

102